# Exhibit A

**UNITED STATES OF AMERICA**
**CONSUMER FINANCIAL PROTECTION BUREAU**

ADMINISTRATIVE PROCEEDING
File No. 2023-CFPB-0003

| | |
|---|---|
| In the Matter of:<br><br><br>**ONEMAIN FINANCIAL HOLDINGS, LLC; ONEMAIN FINANCIAL GROUP, LLC; ONEMAIN FINANCIAL (HI), INC.; ONEMAIN FINANCIAL, INC.; ONEMAIN FINANCIAL OF MINNESOTA, INC.** | **CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) has reviewed the

practices of OneMain Financial Holdings, LLC; OneMain Financial Group, LLC;

OneMain Financial (HI), Inc.; OneMain Financial, Inc.; OneMain Financial of

Minnesota, Inc. (OneMain or Respondent, as defined below) relating to the

marketing, sales, and financing of optional ancillary products (Optional Add-On

Products, as defined below) and has identified unfair, deceptive, and abusive acts

or practices engaged in by Respondent in violation of Sections 1031 and

1

1036(a)(1)(B) of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5531(c), 5531(d)(1) and 5536(a)(1)(B).

Under §§ 1053 and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

## I.

### Jurisdiction

1. The Bureau has jurisdiction over this matter under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565.

## II.

### Stipulation

2. Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated May 26, 2023 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## III.

## Definitions

3.    The following definitions apply to this Consent Order:

a.  "Optional Add-On Product" means any consumer financial product or

service as defined by § 1002(5) of the CFPA, 12 U.S.C. § 5481(5), that

Respondent markets, sells, or offers (or has marketed, sold, or offered) to

Customers as an optional product supplementary to the credit provided

by Respondent.

b.  "Affected Customer" includes any Customer who was provided a full

premium or fee refund, but not the interest attributable to the premium or

fee, after an Optional Add-On Product cancellation occurring within four

(4) years prior to the Effective Date.

c.  "Board" means Respondent's duly elected and acting Board of Directors.

d.  "Customer" means any person who takes or has taken out a loan with

Respondent and to whom Respondent sells or has sold at least one

Optional Add-On Product.

e.  "Effective Date" means the date on which the Consent Order is entered

on the administrative docket.

3

f.  "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or their delegate.

g.  "Full Refund Period" means the period Respondent had prescribed to Customers before the Effective Date of this Consent Order, typically 30 or 45 days from purchase, during which a Customer could cancel an Optional Add-On Product for a refund.

h.  "Improper Sales Acts or Practices" means selling or attempting to sell an Optional Add-On Product to a consumer without their knowledge and consent.

i.  "Redress" means the unrefunded interest attributable to full premium or fee refunds resulting from Optional Add-On Product cancellations within four (4) years prior to the Effective Date.

j.  "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section IV of this Consent Order.

k.  "Respondent" means OneMain Financial Holdings, LLC; OneMain Financial Group, LLC; OneMain Financial (HI), Inc.; OneMain

Financial, Inc.; OneMain Financial of Minnesota, Inc., individually, collectively, or in any combination, and their successors and assigns.

l.  "Service Provider" means any service provider, as defined in § 1002(26) of the CFPA, 12 U.S.C. § 5481, that provides or provided a material service to Respondent in connection with the offering or provision by Respondent of a consumer financial product or service.

m. "Unused Optional Add-On Product" means an Optional Add-On Product for which no claim has been paid.

n.  "60-Day Full Refund Period" means, for Customers who purchase an Optional Add-On Product after the Effective Date, the 60-day period after purchase during which the Customer can cancel the Optional Add-On Product for a refund of the full premium or fee plus all interest attributable to the premium or fee. This period will apply retroactively upon receipt of the Enforcement Director's non-objection and implementation of the Compliance Plan, to any Customers who purchase and cancel an Optional Add-On product after the Effective Date.

## IV.

### Bureau Findings and Conclusions

The Bureau finds the following:

5

4.  Respondent is one of the largest non-bank installment lenders in the United States, with more than 1,400 branches across 44 states. As of December 31, 2022, Respondent reported $19.2 billion in net receivables on personal loans.

5.  Respondent is a "covered person" as that term is defined by 12 U.S.C. § 5481(6)(A).

6.  Respondent markets, sells, and finances credit insurance and non-credit-insurance Optional Add-On Products in connection with originating and renewing loans to Customers.

7.  Respondent markets credit-insurance Optional Add-On Products as products that pay off some or all of the Customer's outstanding loan in the event of death, disability, or unemployment.

8.  Respondent markets non-credit-insurance Optional Add-On Products as products that provide benefits and services to assist with everyday events, such as roadside assistance, identity theft protection, and discounts on entertainment.

9.  The credit-insurance Optional Add-On Products are currently provided by American Health and Life Insurance Company and Triton Insurance Company, both of which are affiliates of Respondent. Respondent also sold credit-insurance provided by its former affiliates Yosemite Insurance

Company and Merit Life Insurance Company until the companies were sold in 2018 and 2019 respectively.

10.    The non-credit-insurance Optional Add-On Products are provided by FIMC Partners, an unaffiliated third party.

11.    The credit-insurance premiums and non-credit-insurance fees for the Optional Add-On Products are added to Customers' loans and are subject to a finance charge.

12.    Respondent pays the credit-insurance premiums and non-credit-insurance fees to the products' providers but keeps the interest charged on the premiums and fees.

13.    For at least the past four years, Respondent has marketed the Optional Add-On Products as coming with a Full Refund Period, during which the Customer could consider whether to keep or cancel the Optional Add-On Product purchase. Per Respondent's policy, after expiration of the Full Refund Period, the Optional Add-On Products could be cancelled for a refund of the unearned portion of the premium or fee.

### *The Full Refund Period*

14.    Respondent directed its employees to inform consumers that the Optional Add-On Products could be cancelled within 30 (or sometimes 45) days of purchase during what was referred to as the "Full Refund Period."

15. Respondent trained its employees to use language implying that Optional Add-On Product cancellations during the Full Refund Period are cost-free. For example: a training presentation titled "Credit Insurance General Overview" instructs employees to tell consumers about the "30-day period from the date a policy is purchased to evaluate the product and cancel with a full refund" and Respondent's Optional Products Standards Policy states:

> Customers must be provided with a period of time during which they can cancel the Optional Product and receive a full refund of the purchase price (the "Full Refund Period"), to allow the customer to read and understand the full limitations and exclusions of the product following the initial decision to purchase.

16. Consistent with their training, some of Respondent's employees used language that suggested Optional Add-On Product cancellations during the Full Refund Period were cost-free, to overcome consumers' resistance to purchasing an Optional Add-On Product.

17. Numerous Customers only discovered that the products were attached to their loan, or that they were optional, when they received a post-origination letter, which informed Customers of the purchase and its optional nature and provided directions on how to cancel within a prescribed Full Refund Period, typically 30 or 45 days, for a "full refund of [the] purchase price."

18. Customers who cancelled their Optional Add-On Products within the Full Refund Period believed that Respondent would then return them to the

8

financial position they would have been in had the product not been added to the loan in the first place.

19. In many instances, however, for at least the past four years, Respondent did not provide full refunds of interest attributable to non-credit-insurance Optional Add-On Product fees such that Customers who cancelled were returned to the financial position they would have been in had Respondent not added an Optional Add-On Product to their loans.

20. This is because during at least the past four years, Respondent's Customers who cancelled non-credit-insurance Optional Add-On Products during the Full Refund Period were refunded the fee, but not the interest attributable to it.

21. Numerous Customers who cancelled during the Full Refund Period—some in response to the post-origination letter that included instructions for how to cancel the products—did not know that the so-called "full" refund they received did not include a refund of the interest Respondent had charged them.

22. Respondent charged precomputed interest on some Customers' loans and Optional Add-On Product premiums or fees. For a loan with precomputed interest, Respondent calculated up front how much interest would be paid over the life of the loan if the consumer paid only the minimum amount due

every month. Respondent then added that total amount of interest to the Customer's starting principal balance and the combined total dictated the Customer's monthly payments.

23.    Beginning more than four years ago, for Customers who cancelled credit-insurance Optional Add-On Products during the Full Refund Period, Respondent refunded the interest it charged on premiums during the Full Refund Period.

24.    For cancellations of the premiums with precomputed interest, the average refund between May 20, 2019 and May 20, 2021, was $827 per product, $337 of which was attributable to precomputed interest. Some of these Customers cancelled their credit-insurance Optional Add-On Products within days of purchase and were refunded thousands of dollars in interest.

25.    Unlike Customers cancelling credit-insurance Optional Add-On Products during the Full Refund Period, Customers cancelling non-credit-insurance Optional Add-On Products were not refunded interest. Over the past four years, more than 25,000 Customers collectively paid Respondent approximately $10 million in interest attributable to tens of thousands of non-credit-insurance Optional Add-On Products cancelled within the Full Refund Period. None of this interest was refunded.

*Respondent's Add-On Sales Practices*

10

26. Respondent expected its employees to offer Optional Add-On Products to eligible consumers with every loan. The company-wide expected CPL (coverages per loan), or the average number of Optional Add-On Products expected to be sold, has varied. In 2019, the CPL was 1.3 Optional Add-On Products with each loan.

27. Respondent's written training materials directed employees to attempt to sell Optional Add-On Products to consumers even when the employees think the consumer will not want them or the consumer previously declined Optional Add-On Products when obtaining a prior loan.

28. Individual salespersons' performance reviews were based in part on their CPL rate, and some received commissions for selling non-credit-insurance Optional Add-On Products.

29. According to some of Respondent's former employees, low CPL rates could lead to adverse employment consequences including termination.

30. Some of Respondent's former employees also explained that a common method of selling Optional Add-On Products was adding them onto a loan before showing the paperwork to the consumer (referred to by some former employees as "pre-packing") and without verbally informing the consumer that the products were included or optional. And then, if the consumer

identified the products and asked for their removal, employees were expected to make it seem difficult to remove the products.

31.    These former employee statements are consistent with complaints made to Respondent and the Bureau.

32.    Although Respondent provided written disclosures concerning the Optional Add-On Products' optional nature, the disclosures were sometimes rendered ineffective because they were obscured or directly contradicted by Respondent's employees while speaking with consumers in-person or over the phone.

### *Cancellations after the Full Refund Period*

33.    Some of Respondent's customers did not discover that Respondent attached Optional Add-On Products to their loans, or learn of the product's optional nature, until months after origination. Thus, in addition to not being refunded the interest charged on their unwanted Optional Add-On Products, such consumers were typically not even refunded the full premium or fee.

34.    Over the past four years, Respondent's Customers have cancelled tens of thousands of Optional Add-On Products after the Full Refund Period. Despite some of these products being added to their loans without their knowledge and consent, the Customers were only refunded partial premiums

or fees. None of these Customers were refunded the interest charged on the premiums or fees.

**Findings and Conclusions as to Respondent's Misrepresentations that Customers Could Cancel Optional Add-On Products Within a Prescribed Time Period Without Cost**

35. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). Misrepresentation of a material fact and omission of a material fact constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

36. In numerous instances, Respondent, directly or indirectly, expressly or by implication, and in connection with loan originations and renewals, has represented to Customers prior to loan origination that if they purchase an Optional Add-On Product, they will have the ability to cancel it during a prescribed period and be returned to the financial position they would have been in had the product never been added to their loan origination or renewal.

37. Respondent has additionally represented to Customers after loan origination through letters that advise them how to cancel their Optional Add-On Product within the Full Refund Period for a "full refund of [the] purchase price," that if they followed Respondent's directions, they would

13

be returned to the financial position they would have been in had they declined the product at their loan origination or renewal.

38. In fact, when Customers cancelled non-credit-insurance Optional Add-On Products during the prescribed period, Respondent did not refund the interest charged on the Optional Add-On Product fee. Thus, Respondent did *not* return these Customers to the financial position they would have been in had the product never been added to their loan origination or renewal, even when they cancelled in accordance with the instructions in Respondent's post-origination letter.

39. Respondent's acts or practices were likely to mislead a reasonable consumer into believing that they were entitled to a cost-free Full Refund Period in which to consider the Optional Add-On Product and that if they cancelled the product during the prescribed period, they would receive a refund of the fee and all costs associated with the purchase of the Optional Add-On Product.

40. Respondent's misrepresentations were material because they concerned the cost of credit and influenced whether the consumer purchased a product that increased the cost of the consumer's loan, and whether the consumer sought a complete refund or accepted the incomplete refund that Respondent had given them.

41. Therefore, Respondent engaged in deceptive acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Unfairly Charging and Failing to Refund the Interest that Accrued During a Purported Full Refund Period**

42. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable, and that substantial injury is not outweighed by countervailing benefits to consumers or to competition. *Id*. § 5531(c).

43. In numerous instances, by failing to refund interest attributable to tens of thousands of Optional Add-On Products that were cancelled during the Full Refund Period, Respondent engaged in acts or practices that caused, or were likely to cause, substantial injury to consumers. This injury included, at a minimum, the unrefunded interest.

44. Due to Respondent's high-pressure sales tactics, which led some Customers to believe the products were not optional, the injury was not reasonably avoidable by Customers. In fact, many Customers did not even know they had been injured because they incorrectly believed Respondent provided them a full refund.

15

45.    Charging and retaining interest during the Full Refund Period that Customers reasonably understand to be cost-free and that was used to induce consumers to purchase a product provides no benefits to consumers or competition.

46.    Therefore, Respondent engaged in unfair acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c)(1), and 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Abusive Interference with Customers' Ability to Understand that Respondent Charged Non-Refundable Interest During the Full Refund Period**

47.    Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). Under section 1031(d)(1) of the CFPA, an act or practice that "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service . . . ." is abusive and is therefore prohibited by the CFPA. 12 U.S.C. § 5531(d)(1).

48.    In numerous instances, Respondent has engaged in high-pressure sales tactics and misled and deceived Customers regarding the availability of a cost-free trial period and by doing so materially interfered with consumers' ability to understand that: (1) they would be charged interest on Optional Add-On Products along with their loan origination or renewal, and (2) they

16

would not be refunded this interest even if they cancelled the Optional Add-On Product within the Full Refund Period.

49. This interference is material because some Customers would not have purchased the Optional Add-On Product had they known cancellations during the Full Refund Period would not include a refund of the interest attributable to the product fee.

50. Because of Respondent's practices, Customers suffered financial injury in the form of unrefunded interest.

51. Respondent's employees thus materially interfered with Customers' ability to understand that Respondent charged non-refundable interest during the Full Refund Period.

52. Therefore, Respondent engaged in abusive acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(d)(1) and 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Misrepresentations that Customers Must Purchase Optional Add-On Products to Receive Loans**

53. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). Misrepresentation of a material fact and omission of a material fact constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

17

54. Respondent directly or indirectly, expressly or by implication, misrepresented to some Customers that they must purchase an Optional Add-On Product to receive a loan, or that they received a loan that did not include an Optional Add-On Product.

55. Respondent did so by (1) expressly representing to some Customers that they must purchase Optional Add-On Products to receive a loan, or (2) adding Optional Add-On Products to loans without informing some Customers that the products had been added or that they were optional.

56. In fact, the Optional Add-On Products were optional and Respondent's extension of credit to the consumer was not contingent on agreement to purchase the products.

57. Respondent's acts or practices were likely to mislead a reasonable consumer into believing that they must purchase an Optional Add-On Product to receive a loan, or that they received a loan that did not include an Optional Add-On Product when in fact the loan did have an Optional Add-On Product.

58. Respondent's written disclosures of the optional nature of the products did not correct the misrepresentations made by its employees to some Customers.

59. Respondent's misrepresentations were material because purchasing Optional Add-On Products increased the cost of the Customer's loan. Indeed, had Customers known the Optional Add-On Products were optional, or that the Optional Add-On Products had been added to their loan without their knowledge and consent, many would have declined the purchase.

60. Therefore, Respondent engaged in deceptive acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Abusive Interference with Customers' Ability to Understand that Optional Add-On Products Are Optional**

61. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). Under section 1031(d)(1) of the CFPA, an act or practice that "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service . . . ." is abusive and is therefore prohibited by the CFPA. 12 U.S.C. § 5531(d)(1).

62. In numerous instances, by engaging in high-pressure sales tactics, speeding through written disclosures, adding unrequested Optional Add-On Products to some Customers' loans, and misrepresenting to some

Customers whether Optional Add-On Products had been added to Customers' loans or that these products were optional, Respondent's employees have engaged in conduct the natural consequence of which impedes the Customers' ability to understand whether Optional Add-On Products had been added to Customers' loans and whether these products were optional.

63. These statements and practices contradicted Respondent's written disclosures and hindered Customers' ability to understand whether they had purchased, or were required to purchase, Optional Add-On Products.

64. Some customers reasonably believed that they must purchase an Optional Add-On Product to receive a loan, or that they have been given a loan that did not include an Optional Add-On Product. In fact, the Optional Add-On Products were optional and sometimes pre-packed into their loan.

65. Respondent's employees thus materially interfered with Customers' ability to understand that the Optional Add-On Products were optional, and that Customers were entitled to take a loan that did not include any Optional Add-On Products.

66. Therefore, Respondent engaged in abusive acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(d)(1) and 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Unfairly Charging and Failing to Refund the Full Premium and Interest that Accrued on Optional Add-On Products that Customers Did Not Agree to Purchase**

67. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable, and that substantial injury is not outweighed by countervailing benefits to consumers or to competition. *Id*. § 5531(c).

68. In some instances, Respondent engaged in acts or practices that caused, or were likely to cause, substantial injury to Customers by charging and failing to refund all premiums or fees and attributable interest on money it financed for Optional Add-On Products that were purchased without Customers' knowledge and consent or for products that Customers purchased because they were told or otherwise reasonably believed the product was required to obtain a loan.

69. In some instances, Customers did not discover they had been charged for the Optional Add-On Product, or learn of the product's optional nature, until months into the loan term. Such Customers who cancelled the Optional Add-On Products received refunds of premiums or fees yet to be charged. They did not, however, receive a full premium or fee refund, or

21

any refund of the interest attributable to the Optional Add-On Product purchase.

70. These injuries were not reasonably avoidable because the products were purchased without Customers' knowledge and consent or Customers were told or otherwise reasonably believed the products were required, and because many Customers did not understand they had received an incomplete refund (that is, a refund that did not include the full premium or fee, plus interest associated with the Optional Add-On Product purchase).

71. Charging and then failing to refund the full costs (premium or fee, plus interest) on an Optional Add-On Product that either a Customer did not know had been added to the loan or that Respondent's employees misled the Customer into believing was not optional, provides no benefits to consumers or competition.

72. Therefore, Respondent engaged in unfair acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c)(1), and 5536(a)(1)(B).

## V.

### CONDUCT PROVISIONS

**IT IS ORDERED**, under §§ 1053 and 1055 of the CFPA, that:

22

73.    Respondent and its officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Consent Order, whether acting directly or indirectly, may not violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536, in connection with the marketing, selling, and financing of Optional Add-On Products, and are prohibited from:

a.    Marketing a lower interest rate as a benefit of purchasing an Optional Add-On Product. Provided, however, that nothing in the Consent Order shall prohibit Respondent from providing truthful disclosures about the interest rate that would apply depending on a loan's amount financed;

b.    Quoting or marketing directly to a consumer an interest rate for a loan that includes an Optional Add-On Product without first quoting or marketing directly to the consumer the interest rate for the loan without any Optional Add-On Products;

c.    Upon the date specified in the Compliance Plan, selling an Optional Add-On Product without first providing the consumer a written loan offer in a paper or electronic form that the consumer can keep and that does not include any Optional Add-On Products; and

d.  Increasing or threatening to increase an interest rate as a result of an

Optional Add-On Product cancellation that occurs after loan

origination.

**Affirmative Requirements**

**IT IS FURTHER ORDERED that**:

74.  Respondent, whether acting directly or indirectly, must take the following

affirmative actions:

a.  Respondent must take reasonable measures to ensure that its Service

Providers, affiliates, and other agents do not violate sections 1031 and

1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536, in connection with the

marketing, selling, and financing of Optional Add-On Products.

b.  Respondent must create, implement, and maintain policies and

procedures to comply with this Consent Order.

*Policies and Procedures to Prevent and Detect*
*Improper Sales Acts or Practices*

**IT IS FURTHER ORDERED that:**

75.  Respondent must enhance and maintain policies and procedures to prevent

and detect Improper Sales Acts or Practices. The policies and procedures

must ensure Respondent:

a. Devotes sufficient personnel and resources to monitor Optional Add-On Product sales;

b. Appropriately handles consumer inquiries or complaints of Improper Sales Acts or Practices;

c. Appropriately handles employee inquiries, concerns, or complaints of sales pressure or Improper Sales Acts or Practices;

d. Tracks and addresses indicia of Improper Sales Acts or Practices;

e. Provides employee training reasonably designed to prevent Improper Sales Acts or Practices; and

f. Has performance-management and sales goals for its employees that are reasonably designed to prevent Improper Sales Acts or Practices.

### *Enhanced Add-On Disclosures*

**IT IS FURTHER ORDERED** that:

76. In addition to any disclosures required by Federal, state, or local law, Respondent must, beginning on the date specified in the Compliance Plan, provide to each Customer the following enhanced disclosures ("Enhanced Add-On Disclosures") in English or Spanish, as applicable:

a. Name of each Optional Add-On Product purchased by the Customer;

25

b. Anticipated total cost (including interest) of each Optional Add-On Product purchased by the Customer, presuming the Customer will make timely payments on each of the remaining due dates;

c. Comparison of the Customer's existing monthly payment amount and payoff date versus the monthly payment amount and payoff date if each Optional Add-On Product is cancelled during the 60-Day Full Refund Period;

d. Clear and prominent explanation that the Customer is financing the cost of the Optional Add-On Product;

e. The calendar date or deadline by which the Customer must cancel the Optional Add-On Product in order to receive a full refund;

f. Clear and prominent directions for how each Optional Add-On Product can be cancelled for a full refund during the 60-Day Full Refund Period and a refund of the unearned premium or fee, plus attributable interest after the 60-Day Full Refund Period; and

g. Notification that Respondent is regulated by the Consumer Financial Protection Bureau (CFPB) along with the current CFPB web address for consumer complaints (www.consumerfinance.gov/complaint/ on the Effective Date) and the consumer complaint hotline number (855-411-2372; TTY/TDD: 855-729-2372 on the Effective Date).

26

77. Beginning on the date specified in the Compliance Plan, the Enhanced Add-On Disclosures must be provided by both letter or email sent to the Customer within 72 hours of purchase of an Optional Add-On Product and in a recorded call between a live agent and Customer occurring more than 48 hours after purchase of an Optional Add-On Product but before expiration of the 60-Day Full Refund Period, except that where a Customer has used an Optional Add-On Product, no further Enhanced Add-On Disclosures shall be required for that Optional Add-On Product.

78. Respondent will be deemed to have satisfied the recorded call requirement if it makes three documented attempts, on three different days, to reach the Customer by phone during the 60-Day Full Refund Period to provide the Enhanced Add-On Disclosures and provides a second copy of the Enhanced Add-On Disclosures to the Customer by letter or email.

79. In all monthly billing statements, written debt collection communications, and written payment reminders (excluding text/SMS messages) sent after the date specified in the Compliance Plan to any Customer paying for an Unused Optional Add-On Product, Respondent must inform the Customer that they purchased an Optional Add-On Product and that the cost of the product can be refunded.

27

*Cancellations During and After the 60-Day Full Refund Period*

**IT IS FURTHER ORDERED** that:

80. Upon the date specified in the Compliance Plan, all Optional Add-On Products marketed or sold by Respondent after the Effective Date shall be subject to a 60-Day Full Refund Period during which the Customer can cancel the Unused Optional Add-On Product without cost (meaning Respondent will refund the premium or fee for the Optional Add-On Product plus all interest attributable to the refunded premium or fee for the Optional Add-On Product).

81. Any Optional Add-On Product cancellation resulting from a determination that the Customer was ineligible for the product shall be treated as a cancellation made during the 60-Day Full Refund Period, regardless of when during the loan term it occurs.

82. Upon the date specified in the Compliance Plan, Customers who after the Effective Date, cancel their Unused Optional Add-On Products after the period in which they are entitled to a full refund, shall be eligible for a refund of the unearned premium or fee, plus interest attributable to the unearned premium or fee being refunded, which shall be provided by Respondent. Provided, however, that Respondent may retain the interest

28

on the premium or fee prior to the effective date of the Customer's cancellation request.

83. Upon the date specified in the Compliance Plan, for Unused Optional Add-On Products cancelled in jurisdictions that allow Respondent to refund Optional Add-On Product premiums and fees by crediting the Customer's underlying loan, Respondent shall:

   a. For cancellations during the 60-day Full Refund Period: Credit to the Customer the full premium or fee, plus all interest attributable to the credited premium or fee, and recalculate the loan to reduce the Customer's monthly payment;

   b. For cancellations after the 60-day Full Refund Period: Credit to the Customer the unearned premium or fee, plus all interest attributable to the unearned premium or fee being refunded, and recalculate the loan to reduce the Customer's monthly payment. Provided, however, that OneMain may retain the interest on the premium or fee prior to the effective date of the Customer's cancellation request; and

   c. For all such cancellations, send the Customer a letter or email confirming the cancellation, providing the total of the amount of the refunded premium(s) or fee(s) and interest, and identifying the post-refund monthly payment amount, and payoff date.

84. Upon the date specified in the Compliance Plan, for Unused Optional Add-On Products cancelled in jurisdictions that require Respondent to refund Optional Add-On Product premiums or fees by issuing a check, Respondent shall:

a. Issue a check to the Customer when required by law;

b. Send the Customer a letter confirming the cancellation, providing the refund amount, and identifying the amount of interest attributable to the premium or fee being refunded. The letter shall also explain that if, within 60 days of the date of the letter, the Customer informs Respondent via its designated toll-free number that the Customer wishes to apply the refunded premium or fee to the loan, and remits the check proceeds to Respondent, Respondent shall:

    i. Credit to the Customer's loan balance the refunded premium or fee plus all interest attributable to the credited premium or fee;

    ii. Recalculate the loan to reduce the Customer's monthly payment; and

    iii. Send the Customer a letter or email confirming the cancellation, providing the total amount of the premium or fee credit and attributable interest, and identifying the post-refund monthly payment amount, and payoff date.

85. In the letter or email referenced in subparagraph 84(b), Respondent shall state that the Customer can also remit the check proceeds to Respondent by taking the check into Respondent's branch office. If done within 60 days, Respondent's representative will assist the Customer with calling the designated toll-free number mentioned in paragraph 84(b) to apply the refunded premium or fee to the loan and receive a credit for the interest attributable to the amount of the premium or fee being refunded.

86. For Optional Add-On Product cancellations made between the Effective Date and implementation of the Compliance Plan, refunds and recalculations pursuant to Paragraphs 80-85 shall be made on a date specified in the Compliance Plan, and retroactively treated as effective on the date of cancellation.

### *Optional Add-On Product Easy Cancellation Procedure*

**IT IS FURTHER ORDERED** that:

87. Respondent must permit Customers to cancel any Optional Add-On Product verbally and directly with Respondent in-person, by phone, by letter, or by email.

88. Upon the date specified in the Compliance Plan, Respondent must implement a centralized cancellation team to receive, respond, and resolve all Optional Add-On Product cancellations.

89. All calls between Customers and Respondent's centralized cancellation team must be recorded and retained for the duration of the Order.

90. Within three (3) business days of a Customer's or Customer's agent's request to cancel an Optional Add-On Product after implementation of the Compliance Plan, Respondent must process the cancellation, issue the refund, and send the refund confirmation letter described in Paragraphs 83 and 84. The cancellation and refund will be effective as of the date of the request.

91. For Optional Add-On Product cancellations made between the Effective Date and implementation of the Compliance Plan, Respondent shall send the refund confirmation letter described in Paragraphs 83 and 84 on a date specified in the Compliance Plan.

92. Respondent must provide all of its customer-facing employees with enhanced training on handling Optional Add-On Product cancellation requests.  Such employees shall be required to route Customers who inquire about cancelling an Optional Add-On Product to the centralized cancellation team. At a minimum, Respondent's customer-facing employees shall:

   a. Call the centralized cancellation team for any Customer inquiring in-person about cancelling an Optional Add-On Product; and

32

b.  Transfer a Customer's phone call to the centralized cancellation team for any Customer who calls any of Respondent's telephone numbers to inquire about canceling an Optional Add-On Product.

# VI.

## Compliance Plan

**IT IS FURTHER ORDERED** that:

93.  Within 45 days of the Effective Date, Respondent must submit to the Enforcement Director for review and determination of non-objection a comprehensive compliance plan designed to ensure that Respondent's marketing, selling, and financing of Optional Add-On Products complies with all applicable laws that the Bureau enforces, including Federal consumer financial laws, and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

a.  detailed steps for addressing each action required by this Consent Order;

b.  a mechanism to ensure that the Board is kept apprised of the status of compliance actions; and

c.  specific timeframes and deadlines for implementation of the steps described above.

94. The Enforcement Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Compliance Plan, Respondent must revise and resubmit the Compliance Plan to the Enforcement Director within 30 days.

95. After receiving notification that the Enforcement Director has made a determination of non-objection to the Compliance Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## VII.

## Role of the Board and Executives

**IT IS FURTHER ORDERED** that:

96. Respondent's Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with the laws that the Bureau enforces, including Federal consumer financial laws, this Consent Order, the Compliance Plan, and Redress Plan.

97. Respondent's Chief Executive Officer and Respondent's Board must review all plans and reports required by this Consent Order, and any submissions to the Bureau prior to such submission.

98.  One year after the Effective Date, and yearly thereafter, Respondent must submit to the Enforcement Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board, the accuracy of which is sworn to under penalty of perjury by Respondent's Chief Executive Officer, and which, at a minimum:

   a.  Describes the steps that Respondent's Chief Executive Officer has taken to reasonably assess whether Respondent is complying with the Compliance Plan, Redress Plan, and each applicable paragraph and subparagraph of the Order;

   b.  Describes in detail whether and how Respondent has complied with the Compliance Plan, Redress Plan, and each applicable paragraph and subparagraph of the Order, including the manner of verification of such compliance and any corrective actions taken to remedy potential non-compliance with the applicable requirement, paragraph, or subparagraph; and

   c.  attaches a copy of each Order Acknowledgment obtained under Section XII, unless previously submitted to the Bureau.

99.  Respondent's Board and Chief Executive Officer must:

a. Authorize whatever actions are necessary for Respondent to assess whether Respondent is complying with the Compliance Plan, Redress Plan, and each applicable paragraph and subparagraph of the Order;

b. Authorize whatever actions, including corrective actions, are necessary for Respondent to fully comply with the Compliance Plan, Redress Plan, and each applicable paragraph and subparagraph of the Order; and

c. Require timely reporting by management to Respondent's Board and Chief Executive Officer on the status of compliance obligations.

## MONETARY PROVISIONS

## VIII.

### Order to Pay Redress

**IT IS FURTHER ORDERED** that:

100. Within 10 days of the Effective Date, Respondent must reserve or deposit into a segregated deposit account Redress in an amount not less than $10 million (Payment Floor), for the purpose of providing redress to Affected Customers as required by this Section.

101. Within 45 days of the Effective Date, Respondent must submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order (Redress Plan). The Enforcement Director will have the discretion to make

a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Redress Plan, Respondent must revise and resubmit the Redress Plan to the Enforcement Director within 30 days. After receiving notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

102.  The Redress Plan must:

a.  Provide a mechanism to pay to Affected Customers all Redress, and to ensure that each Affected Customer receives the amount of Redress to which they are entitled;

b.  Provide that the Redress will be refunded by issuing checks to Affected Customers, unless the Affected Customer has an active or outstanding (including charged-off) loan with Respondent, in which case Respondent may make the refund by crediting the amount of the refund to the active or outstanding loan, except that upon written request by Respondent, an Affected Customer, or their agent, the Enforcement Director or his delegated representative may modify the form of redress in whole or in part, upon a showing of good cause;

 c. Specify how Respondent will identify Affected Customers and determine the amount of Redress to be provided each Affected Customer;

 d. Include an exemplar of the form letter or (in the case of a consumer who has elected to receive electronic communications from Respondent and for whom Respondent has evidence that the consumer has opened such communications from Respondent and for whom Respondent has current contact information) electronic communication to be sent notifying Affected Customers of their redress (Redress Notification), which must include clear and simple language explaining how the amount of redress was calculated and a statement that redress is being provided in accordance with the terms of the Consent Order; and

 e. Include an exemplar of the form of the envelope and electronic communication subject line that will contain the Redress Notification.

103. After completing the Redress Plan, if the amount of Redress provided to Affected Customers is less than the Payment Floor, within 30 days of the completion of the Redress Plan, Respondent must pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions, the difference between the amount of

Redress provided to Affected Customers and the Payment Floor (Remaining Redress).

104. The Bureau may use the Remaining Redress to pay additional redress to Affected Customers. If the Bureau determines, in its sole discretion, that additional redress is wholly or partially impracticable or otherwise inappropriate, or if funds remain after the additional redress is completed, the Bureau will deposit any remaining funds in the U.S. Treasury. Respondent will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

105. Respondent may not condition the payment of any redress to any Affected Customer under this Consent Order on that Affected Customer waiving any right.

## IX.

### Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

106. Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, Respondent must pay a civil money penalty of $10 million to the Bureau.

107. Within 10 days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

108. The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by Section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

109. Respondent, for all purposes, must treat the civil money penalty paid under this Consent Order as a penalty paid to the government. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

   a. Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

   b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

110. To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of

any payment that the Bureau makes from the Civil Penalty Fund. If the court in any Related Consumer Action offsets or otherwise reduces the amount of compensatory monetary remedies imposed against Respondent based on the civil money penalty paid in this action or based on any payment that the Bureau makes from the Civil Penalty Fund, Respondent must, within 30 days after entry of a final order granting such offset or reduction, notify the Bureau, and pay the amount of the offset or reduction to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X.

### Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

111.  In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

112. Respondent must relinquish all dominion, control, and title to the funds
paid to the fullest extent permitted by law and no part of the funds may be
returned to Respondent.

113. Respondent acknowledges that its Taxpayer Identification Number, which
Respondent previously submitted to the Bureau, may be used for
collecting and reporting on any delinquent amount arising out of this
Order, in accordance with 31 U.S.C. § 7701.

114. Within 30 days of the entry of a final judgment, consent order, or
settlement in a Related Consumer Action, Respondent must notify the
Enforcement Director of the final judgment, consent order, or settlement in
writing. That notification must indicate the amount of redress, if any, that
Respondent paid or is required to pay to consumers and describe the
consumers or classes of consumers to whom that redress has been or will
be paid.

## COMPLIANCE PROVISIONS

## XI.

### Reporting Requirements

**IT IS FURTHER ORDERED** that:

115. Respondent must notify the Bureau of any development that may affect
compliance obligations arising under this Consent Order, including but not

42

limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but, in any case, no later than 14 days after the development.

116. Within 7 days of the Effective Date, Respondent must:

    a. designate at least one telephone number and email, physical, and postal addresses as points of contact, that the Bureau may use to communicate with Respondent;

    b. identify all businesses for which Respondent is the majority owner, or that Respondent directly or indirectly controls, by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; and

    c. describe the activities of each such business, including the products and services offered, and the means of advertising, marketing, and sales.

117. Respondent must report any change in the information required to be submitted under Paragraph 116 above at least 30 days before the change or

as soon as practicable after the learning about the change, whichever is sooner.

## XII.

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

118. Within 7 days of the Effective Date, Respondent must submit to the Enforcement Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

119. Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

120. For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

44

121. Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 *et seq.*, within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

122. Ninety days after the Effective Date, Respondent must submit to the Bureau a list of all persons and their titles to whom this Consent Order has been delivered under the Section of this Order titled "Order Distribution and Acknowledgment" and a copy of all signed and dated statements acknowledging receipt of this Consent Order under Paragraph 119.

## XIII.

## Recordkeeping

**IT IS FURTHER ORDERED** that:

123. Respondent must create and retain the following business records:

   a. all documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau.

   b. all documents and records pertaining to the Redress Plan, described in Section VIII above.

   c. copies of all training materials; advertisements; consumer-facing

disclosures; websites; and other marketing materials, including any such materials used by a third party on Respondent's behalf, relating to the subject of this Consent Order, and all material used to implement the Compliance Plan and measure or evaluate Respondent's fulfillment of the Compliance Plan, described in Section VI above.

d. for each individual Affected Customer:

    i. the Affected Customer's name, address, phone number, and email address;

    ii. the name of each Optional Add-On Product purchased by the Affected Customer;

    iii. the amount paid for each Optional Add-On Product purchased by the Affected Customer, disaggregated by premium or fee, and interest attributable to the premium or fee;

    iv. the date each Optional Add-On Product was added to the Affected Customer's loan;

    v. the date each Optional Add-On Product was cancelled or removed from the Affected Customer's loan, if applicable;

    vi. the method by which the Affected Customer was refunded (check or credit); and

    vii. the amount of Redress paid by Respondent to the Affected

46

Customer.

e.  for each individual Customer who receives a retroactive refund

   pursuant to Paragraph 86:

   i.   the Customer's name, address, phone number, and email address;

   ii.  the name of each Optional Add-On Product for which the

       Customer received a retroactive refund;

   iii. the amount paid for each Optional Add-On Product for which the

       Customer received a retroactive refund, disaggregated by premium

       or fee, and interest attributable to the premium or fee;

   iv.  the date each Optional Add-On Product for which the Customer

       received a retroactive refund was added to the Customer's loan;

   v.   the date each Optional Add-On Product for which the Customer

       received a retroactive refund was cancelled or removed from the

       Customer's loan;

   vi.  the method by which the Customer was provided the retroactive

       refund (check or credit);

   vii. the amount of the retroactive refund; and

   viii. the date the Customer received the retroactive refund.

f.  accounting records showing the gross and net revenues generated by

   Optional Add-On Products.

g.  all consumer complaints and refund requests (whether received directly or indirectly, such as through a third party) relating to Optional Add-On Products, and any responses to those complaints or requests.

124.  Respondent must make the documents identified in Paragraph 123 available to the Bureau upon the Bureau's request.

## XIV.

## Notices

**IT IS FURTHER ORDERED** that:

125.  Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "*In re OneMain Financial Holdings, LLC File No. 2023-CFPB-0003*," and send them by overnight courier or first-class mail to the below address and contemporaneously by email to Enforcement_Compliance@cfpb.gov:

Assistant Director for Enforcement
Consumer Financial Protection Bureau
ATTENTION: Office of Enforcement
1700 G Street, N.W.
Washington D.C. 20552

## XV.

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

126. Respondent must cooperate fully to help the Bureau determine the identity and location of, and the amount of injury sustained by, each Affected Customer. Respondent must provide such information in its or its agents' possession or control within 14 days of receiving a written request from the Bureau.

## XVI.

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

127. Within 14 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents. Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview regarding: (a) this matter; (b) anything related to or associated with the conduct described in Section IV; or (c) compliance with the Consent Order. The person interviewed may have counsel present.

128. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII.

## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

129. Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Enforcement Director.

130. The Enforcement Director may, in their discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if the Enforcement Director determines good cause justifies the modification. Any such modification by the Enforcement Director must be in writing.

# XVIII.

# ADMINISTRATIVE PROVISIONS

**IT IS FURTHER ORDERED** that:

131.  The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau from taking any other action against Respondent, except as described in Paragraph 132. Further, for the avoidance of doubt, the provisions of this Consent Order do not bar, estop, or otherwise prevent any other person or governmental agency from taking any action against Respondent.

132.  Upon full payment of redress under the Redress Plan, as provided in Section VIII, and full payment of the civil money penalty, as provided in Section IX, the Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty.

51

This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

133. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under Section 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

134. This Consent Order will terminate 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

135. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

136. Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

137. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

138. This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

139. Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 30th day of May, 2023.

Rohit Chopra

Director
Consumer Financial Protection Bureau