# Exhibit E

Case 1:26-cv-02117-PAE   Document 104-5   Filed 06/01/26   Page 2 of 37

a stimulus that will cost taxpayers nothing by freeing our small businesses and especially our entrepreneurial and high-tech businesses from the burdens of all this paperwork and instead let them focus on growing, on listing their IPOs in America for the benefit of the American economy. That is what we should be doing, and that is what the editorial says.

I hope very much my colleagues will listen and we will be able to pass the Hutchison-Landrieu amendment, hopefully by voice vote. This should be a unanimous amendment passage.

I yield the floor.

The PRESIDING OFFICER. The Senator from Connecticut is recognized.

Mr. DODD. Mr. President, I want to propound a unanimous consent request. It has been cleared on both sides. I ask unanimous consent that at 2:15 p.m., the Senate consider the following two amendments: Senator CORKER of Tennessee, amendment No. 4034, and Senator CARPER of Delaware, amendment No. 4071, which is side-by-side to the Corker amendment; that the amendments be debated concurrently for a total of 30 minutes, with the time equally divided and controlled between Senators CARPER and CORKER or their designees; that upon the use or yielding back of time, the Senate proceed to vote in relation to the Corker amendment, to be followed by a vote in relation to the Carper amendment, with no amendment in order to either amendment prior to a vote.

The PRESIDING OFFICER. Without objection, it is so ordered.

### RECESS

The PRESIDING OFFICER. Under the previous order, the Senate stands in recess until 2:15 p.m.

Thereupon, the Senate, at 12:40 p.m., recessed until 2:15 p.m. and reassembled when called to order by the Presiding Officer (Mr. BEGICH).

The PRESIDING OFFICER. The Senator from Vermont.

Mr. LEAHY. I ask unanimous consent to speak for 3 minutes as in morning business.

The PRESIDING OFFICER. Without objection, it is so ordered.

### RESTORING AMERICAN FINANCIAL STABILITY ACT OF 2010—Continued

#### ANTIPERSONNEL LANDMINES

Mr. LEAHY. Mr. President, earlier today I, along with 67 other Senators, sent a letter to President Obama on an issue that has concerned the Congress since the late 1980s.

Our letter, signed by more than two-thirds of the Senate, commends the President for conducting a comprehensive review of the U.S. Government's policy on antipersonnel mines. That review has been underway for some time, and I expect it will be completed later this summer.

It has involved consultations with the Department of Defense including active and retired U.S. military officers, the Department of State including current and former U.S. diplomats, key military allies, and humanitarian and arms control organizations. The review has examined the historical record, asked rigorous questions, and solicited a wide range of views.

I want to thank the Senators who joined me and Senator VOINOVICH in signing this letter, which states our belief that through a thorough, deliberative review the administration can identify any obstacles to joining the Ottawa Treaty banning the production, use, transfer and stockpiling of antipersonnel mines, and develop a plan to overcome them as soon as possible.

The treaty has been signed by 158 countries, including our NATO allies whose troops are fighting with our forces in Afghanistan and Iraq, and by every other country in this hemisphere except Cuba.

This issue has a long history, and I do not have time to recount it in detail today. But suffice it to say that 13 years ago the United States missed an opportunity to play a leadership role in the international effort to ban antipersonnel mines, which culminated in the treaty. Although our country declined to join the treaty then, as early as 1994 President Clinton announced to the United Nations General Assembly his support for ridding the world of antipersonnel mines, and a plan to develop alternatives to these weapons with the intent of joining the treaty by 2006.

That date came and went, alternatives were developed, and U.S. troops have fought in two wars without, to the best of our knowledge, using these weapons. In the meantime, most of our closest allies have renounced antipersonnel mines, and their militaries long ago made the necessary doctrinal and technological adjustments to meet their force protection needs in accordance with the requirements of the treaty.

Antipersonnel landmines, which are triggered by the victim, have no place in the arsenal of a modern military. They function like some of the IEDs used by insurgents in Afghanistan and Iraq that have caused so many casualties of innocent people, as well as U.S. and coalition forces. Landmines are inherently indiscriminate, and no matter how sophisticated the technology they do not distinguish between a combatant and a civilian. They can be dropped by aircraft or disbursed by artillery by the thousands over wide areas. In today's fast moving battlefield where mobility is a priority, they can pose as much of a danger to our own forces as to the enemy.

Thirteen years ago the Pentagon argued that we should continue to stockpile antipersonnel mines. They said these weapons might be necessary in Korea or in a mechanized war against enemy armor.

But ownership and control of the mines in the Korean DMZ have been transferred to South Korea, and the United States has renounced the use of these types of mines, including in Korea. While there is the possibility that one day we may find ourselves in a conventional war against a major world power, antipersonnel landmines would have little if any utility or relevance in such a war. Rather than our own troops needing these weapons, if our adversary were so lacking in more effective weapons as to use them, our troops would not need antipersonnel mines they would need effective countermine technology.

There have been other arguments made, none of which are persuasive. For example:

Some have asked, after landmines what is the next weapon the Pentagon will be asked to give up? Isn't this a slippery slope for those seeking to ban other types of weapons? This hypothetical question has nothing to do with antipersonnel landmines, which are in a unique category of weapons that are designed to be triggered by the victim.

They are not like bullets or bombs that are aimed or targeted by a soldier. They are inherently indiscriminate, activated by whoever comes into contact with them, whether an enemy soldier, a refugee woman searching for firewood, or a child. Renouncing landmines should have no bearing on U.S. policy toward other weapons.

I have heard it asked how we can ensure that our troops can operate in coalitions with countries that are not parties to the treaty, for example South Korea. The answer is the same way as the NATO countries that have signed the treaty whose troops are fighting in coalition with our forces in Afghanistan and Iraq.

Why join the treaty when we are in de facto compliance already? What would we gain at this point? First, this question implicitly acknowledges that the United States does not require antipersonnel landmines. We have not used them since 1991, we have not exported them since 1992, we have not produced them since 1997 and the Pentagon has no plan to do so in the future.

It is important to recognize that the United States is not causing the mine problem today, although mines we exported to dozens of countries, or that are left over from past wars involving U.S. forces especially in Southeast Asia, continue to kill and injure civilians.

But most importantly, it would be a mistake to underestimate or devalue the positive reaction, practical effects and depth of goodwill toward the United States and our military that would result from joining the treaty. Other countries know the United States, the world's most powerful nation, needs to be part of multilateral agreements if those agreements are to achieve their goals. And they know the United States needs to be part of the solution to the landmine problem,

which means more than conforming our policy to the treaty and it means more than joining the treaty. It means actively using our influence to persuade other counties to join. Countries like India and Pakistan, China and Russia, Israel and Egypt today make the excuse that the United States has not joined, so why should they?

One particularly farfetched notion is that giving up landmines while Russia, China and other potential adversaries keep theirs is at odds with our usual arms control strategy, which seeks to use disarmament agreements as a means of enhancing U.S. security. This makes sense in the context of long-range missiles and nuclear bombs, but antipersonnel landmines? We have not used these weapons for 19 years, and no one can credibly argue that they are necessary to protect the national security of the United States or that our security is threatened by China's and Russia's antipersonnel landmines which are deployed along their common border.

Today, the United States is the largest contributor to humanitarian demining, a fact I am proud of, and I have been asked if by joining the treaty we would feel less obligated to support it. This question is nonsensical to me. Speaking as the chairman of the Appropriations subcommittee that funds these programs, whether or not we are a party to the treaty has nothing to do with our interest and responsibility in helping get rid of the millions of mines and other unexploded ordnance that litter and plague dozens of countries, including allies like Jordan, Afghanistan and Vietnam whose citizens continue to lose their lives and limbs from these hidden killers. Some of those mines and bombs were manufactured here and left behind by U.S. forces decades ago.

Some might ask why bother developing a plan to join the treaty, since the fact that 68 Senators signed a letter supporting it does not guarantee that two-thirds of the Senate will vote to ratify it. It is true that no one can guarantee what the U.S. Senate will do about treaties or anything else. But that is hardly a reason not to join. The fact that more than two-thirds of the Senate today supports such a policy, including 10 Republicans and 2 Independents, should certainly give momentum to doing so, and convey to the President that the treaty would find wide acceptance in the Senate.

Finally, I have heard it suggested that U.S. troops might need anti-personnel mines in Afghanistan. I find it hard to imagine that the United States, which has spent hundreds of millions of dollars to get rid of mines left over from past wars in Afghanistan that have killed and injured more civilians than in any other country, at a time when our military leaders are trying to minimize civilian casualties which have caused so many Afghans to turn against us, would use anti-personnel landmines in Afghanistan—a party to the treaty—and risk the public outcry that would result.

We could debate whether the United States should have joined the Ottawa Convention 13 years ago, but there is no point in that. The question today is why not now? Many years have passed and we have seen the benefits of the treaty. The number of antipersonnel mines produced and exported has plummeted, as has the number of victims.

But landmines remain a deadly legacy in many countries, and the world needs the leadership of the United States to help universalize the treaty and put an end to the time when anti-personnel landmines were an acceptable weapon. It will not happen overnight, but it will never happen without U.S. support. As President Obama said in his acceptance speech for the Nobel Peace Prize, "I am convinced that adhering to standards, international standards, strengthens those who do, and isolates and weakens those who don't." We are fortunate to have a President, and top leaders at the Pentagon and commanders on the battlefield, who recognize that civilians far too often bear the brunt of war's misery, and who believe that we can and must do more to prevent it. There is no better way to begin implementing that important principle, and working toward that goal, than by joining the Ottawa Treaty.

The United States is by far the world's strongest military power. We also have the moral authority that no other country has and the obligation to use that authority in ways that set an example for the rest of the world. It was 16 years ago that President Clinton embraced the goal of ridding the world of these indiscriminate weapons. The Obama administration's review of U.S. policy can finally turn that goal into reality.

I ask unanimous consent that a copy of the letter sent to President Obama be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S. SENATE,
*Washington, DC, May 18, 2010.*
Hon. BARACK OBAMA,
*The White House,*
*Washington, DC.*
DEAR MR. PRESIDENT, we are writing to convey our strong support for the Administration's decision to conduct a comprehensive review of United States policy on landmines. The Second Review Conference of the Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on Their Destruction, held last December in Cartagena, Colombia, makes this review particularly timely. It is also consistent with your commitment to reaffirm U.S. leadership in solving global problems and with your remarks in Oslo when you accepted the Nobel Peace Prize: "I am convinced that adhering to standards, international standards, strengthens those who do, and isolates and weakens those who don't."

These indiscriminate weapons are triggered by the victim, and even those that are designed to self-destruct after a period of time (so-called "smart" mines) pose a risk of being triggered by U.S. forces or civilians, such as a farmer working in the fields or a young child. It is our understanding that the United States has not exported anti-personnel mines since 1992, has not produced anti-personnel mines since 1997, and has not used anti-personnel mines since 1991. We are also proud that the United States is the world's largest contributor to humanitarian demining and rehabilitation programs for landmine survivors.

In the ten years since the Convention came into force, 158 nations have signed including the United Kingdom and other ISAF partners, as well as Iraq and Afghanistan which, like Colombia, are parties to the Convention and have suffered thousands of mine casualties. The Convention has led to a dramatic decline in the use, production, and export of anti-personnel mines.

We note that our NATO allies have addressed their force protection needs in accordance with their obligations under the Convention. We are also mindful that anti-personnel mines pose grave dangers to civilians, and that avoiding civilian casualties and the anger and resentment that result has become a key priority in building public support for our mission in Afghanistan. Finally, we are aware that anti-personnel mines in the Korean DMZ are South Korean mines, and that the U.S. has alternative munitions that are not victim-activated.

We believe the Administration's review should include consultations with the Departments of Defense and State as well as retired senior U.S. military officers and diplomats, allies such as Canada and the United Kingdom that played a key role in the negotiations on the Convention, Members of Congress, the International Committee of the Red Cross, and other experts on landmines, humanitarian law and arms control.

We are confident that through a thorough, deliberative review the Administration can identify any obstacles to joining the Convention and develop a plan to overcome them as soon as possible.

Sincerely,

Patrick Leahy, George V. Voinovich, Richard G. Lugar, John F. Kerry, Jack Reed, Orrin G. Hatch, Daniel K. Inouye, Carl Levin, Olympia J. Snowe, Charles E. Schumer, Joseph I. Lieberman, Robert F. Bennett, Jeff Bingaman, Dianne Feinstein, Susan M. Collins, Ben Nelson, Max Baucus, Lisa Murkowski, Judd Gregg, Robert Menendez, Arlen Specter, Barbara A. Mikulski, Sheldon Whitehouse, Christopher J. Dodd, Harry Reid, Sherrod Brown, Benjamin L. Cardin, Kent Conrad, Mike Crapo, Bill Nelson, Richard J. Durbin, Patty Murray, Ron Wyden, Blanche L. Lincoln, Byron Dorgan, Mark Warner, Evan Bayh, George S. LeMieux, Michael F. Bennet, Mary L. Landrieu, Russell D. Feingold, Tim Johnson, Maria Cantwell, Thomas R. Carper, Herb Kohl, Kirsten E. Gillibrand, Robert C. Byrd, Frank R. Lautenberg, Jon Tester, John D. Rockefeller IV, Edward E. Kaufman, Daniel K. Akaka, Mark L. Pryor, Kay R. Hagan, Tom Udall, Jeanne Shaheen, Claire McCaskill, Al Franken, Mark Udall, Jeff Merkley, Debbie Stabenow, Robert P. Casey, Jr., Mark Begich, Amy Klobuchar, Tom Harkin, Barbara Boxer, Roland W. Burris, Bernard Sanders.

The PRESIDING OFFICER. The Senator from Kansas is recognized.

AMENDMENT NO. 3997 TO AMENDMENT NO. 3739

Mr. BROWNBACK. Mr. President, I ask unanimous consent that the pending business be set aside and my amendment No. 3997 be called up.

The PRESIDING OFFICER. Is there objection?

Mr. DODD. Mr. President, reserving the right to object, I understand the amendment is dealing with the Congo that is being offered by my colleague from Kansas and the Senator from Maryland. Is that correct?

Mr. BROWNBACK. The Senator from Wisconsin and the Senator from Illinois are the cosponsors on this one.

Mr. DODD. This is a good amendment and one that I believe has great value. It has been agreed to across the spectrum in the Senate. So if we can get a quick voice vote, I am prepared to do so.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will report.

The assistant bill clerk read as follows:

The Senator from Kansas [Mr. BROWNBACK], for himself, Mr. FEINGOLD, Mr. DURBIN, Mr. SPECTER, Mr. BROWN of Ohio, Mr. JOHNSON, Mr. WHITEHOUSE, Mr. LAUTENBERG, Mrs. BOXER, and Mr. MERKLEY, proposes an amendment numbered 3997 to amendment number 3739.

Mr. BROWNBACK. I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To require annual disclosure by certain persons to the Securities and Exchange Commission if columbite-tantalite, cassiterite, gold, or wolframite from the Democratic Republic of Congo are necessary to the functionality or production of a product manufactured by the person)

On page 1565, after line 23, add the following:

**TITLE XIII—CONGO CONFLICT MINERALS**

**SEC. 1301. SENSE OF CONGRESS ON EXPLOITATION AND TRADE OF COLUMBITE-TANTALITE, CASSITERITE, GOLD, AND WOLFRAMITE ORIGINATING IN DEMOCRATIC REPUBLIC OF CONGO.**

It is the sense of Congress that the exploitation and trade of columbite-tantalite, cassiterite, gold, and wolframite in the eastern Democratic Republic of Congo is helping to finance extreme levels of violence in the eastern Democratic Republic of Congo, particularly sexual and gender-based violence, and contributing to an emergency humanitarian situation therein, warranting the provisions of section 13(o) of the Securities Exchange Act of 1934, as added by section 1302.

**SEC. 1302. DISCLOSURE TO SECURITIES AND EXCHANGE COMMISSION RELATING TO COLUMBITE-TANTALITE, CASSITERITE, GOLD, AND WOLFRAMITE ORIGINATING IN DEMOCRATIC REPUBLIC OF CONGO.**

Section 13 of the Securities Exchange Act of 1934 (15 U.S.C. 78m), as amended by section 763 of this Act, is further amended by adding at the end the following new subsection:

"(o) DISCLOSURES TO COMMISSION RELATING TO COLUMBITE-TANTALITE, CASSITERITE, GOLD, AND WOLFRAMITE ORIGINATING IN DEMOCRATIC REPUBLIC OF CONGO.—

"(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this subsection, the Commission shall promulgate rules requiring any person described in paragraph (2)—

"(A) to disclose annually to the Commission in a report—

"(i) whether the columbite-tantalite, cassiterite, gold, or wolframite that was nec-

essary as described in paragraph (2)(A)(ii) in the year for which such report is submitted originated or may have originated in the Democratic Republic of Congo or an adjoining country; and

"(ii) a description of the measures taken by the person, which may include an independent audit, to exercise due diligence on the source and chain of custody of such columbite-tantalite, cassiterite, gold, or wolframite, or derivatives of such minerals, in order to ensure that the activities of such person that involve such minerals or derivatives did not directly or indirectly finance or benefit armed groups in the Democratic Republic of Congo or an adjoining country; and

"(B) make the information disclosed under subparagraph (A) available to the public on the Internet website of the person.

"(2) PERSON DESCRIBED.—

"(A) IN GENERAL.—A person is described in this paragraph if—

"(i) the person is required to file reports to the Commission under subsection (a)(2); and

"(ii) columbite-tantalite, cassiterite, gold, or wolframite is necessary to the functionality or production of a product manufactured by such person.

"(B) DERIVATIVES.—For purposes of this paragraph, if a derivative of a mineral is necessary to the functionality or production of a product manufactured by a person, such mineral shall also be considered necessary to the functionality or production of a product manufactured by the person.

"(3) REVISIONS AND WAIVERS.—The Commission shall revise or temporarily waive the requirements described in paragraph (1) if the President determines that such revision or waiver is in the public interest.

"(4) TERMINATION OF DISCLOSURE REQUIREMENTS.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), the requirements of paragraph (1) shall terminate on the date that is 5 years after the date of the enactment of this subsection.

"(B) EXTENSION BY SECRETARY OF STATE.— The date described in subparagraph (A) shall be extended by 1 year for each year in which the Secretary of State certifies that armed parties to the ongoing armed conflict in the Democratic Republic of Congo or adjoining countries continue to be directly involved and benefitting from commercial activity involving columbite-tantalite, cassiterite, gold, or wolframite.

"(5) ADJOINING COUNTRY DEFINED.—In this subsection, the term 'adjoining country', with respect to the Democratic Republic of Congo, means a country that shares an internationally recognized border with the Democratic Republic of Congo.".

**SEC. 1303. REPORT.**

Not later than 2 years after the date of the enactment of this Act, the Comptroller General of the United States shall submit to Congress a report that includes the following:

(1) An assessment of the effectiveness of section 13(o) of the Securities Exchange Act of 1934, as added by section 1302, in promoting peace and security in the eastern Democratic Republic of Congo.

(2) A description of the problems, if any, encountered by the Securities and Exchange Commission in carrying out the provisions of such section 13(o).

(3) A description of the adverse impacts of carrying out the provisions of such section 13(o), if any, on communities in the eastern Democratic Republic of Congo.

(4) Recommendations for legislative or regulatory actions that can be taken—

(A) to improve the effectiveness of the provisions of such section 13(o) to promote peace and security in the eastern Democratic Republic of Congo;

(B) to resolve the problems described pursuant to paragraph (2), if any; and

(C) to mitigate the adverse impacts described pursuant paragraph (3), if any.

Mr. BROWNBACK. This is an issue that has been around for several years. It is on Congo conflict commodities. It is a narrow SEC reporting requirement. As I understand, both sides have cleared it. I would ask, if possible, if we can get it up for a voice vote. I certainly want to go with the timeframes of the manager and be cognizant of the Senator from Tennessee.

The PRESIDING OFFICER. The question is on agreeing to the amendment.

The amendment (No. 3997) was agreed to.

Mr. DODD. Mr. President, I move to reconsider that vote and lay that motion upon the table.

The motion to lay upon the table was agreed to.

Mr. DODD. Mr. President, what is the pending business now?

The PRESIDING OFFICER. The next amendment in order is the Corker amendment.

Mr. DODD. There is 30 minutes equally divided between the proponents and opponents of that and the Carper amendment?

The PRESIDING OFFICER. That is correct.

The Senator from Tennessee.

AMENDMENT NO. 4034 TO AMENDMENT NO. 3739

Mr. CORKER. Mr. President, I hope I have the good fortune our Senator from Kansas just had. I ask unanimous consent to call up amendment No. 4034.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Tennessee [Mr. CORKER] proposes an amendment numbered 4034 to amendment No. 3739.

The amendment is as follows:

(Purpose: To address the applicability of certain State authorities with respect to national banks, and for other purposes)

On page 1315, strike line 18, and all that follows through page 1325, line 20 and insert the following:

"(B) the State consumer financial law is preempted in accordance with the legal standards of the decision of the Supreme Court in Barnett Bank v. Nelson (517 U.S. 25 (1996)), and any preemption determination under this subparagraph may be made by a court or by regulation or order of the Comptroller of the Currency, on a case-by-case basis, in accordance with applicable law; or

"(C) the State consumer financial law is preempted by a provision of Federal law other than this title.

"(2) SAVINGS CLAUSE.—This title does not preempt, annul, or affect the applicability of any State law to any subsidiary or affiliate of a national bank (other than a subsidiary or affiliate that is chartered as a national bank).

"(3) CASE-BY-CASE BASIS.—

"(A) DEFINITION.—As used in this section the term 'case-by-case basis' refers to a determination pursuant to this section made by the Comptroller concerning the impact of a particular State consumer financial law on any national bank that is subject to that law, or the law of any other State with substantively equivalent terms.

"(B) CONSULTATION.—When making a determination on a case-by-case basis that a State consumer financial law of another State has substantively equivalent terms as one that the Comptroller is preempting, the Comptroller shall first consult with the Bureau of Consumer Financial Protection and shall take the views of the Bureau into account when making the determination.

"(4) RULE OF CONSTRUCTION.—This title does not occupy the field in any area of State law.

"(5) STANDARDS OF REVIEW.—

"(A) PREEMPTION.—A court reviewing any determinations made by the Comptroller regarding preemption of a State law by this title shall assess the validity of such determinations, depending upon the thoroughness evident in the consideration of the agency, the validity of the reasoning of the agency, the consistency with other valid determinations made by the agency, and other factors which the court finds persuasive and relevant to its decision.

"(B) SAVINGS CLAUSE.—Except as provided in subparagraph (A), nothing in this section shall affect the deference that a court may afford to the Comptroller in making determinations regarding the meaning or interpretation of title LXII of the Revised Statutes of the United States or other Federal laws.

"(6) COMPTROLLER DETERMINATION NOT DELEGABLE.—Any regulation, order, or determination made by the Comptroller of the Currency under paragraph (1)(B) shall be made by the Comptroller, and shall not be delegable to another officer or employee of the Comptroller of the Currency.

"(c) SUBSTANTIAL EVIDENCE.—No regulation or order of the Comptroller of the Currency prescribed under subsection (b)(1)(B), shall be interpreted or applied so as to invalidate, or otherwise declare inapplicable to a national bank, the provision of the State consumer financial law, unless substantial evidence, made on the record of the proceeding, supports the specific finding regarding the preemption of such provision in accordance with the legal standard of the decision of the Supreme Court of the United States in Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al., 517 U.S. 25 (1996).

"(d) PERIODIC REVIEW OF PREEMPTION DETERMINATIONS.—

"(1) IN GENERAL.—The Comptroller of the Currency shall periodically conduct a review, through notice and public comment, of each determination that a provision of Federal law preempts a State consumer financial law. The agency shall conduct such review within the 5-year period after prescribing or otherwise issuing such determination, and at least once during each 5-year period thereafter. After conducting the review of, and inspecting the comments made on, the determination, the agency shall publish a notice in the Federal Register announcing the decision to continue or rescind the determination or a proposal to amend the determination. Any such notice of a proposal to amend a determination and the subsequent resolution of such proposal shall comply with the procedures set forth in subsections (a) and (b) of section 5244 of the Revised Statutes of the United States (12 U.S.C. 43 (a), (b)).

"(2) REPORTS TO CONGRESS.—At the time of issuing a review conducted under paragraph (1), the Comptroller of the Currency shall submit a report regarding such review to the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate. The report submitted to the respective committees shall address whether the agency intends to continue, rescind, or

propose to amend any determination that a provision of Federal law preempts a State consumer financial law, and the reasons therefor.

"(e) APPLICATION OF STATE CONSUMER FINANCIAL LAW TO SUBSIDIARIES AND AFFILIATES.—Notwithstanding any provision of this title, a State consumer financial law shall apply to a subsidiary or affiliate of a national bank (other than a subsidiary or affiliate that is chartered as a national bank) to the same extent that the State consumer financial law applies to any person, corporation, or other entity subject to such State law.

"(f) PRESERVATION OF POWERS RELATED TO CHARGING INTEREST.—No provision of this title shall be construed as altering or otherwise affecting the authority conferred by section 5197 of the Revised Statutes of the United States (12 U.S.C. 85) for the charging of interest by a national bank at the rate allowed by the laws of the State, territory, or district where the bank is located, including with respect to the meaning of 'interest' under such provision.

"(g) TRANSPARENCY OF OCC PREEMPTION DETERMINATIONS.—The Comptroller of the Currency shall publish and update no less frequently than quarterly, a list of preemption determinations by the Comptroller of the Currency then in effect that identifies the activities and practices covered by each determination and the requirements and constraints determined to be preempted.".

(b) CLERICAL AMENDMENT.—The table of sections for chapter one of title LXII of the Revised Statutes of the United States is amended by inserting after the item relating to section 5136B the following new item:

"Sec. 5136C. State law preemption standards for national banks and subsidiaries clarified.".

## SEC. 1045. CLARIFICATION OF LAW APPLICABLE TO NONDEPOSITORY INSTITUTION SUBSIDIARIES.

Section 5136C of the Revised Statutes of the United States (as added by this subtitle) is amended by adding at the end the following:

"(i) CLARIFICATION OF LAW APPLICABLE TO NONDEPOSITORY INSTITUTION SUBSIDIARIES AND AFFILIATES OF NATIONAL BANKS.—

"(1) DEFINITIONS.—For purposes of this subsection, the terms 'depository institution', 'subsidiary', and 'affiliate' have the same meanings as in section 3 of the Federal Deposit Insurance Act.

"(2) RULE OF CONSTRUCTION.—No provision of this title shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank (other than a subsidiary, affiliate, or agent that is chartered as a national bank).".

## SEC. 1046. STATE LAW PREEMPTION STANDARDS FOR FEDERAL SAVINGS ASSOCIATIONS AND SUBSIDIARIES CLARIFIED.

(a) IN GENERAL.—The Home Owners' Loan Act (12 U.S.C. 1461 et seq.) is amended by inserting after section 5 the following new section:

## "SEC. 6. STATE LAW PREEMPTION STANDARDS FOR FEDERAL SAVINGS ASSOCIATIONS CLARIFIED.

"(a) IN GENERAL.—Any determination by a court or by the Director or any successor officer or agency regarding the relation of State law to a provision of this Act or any regulation or order prescribed under this Act shall be made in accordance with the laws and legal standards applicable to national banks regarding the preemption of State law.

"(b) PRINCIPLES OF CONFLICT PREEMPTION APPLICABLE.—Notwithstanding the authorities granted under sections 4 and 5, this Act

does not occupy the field in any area of State law.".

(b) CLERICAL AMENDMENT.—The table of sections for the Home Owners' Loan Act (12 U.S.C. 1461 et seq.) is amended by striking the item relating to section 6 and inserting the following new item:

"Sec. 6. State law preemption standards for Federal savings associations and subsidiaries clarified.".

## SEC. 1047. VISITORIAL STANDARDS FOR NATIONAL BANKS AND SAVINGS ASSOCIATIONS.

(a) NATIONAL BANKS.—Section 5136C of the Revised Statutes of the United States (as added by this subtitle) is amended by adding at the end the following:

"(j) VISITORIAL POWERS.—

"(1) IN GENERAL.—In accordance with the decision of the Supreme Court of the United States in Cuomo v. Clearing House Assn., L. L. C., 5 (129 S. Ct. 2710 (2009)), no provision of this title which relates to visitorial powers or otherwise limits or restricts the visitorial authority to which any national bank is subject shall be construed as limiting or restricting the authority of any attorney general (or other chief law enforcement officer) of any State to bring an action in a court of appropriate jurisdiction to enforce an applicable nonpreempted State law against a national bank, as authorized by such law, and to seek relief as authorized by such law.

"(2) EXCLUSION.—The powers granted to State attorneys general and State regulators under section 1042 of the Restoring American Financial Stability Act of 2010 shall not apply to any national bank, or any subsidiary thereof, regulated by the Office of the Comptroller of the Currency.

"(k) ENFORCEMENT ACTIONS.—The ability of the Comptroller of the Currency to bring an enforcement action under this title or section 5 of the Federal Trade Commission Act does not preclude any private party from enforcing rights granted under Federal or State law in the courts.".

(b) SAVINGS ASSOCIATIONS.—Section 6 of the Home Owners' Loan Act (as added by this title) is amended by adding at the end the following:

"(c) VISITORIAL POWERS.—The provisions of sections 5136C(j) of the Revised Statutes of the United States shall apply to Federal savings associations, and any subsidiary thereof, to the same extent and in the same manner as if such savings associations, or subsidiaries thereof, were national banks or subsidiaries of national banks, respectively.".

Mr. CORKER. Mr. President, I know we have two side-by-side amendments. I know the Senator from Delaware, Mr. CARPER, has an amendment which, by the way, I hope everyone on my side of the aisle will support. It has to do with Federal preemption. I think it is a good amendment. I do not think it goes far enough.

Let me speak to the differences. First of all, both the Carper amendment and the Corker amendment deal with the fact that if there is a Federal law relating to our banking system, that cannot be preempted, generally speaking, by State law. I think that is a good step in the right direction. Certainly, I commend Senator CARPER for doing that.

It is something that, by the way, our national banks obviously fully support. They want the ability to operate around the country and know that the rules of the road are basically going to be the same. Where the Carper amendment falls short, and my amendment

deals with an issue, is the fact that there are 50 State AGs around the country who, as a result of the Dodd bill, are going to be turned loose on our community banks.

What I mean by that is, the consumer protection agency, as it has been created in the Dodd bill, has no check and balance. It has a very large budget. It is renting space, if you will, at the Federal Reserve. So it has no prudential regulator that is overseeing the rules that it creates.

This consumer protection agency has the ability to write rules with no veto authority against the safety and soundness of financial institutions. Then it has the ability to enforce those rules. A lot of my friends on the other side of the aisle, and certainly people on my side of the aisle, have sought to protect community banks from this consumer protection agency. Let's face it. A big part of that was to build political support for this bill so that community bankers all across our country would rally because they were not necessarily going to be directly under the enforcement of consumer protection.

But the Dodd bill does something else that is very detrimental. That is why they still are very concerned. It allows the 50 State AGs around this country to take actions against credit unions, to take actions against community banks, based on the rules that this consumer protection agency creates.

So here we are, we are going to create an organization that has no real check and balance against the rules that it writes. Then when it writes a rule, an AG in Tennessee or an AG in Alabama or an AG in Delaware or Connecticut can take action against a community bank over these rules.

So it does not matter anymore that this consumer protection agency does not enforce directly against that. Instead, what we have is these AGs all around the country who now will be suing credit unions, suing small banks over rules this Federal agency is creating that has no check and balance against it.

I find that very cumbersome. But to add to that, the Dodd bill adds language called "abusive." In other words, there is a new standard that is going to be created and be the law of the land, a new standard called "abusive" that is very vague. By the way, this "abusive" language comes in after the fact.

So what it means is, if party A and party B enter into a deal and an AG decides that under this abusive standard one party has been aggrieved—this is after the fact—then whatever contract they have entered into, if it was a loan, for instance, which is likely to be the case, that loan is totally done away with. You cannot enforce against it.

I think this is one of the worst attributes of this bill. The fact that community bankers all across this country in some ways may have thought originally that they were not going to get caught up in this consumer protection agency—oh, no, that is not the case.

The fact is, again, 50 AGs around this country—not based on statutes, based on rules—in other words, you know they have the enumerated statutes in this bill under which they can make rules. Then there has been some added in title X—the definition of "abusive," which, again, is very vague, added into this.

But this agency is an agency I believe is going to be very proactive, and I think that is why most people on the other side of the aisle are so excited about this. That is why the White House is very excited about this. They know this is another one of those cases—let no crisis go to waste. We have the opportunity now, because of this crisis, to create this czar, this czar that has no board, and under statutes that are already passed, and some that we are going to pass if this bill passes. This agency can then make rules.

I want to say this one more time. They are going to make rules, and then every AG in the country is going to have the ability, after contracts have been entered into, to say: No, that is abusive, and to basically void those.

This is going to create so much uncertainty out there. Again, to have an organization like this, unfettered, dealing with these types of issues, and then for the first time, for the first time in years, allowing those State AGs to take actions against some of these smaller institutions, I know people in Tennessee—it is not the people on Wall Street. I think we know CitiGroup and Goldman have all come out and said they support this bill.

Why not? The big guys always do better when we create regulations. It is the small guys back in my State who have great concerns. I just want to say, this is one of the most dangerous and problematic attributes of this bill.

So in the name of ensuring that our community banks and credit unions and other small institutions across our country are not abused, are not abused as it relates to this bill, what I hope will happen is that people will not only support the Carper amendment, which does half the job—when you have a bill like this, certainly I support half a loaf of improvement. I hope they will support the Carper amendment, but I hope my friends on the other side of the aisle will join what I believe will be almost everyone on this side of the aisle to ensure that those very people we talk about, talk about back home, do not have advantage taken of them by this consumer protection agency that is unfettered, that is going to write rules, that is going to give the ability to State AGs around this country to take actions against State banks, local banks, but also national banks, to take actions against them based on Federal rules—not just Federal laws, Federal rules.

I will stop. I know my time is about up. This is a very commonsense amendment. I say to my friends on the other side of the aisle: I have offered no messaging amendments, none. I have tried to offer a few commonsense amendments to deal with frailties in this bill that I believe are real. I know there is a lot of stress on the other side of the aisle with everybody trying to hold together. I know the White House and Treasury are over here meeting in backrooms trying to keep people from supporting things that make common sense. I hope others will join with me to ensure that we don't allow this unfettered organization, this czar over consumer protection, to create rules that then put community banks and others at great risk and have the ability to break contracts after the fact based on very vague language that 50 AGs may interpret in very different ways on a case-by-case basis, in whatever mood they are in on that day. I think that is problematic.

I yield the floor.

AMENDMENT NO. 4071 TO AMENDMENT NO. 3739

(Purpose: To address the applicability and preservation of certain State authorities, and for other purposes)

Mr. CARPER. Mr. President, I call up amendment No. 4071.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Delaware [Mr. CARPER], for himself, Mr. BAYH, Mr. JOHNSON, and Mr. WARNER, proposes an amendment numbered 4071 to amendment No. 3739.

(The amendment is printed in today's RECORD under "Text of Amendments.")

Mr. CARPER. Mr. President, I would like to state to the manager of the bill, if I could ask a question of Senator DODD, one of Senator REID's right-hand lieutenants asked me to ask for an additional 5 minutes on both the Corker and Carper amendments. I presume that has been cleared with him.

Mr. DODD. I have no objection.

Mr. CARPER. I ask unanimous consent that both on the Corker amendment and the amendment I have offered, we have an additional 5 minutes for a total of 20 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. CARPER. Mr. President, let me start off by thanking Senator CORKER for all the time and energy he and Courtney and others on his staff have put into this issue, both in committee and as we come to the floor.

Last week, Senator CORKER and I and about 11 other Republicans and a number of Democrats joined to offer the amendment he is offering at this time. When it became clear to me that we were not going to be able to muster the 60 votes to prevail on what was our amendment, we began working with Senator DODD and his staff—I hope we kept our colleagues in the loop, as we went through the negotiations—to come up with legislation that enables us to get a half a loaf. I think we probably got more than half a loaf. Time will tell. History will judge.

I wish to back up a little bit and say what I think the authors of the legislation had in mind in the bill as it came to the floor. The idea is to create a new

unit I call the consumer bureau. Their job is to promulgate the rules and regulations with respect to consumer protections, not only for national banks or State-chartered banks, not just for credit unions or nonbank banks but for all of the above. That is a big part of the job. The job of the new consumer bureau is to promulgate rules and regulations going forward to protect consumers.

Does that entity have an enforcement responsibility as well? Yes, they do. Under the bill as it came to the floor, they would have the obligation for enforcing, among the largest national banks—roughly 100—the rules and regulations with respect to consumer protection which they promulgate.

I like to think of about three or four entities. One is nonbank banks, a second is credit unions, third is State chartered banks, and the fourth is the national banks. Of those four, the one for sure the consumer bureau actually enforces the rules that will be promulgated is with national banks and the largest ones there. Most of the banks we have in this country are State chartered. Under current law and under this legislation, not only would their safety and soundness regulator, the FDIC, be the regulator for consumer protections, but under current law, under the law going forward, State officials can also enter into those frays and again try to undertake actions to protect consumers. That could be done now, and it can be done the way the bill is written.

With respect to nonbank banks, under current law, the FTC has the responsibility going into this endeavor of enforcing consumer protections. They would have the responsibility of enforcing the protections of the rules promulgated by the consumer bureau. There is a good chance that going forward the FTC will also have responsibility for enforcing the consumer protections for the nonbank banks. Credit unions, correct me if I am wrong, I think the responsibility there lies with the NCUA. They are the safety and soundness regulators for credit unions, and they are also the responsible regulator for consumer protection. I am not sure that will change.

What will change is they will have some additional rules and regulations promulgated by the consumer bureau to enforce at least that much. This is where we have gotten into a big debate.

The question is, How about national banks that operate, in some cases, in all 50 States? Who is going to enforce the rules to protect consumers from them?

The way it has worked for years, we followed the guidance of two Supreme Court decisions in this regard. One of them is called Barnett Bank. It has been a part of the case law for about 14 years. The other is called Cuomo v. Clearinghouse. I am not sure why. That is what it is called.

Essentially, the first case law under Barnett attempts to say: We have these national banks. They are actually supervised by the Office of the Comptroller of the Currency. For the most part, States want to come in and exert their own desire and their own will and they can do that, to some extent, under current law. But when they come in and try to exert influence over national banks, if the national banks think the State is out of line, they can go to court and say: No, the State can't do this. This is preempted. This is something that is governed by the Federal Government, by our regulator, the OCC or by this new regulator. If the national banks think that what a State is trying to do, under Barnett Bank, if they think it is out of order, inappropriate, not permitted, it is preempted, they can go to their primary regulator, the OCC. That is what they can do now. If the bank thinks the States are acting in an inappropriate way, inconsistent with the Barnett ruling, the national banks can go to the OCC or they can go into court to have it cleared up. That is current law. That is the Barnett Bank ruling in its simplest form. What we do in this compromise is to retain that language, essentially to retain that language or the spirit therein. Where we make a change with respect to the amendment Senator CORKER offers today and that he and I and others had offered to introduce last week, we make a change with respect to who else can enforce the rules and regulations among national banks that are promulgated by this new consumer bureau.

What we have said is, State officials and the AGs can enforce the rules and regulations of the consumer bureau. They can do that. Can they conduct class action lawsuits against with respect to the rules and regulations? They can't do that. Can they go across State lines? Can the attorney general from Alabama go into Florida and try to enforce the rules across State lines? The AGs can't do that. But what they can do under our compromise is, the State AGs in all 50 States can look at the rules and regulations promulgated by the consumer bureau and enforce those in their own State. For us, that is probably the biggest give with respect to what we introduced last week.

This is a confusing issue. It is arcane. I have tried to explain it to my colleagues with mixed success. I hope I am doing better today on the floor. It is not an easily understood issue.

For me, the question is this: If we are going to have national banks—and we have had them for 150 years—if there are going to be national standards and a tough regulator, let's make sure the consumer bureau has the resources and authority it needs to enforce these rules for national banks. When people say: What is the problem with letting the AGs come in, here is the problem. I like to use Washington, DC, as an example. I live in Delaware. I go back and forth on the train just about every day. Let's say I lived in Maryland, and let's say I worked in Washington, as we do.

Let's say my bank is home chartered in Virginia. Let's say I travel all over the country, and I use ATM machines in many different States. If you have a situation where the States can impose their own laws or rules or regulations with respect to features of banking and checking accounts, with respect to my ATM cards and access to ATM machines, the fees I have for my debit cards, that authority sort of thing, how would you apply those rules and regulations in this one instance, someone who lives in Maryland, works in Washington, their bank is in Virginia, and they access banking services all over the country? That could be confusing, very confusing. It is not only going to be confusing for the banks themselves, as they try to comply with this patchwork quilt of 50 different rules and regulations, in addition to the national rules and regulations. It is going to be confusing for consumers too.

This is not something we are doing simply to make the banks happy. They are not doing handstands over the amendment I am offering as a side-by-side with the previous Carper-Corker amendment.

I am convinced of this: What we are doing is good for consumers, and it is fair for the banks.

Again, to Senator DODD and his staff, I thank them for working with us. I express my thanks to our Republican colleagues who joined us as cosponsors on the amendment last week and those who support us today.

I retain the remainder of my time.

Mr. JOHNSON. Mr. President, it is the goal of all of us in this body to address the inadequacies in bank regulation that led to the crisis, but also preserve the dual banking system. After many conversations with Senator DODD and his staff, I believe we have found the right balance to preserve Federal preemption for national banks but also allow State AG enforcement of the rules where appropriate. I want to thank Senator DODD for working with us to find common ground.

Throughout the committee consideration and the floor process, I have worked to ensure that our efforts to build strong uniform standards through the new Consumer Financial Protection Bureau were not undermined by ending up with a patchwork of different laws for banks and consumers. As our Nation recovers from the economic crisis, it was important to avoid making it difficult for businesses to operate across State lines, and to prevent consumers already struggling with access to credit from losing access to affordable products and services.

I believe the Carper amendment addresses these concerns while also ensuring the State AGs a role. The Carper amendment provides that preemption determinations are made according to a uniform standard, providing certainty to those that offer financial products and those who use the products. It also codifies the Supreme

Court's ruling in the Cuomo case by clearly stating the role State AGs may play in enforcing certain laws against national banks. Last, it also preserves a role for State AGs to ensure that consumers are never again put at risk because Federal regulators are asleep at the switch.

I urge my colleagues to support the Carper-Bayh-Warner-Johnson amendment. This amendment, and the underlying bill creating a new consumer agency, will set strong national standards for consumers, and improve our abilities to detect problems and vastly improve consumer protection.

The PRESIDING OFFICER. The Senator from Alabama.

Mr. SHELBY. Mr. President, I will be brief. I commend both the Senator from Delaware and the Senator from Tennessee for their hard work in this area. This is very arcane. It is difficult, but it is very important. I was hoping we could bake a whole loaf of bread, not a half. One-half is better than nothing—but a whole loaf. What we are doing thus far is Main Street. We are not worried about Wall Street. Wall Street will take care of themselves, as Senator CORKER and others have said on this floor. They always have, always will. But it is Main Street, the smaller banks in our communities, in our towns all across the country. If we could, in the wisdom of the chairman of the committee, if we could move to a whole loaf of bread, that would be commendable. I feel like we are not going to do a whole loaf here today because we don't have the votes. But gosh, a whole loaf is always better than half.

I yield the floor.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. DODD. Mr. President, how much time do I have?

The PRESIDING OFFICER. The Senator from Connecticut has 9 minutes 50 seconds.

Mr. DODD. I will take 5 minutes, if the Chair will advise me.

Mr. President, this is striking a balance. If I were king for a day, I might write a different approach than either the Corker or the Carper amendments. But I am 1 of 100 people in this Chamber. Our goal is to try to find common ground on a very difficult issue. This is a complicated question. It isn't just about Main Street and Wall Street; it is about how we enforce laws, how to make sure we don't overreach and create unnecessary duplication and raise costs. We are trying to balance what should not be necessarily competing goals. One is to have stronger consumer protections. I hope I don't have to make that case again. What got us into this mess to begin with was the lack of consumer protection. It was bad mortgages, no documentation, luring people into deals they could never afford, people making decisions to jump into deals they couldn't handle.

For all those reasons, this problem mushroomed out of a mortgage prob-

lem into a large, now almost global, problem we are confronting. So, clearly, as to consumer protection, we are doing that in this bill. For the first time in the history of our country, we will now have an agency exclusively dedicated to protecting the average consumer in this country when it comes to financial services. We have it for products you buy. We have it for the food you eat. But Lord forbid you end up in potential ruin because of a financial product. Where do you go? There is no recall. There is no place to get that financial product recalled if you are running into problems. So we do that in this bill.

Let me be the first to admit there are people who are vehemently opposed to have anything like a Consumer Financial Protection Bureau anywhere in our government at all, and I know that. My colleagues know that. I understand, from time to time, attempts to try and undermine this in whatever way you can has been a part of this.

The second goal is the one my colleague from Delaware has mentioned: preserving our national banking system, which has been around for 150 years. It is clearly in our interest to do that. So how do we strike this in a way that strikes that balance?

The Carper amendment preserves the States' attorneys general role in protecting their citizens from abusive practices. That is about as Main Street as you can get. As I said, the alternative is to have someone from Washington, I suppose, being able to show up to protect those interests. Why not preserve the right of an attorney general at the State level to protect those interests?

But it also makes clear—the Carper amendment does—that the Office of the Comptroller of the Currency can preempt a State consumer law, while preseving our national banking system. So it strikes that balance, which is so critical.

The Carper amendment does three things: It preserves the State's role in enforcing the Federal consumer financial laws. That is No. 1. Secondly, it returns to the Office of the Comptroller of the Currency the preemption of State consumer financial laws to the 1996 Barnett standard, which is the Supreme Court case, and provides for transparent determination procedures for preemption decisions. Thirdly, the Carper amendment makes clear that the States' attorneys general have the authority to enforce certain laws against national banks in their home States.

That is the balance the Carper amendment provides.

The Corker amendment—if we adopted just the Corker amendment—does two things. One, it completely eliminates the State attorney general from enforcement of the Consumer Financial Protection Act. It eliminates it altogether. I do not think you want that. That does not make sense to me. That is where you get confusion. Secondly,

it would confuse the Federal preemption standard under the Barnett case that the OCC should apply when preempting State consumer laws.

We are trying to get clarity, and we get clarity with the Carper amendment. That is what we are looking for: National banking gets preserved. Yet the attorneys general can enforce the laws rather than relying on something at the national level to do the job.

So I urge my colleagues—and I say this respectfully because BOB CORKER and I have worked together on a lot of issues over the last number of months—on this one, I respectfully suggest it goes too far. That is why I urge Senator CARPER, who has a strong interest in this subject matter, to sit down and see if we could fashion a compromise that would maintain the balance of allowing State AGs to do their jobs when it comes to enforcing the rules under our Consumer Financial Protection Bureau, while preserving the national banking system, where the OCC has the right to preempt. That is what we have done with the Carper amendment. That is the balance that gets struck here. I say respectfully, the adoption of the Corker amendment throws that balance off whack, and that is what I think would be a step backward when it comes to this provision.

So for those reasons, I would urge a ''no'' vote on the Corker amendment and a ''yes'' vote on the Carper amendment, which I think strengthens this bill overall.

With that, I see my colleague from Virginia, who may want to be heard on this amendment as well.

The PRESIDING OFFICER. The Senator from Virginia.

Mr. WARNER. Mr. President, I just wish to briefly add to the discussion and thank both the chairman and Senator CARPER and my good friend Senator CORKER as well. We are breaking new ground. We are creating a new national Consumer Financial Protection Bureau.

I share, I think, actually the goals of both Senator CORKER and Senator CARPER that the bureau ought to have a chance to enforce its rules on an orderly national basis. I know my good friend, Senator CORKER, has a slightly different variation, but I think Senator CARPER's amendment has struck that right balance: ensuring there are opportunities for Federal preemption but, at the same time, recognizing that the balance of the attorneys general role ought to be to focus on the regulations—regulations that it will have had an appropriate period to have been commented on by industry, to have gone through an orderly process, rather than simply what the initial draft would have had, which would have allowed the attorneys general to actually focus on the statute itself, that might have allowed them to run a little more without as many restraints.

So I realize this is a new area. We are trying to strike a balance. I agree with

the chairman that the Carper amendment strikes that right balance, and I look forward to supporting his amendment.

I yield the floor.

The PRESIDING OFFICER. The Senator from Tennessee.

Mr. CORKER. Mr. President, I do hope the Senator from Virginia and the Senator from Delaware will support my amendment, since they both cosponsored it originally. I know Treasury has been over and has had a talk with people back in these backrooms. I realize the White House has done that. While there may be discussions about ''striking the appropriate balance,'' the fact is, this was an amendment that had bipartisan support until that occurred.

Let me just say——

Mr. DODD. Will my colleague yield on that point he made?

Mr. CORKER. OK.

Mr. DODD. There is nothing ''in the backroom'' about this. This is an honest, open discussion about how to deal with preemption. The suggestion my colleague makes about a backroom arrangement is not the case.

The PRESIDING OFFICER. The Senator from Tennessee.

Mr. CORKER. Well, it was these rooms back here.

Mr. DODD. No, it is not a backroom.

Mr. CORKER. OK. Well, these front rooms back here.

Let me just say, if I could: Look, the fact is, we had a bipartisan agreement that has been throttled back. There is a chance—I understand. That is what I am saying. I hope the cosponsors of this amendment will at least support it on the floor. I do not think there has been anything enlightening that has occurred—just the fact that, look, the White House has expressed opposition to this. I understand that, and that is the way things are when the White House is the White House.

But what I would say is, the Senator from Connecticut specifically tried to get support for this consumer protection agency by saying that institutions under $10 billion in assets would not be enforced upon directly by this consumer protection agency. But what has happened as a result of the bill is the fact that now, instead of that, we now have State AGs—they are going to enforce against these very institutions on rules that emanate from these Federal statutes.

So I would say that is a far worse situation for these community banks and credit unions. I know they view that as far worse from that standpoint. Then, on top of that, we have added language that is vague, language such as ''abusive'', where the AG has the ability to come in after the fact and basically break contracts if, in their view, they decide that something may have been abusive. Again, that is a very vague term.

So what I would say to you is that, yes, you are embarking on new territory. You, in essence, are creating a consumer protection agency that has no board. It reports to one person, the President. It has a 5-year term. There is no veto—no veto—authority by the prudential regulators as it relates to the rules. Now you have State AGs all across the country who have the ability to enforce. I think that is a huge step in the wrong direction.

I had hoped earlier—a couple months ago it seemed like we had a place that was far more middle of the road than this, that kept the State AGs in place, that allowed them to do the things with State laws they already have the power to do. But I think this is vastly expansive.

I realize that with the people talking against my amendment who actually supported my amendment in the past, it is very unlikely my amendment is going to pass. I have heard people on my side of the aisle saying: Look, should we support CARPER or not? It is just really not what ought to happen.

I would say to my friends on this side: Yes, support the Senator's efforts. It is better than what exists.

But there is no question in my mind—and let's face it, the issue that has divided this floor more than anything else is the fact that this consumer protection agency has been created the way it has been created. I think this rulemaking authority it has is the issue that has divided most of us. Now, without my amendment passing, again, what happens is, State AGs, interpreting these in different ways all across the country, will now be taking actions against these institutions on vague language such as ''abusive.'' I think that is inappropriate. I guess I have trouble understanding what that has to do with what we have just gone through.

If underwriting is a problem, let's deal with underwriting. We tried to offer language that dealt with loans. That is the core of this crisis. But, no, we do not want to deal with that. We do not want any crisis to go to waste. We want to create another unfettered organization to get into the lives of Americans, to sort of take over, take over and deal with these kinds of things because we do not want any crisis to go to waste.

So maybe the Senator from Connecticut was a little arisen a minute ago by me saying what I am saying. Look, the fact is, the White House is, I see, going to have its way probably. I still hope as many people as possible will vote for the Corker amendment. I certainly support the Carper amendment. I wish we had done a more balanced job on this issue. I think we would have far more bipartisan support.

I thank the Presiding Officer for the time. I wish to withhold the remainder of my time in case there are other comments that are made. But I do hope the people who originally cosponsored my amendment would at least support it on the floor today.

The PRESIDING OFFICER (Mr. KAUFMAN). The Senator from Delaware.

Mr. CARPER. Mr. President, how much time do I have remaining?

The PRESIDING OFFICER. The Senator has 3 minutes 27 seconds.

Mr. CARPER. Mr. President, let me try to be clear on one point, as we come to the close of this discussion.

For States or their national banks, under what is proposed and what would occur under our amendment, if a State AG wants to try to enforce a State law on a national bank, the bank can go in and say to the courts, they can go in and say to the regulator, the Office of the Comptroller of the Currency, that State law is preempted. That cannot be enforced against a national bank.

The question here—and this is a point where I gave on and our side gave on in negotiations—how about if the State AG or State officials want to come in and enforce the rules that have been developed by the new consumer bureau? Under the compromise we have reached, while they cannot come in and enforce their own State laws, or, really, come in and enforce the Federal law we are debating today, the State AG can come in and enforce the rules, which have been worked out over a period of months—draft regulations, proposed regulations, common periods, revised regulations with guidance, and finally adopted regulations with guidance.

In those instances, when the regulations are adopted in their final form—gone through that whole process—then the AGs can come in and not selectively enforce them, but they have the right to enforce those, along with—for big banks, big national banks—the bureau, and if they are not so big national banks, the Office of the Comptroller of the Currency.

That is where I think we have ended up here. I do not think it is a bad compromise. As our colleague from Tennessee and certainly the Presiding Officer and our two floor managers, Senator DODD and Senator SHELBY, know, we have been sent to govern, and sometimes I cannot get what I want. But what we try to do is to be willing to give, and in an orderly fashion we have a final compromise that I think meets muster.

Let me say, as a former Governor—I think there are five former Governors on our original amendment—I do not think anyone can accuse me or any of the other former Governors of not being for States rights. But sometimes we need a strong Federal regulator with strong enforcement authority, particularly when we are dealing with issues of interstate commerce and our national banking system, which we seek to preserve.

In closing, I wish to assure my colleagues that I believe the amendment I offer with a number of my colleagues preserves the ability of States' attorneys general to provide a backstop to the new Consumer Financial Protection Bureau. While the new bureau will be the main enforcer of its new rules, we have preserved the role for the

**S3872**                    CONGRESSIONAL RECORD — SENATE                    *May 18, 2010*

State AGs to ensure that the consumers are not put at risk because Federal regulators are asleep at the switch.

Again, I wish to thank Senator CORKER for all his work on not just this issue but on others to try to get us to a better place.

With that, I believe our time is just about expired.

The PRESIDING OFFICER. The Senator from Tennessee.

Mr. CORKER. Mr. President, how much time do I have remaining?

The PRESIDING OFFICER. There is 4 minutes 10 seconds.

Mr. CORKER. Mr. President, first of all, I thank the Senator from Delaware, who is one of those Senators whom I truly enjoy working with. He truly does try to do responsible things in this body. I thank him for that. I enjoy working with him. I do think the Senator is trying to put an amendment in place that will pass, and I thank him for that.

Again, I think a half a loaf is a half a loaf; it is not a whole loaf. But I hope everybody on my side of the aisle will support the Carper amendment. I hope everybody on this side of the aisle, obviously, will support the Corker amendment.

I do wish to say that the Chamber of Commerce has just sent out a letter. I thought I would make everybody aware they are urging people to vote for both amendments also. As a matter of fact, they are key voting this. This is one of those issues they think is very important. The Chamber of Commerce, as you know, represents all kinds of small businesses across this country that are very concerned about this expansive bill, especially as it relates to consumer protection.

Again, I wish to say one more time, an activist, if it turned out to be—my guess is, it will be; everything else in this administration leads me to believe this is going to be a fairly activist organization, OK—can write rules after the fact—after the fact—declaring a practice abusive.

I don't know how many people think that is good practice, to write a rule after the fact determining that it is abusive—again, a very vague benchmark.

I thank the Presiding Officer for the time. I thank the Senator from Connecticut for the way he has conducted business here on the floor. I certainly wish this was a 50-vote threshold instead of 60, but I realize those things have to take place. I thank him for the way he has conducted himself on the floor. I look forward to both of these amendments being voted on. I urge people on both sides of the aisle to support both amendments, as the Chamber of Commerce has said it does.

Thank you very much. I yield my time.

Mr. DODD. Let me just clarify. No. 1, there is no 60-vote requirement.

Mr. CORKER. Very good. Thank you.

Mr. DODD. No. 2, I know people want to vote for everything around here, but

occasionally we run into conflicts, and there is a conflict between the Corker amendment and Carper amendment, and that is the role of the attorneys general. The Corker amendment excludes the attorneys general from enforcing the regulations of the consumer protection agency. The Carper amendment includes it. With all due respect, I know we would like to vote for all amendments, but somehow we do end up with a conflict. It is a legitimate point. I am not suggesting that my friend from Tennessee doesn't have an argument, but I just think the Carper amendment makes more sense.

So I urge my colleagues, out of respect for each other—I know we like to please each other, but the fact is, we end up with a contradictory conclusion when we are trying to come to some clarity. That is the only point I wish to make.

The PRESIDING OFFICER. The Senator from Tennessee.

Mr. CORKER. If I could, I haven't really noticed that much desire to please each other around here, but I do thank you for the fact that it is a 50-vote threshold. I had been told prior to coming down that it was 60, so thank you for that. But I do hope people will try to please both sides of the aisle by voting for both amendments. Thank you very much.

Mr. DODD. Have the yeas and nays been ordered, Mr. President?

The PRESIDING OFFICER. They have not.

Mr. KYL. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second? There appears to be a sufficient second.

The question is on agreeing to the Corker amendment.

The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Arkansas (Mrs. LINCOLN) and the Senator from Pennsylvania (Mr. SPECTER) are necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 43, nays 55, as follows:

[Rollcall Vote No. 154 Leg.]

YEAS—43

| | | |
|---|---|---|
| Alexander | Crapo | McCain |
| Barrasso | DeMint | McConnell |
| Bayh | Ensign | Murkowski |
| Bennett | Enzi | Nelson (NE) |
| Bond | Graham | Risch |
| Brownback | Grassley | Roberts |
| Bunning | Gregg | Sessions |
| Burr | Hatch | Shelby |
| Byrd | Hutchison | Snowe |
| Chambliss | Inhofe | Thune |
| Coburn | Isakson | Vitter |
| Cochran | Johanns | Voinovich |
| Collins | Kyl | Wicker |
| Corker | LeMieux | |
| Cornyn | Lugar | |

NAYS—55

| | | |
|---|---|---|
| Akaka | Brown (MA) | Casey |
| Baucus | Brown (OH) | Conrad |
| Begich | Burris | Dodd |
| Bennet | Cantwell | Dorgan |
| Bingaman | Cardin | Durbin |
| Boxer | Carper | Feingold |

| | | |
|---|---|---|
| Feinstein | Leahy | Sanders |
| Franken | Levin | Schumer |
| Gillibrand | Lieberman | Shaheen |
| Hagan | McCaskill | Stabenow |
| Harkin | Menendez | Tester |
| Inouye | Merkley | Udall (CO) |
| Johnson | Mikulski | Udall (NM) |
| Kaufman | Murray | Warner |
| Kerry | Nelson (FL) | Webb |
| Klobuchar | Pryor | Whitehouse |
| Kohl | Reed | Wyden |
| Landrieu | Reid | |
| Lautenberg | Rockefeller | |

NOT VOTING—2

| | |
|---|---|
| Lincoln | Specter |

The amendment (No. 4034) was rejected.

Mr. DODD. Mr. President, what is the pending business?

VOTE ON AMENDMENT NO. 4071

The PRESIDING OFFICER. The pending question is the Carper amendment No. 4071.

Mr. DODD. Have the yeas and nays been ordered?

The PRESIDING OFFICER. No, they have not.

Mr. DODD. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The question is on agreeing to the amendment.

The clerk will call the roll.

The bill clerk called the roll.

Mr. DURBIN. I announce that the Senator from Arkansas (Mrs. LINCOLN) and the Senator from Pennsylvania (Mr. SPECTER) are necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 80, nays 18, as follows:

[Rollcall Vote No. 155 Leg.]

YEAS—80

| | | |
|---|---|---|
| Akaka | Crapo | Lieberman |
| Alexander | DeMint | Lugar |
| Barrasso | Dodd | McCain |
| Baucus | Ensign | McConnell |
| Bayh | Enzi | Menendez |
| Begich | Feinstein | Mikulski |
| Bennet | Gillibrand | Murkowski |
| Bennett | Graham | Murray |
| Bingaman | Grassley | Nelson (NE) |
| Bond | Gregg | Nelson (FL) |
| Brown (MA) | Hagan | Pryor |
| Brownback | Hatch | Risch |
| Bunning | Hutchison | Roberts |
| Burr | Inhofe | Schumer |
| Burris | Inouye | Sessions |
| Byrd | Isakson | Shelby |
| Cantwell | Johanns | Snowe |
| Cardin | Johnson | Stabenow |
| Carper | Kaufman | Tester |
| Casey | Kerry | Thune |
| Chambliss | Klobuchar | Udall (CO) |
| Coburn | Kohl | Vitter |
| Cochran | Kyl | Voinovich |
| Collins | Landrieu | Warner |
| Conrad | Lautenberg | Webb |
| Corker | LeMieux | Wicker |
| Cornyn | Levin | |

NAYS—18

| | | |
|---|---|---|
| Boxer | Harkin | Rockefeller |
| Brown (OH) | Leahy | Sanders |
| Dorgan | McCaskill | Shaheen |
| Durbin | Merkley | Udall (NM) |
| Feingold | Reed | Whitehouse |
| Franken | Reid | Wyden |

NOT VOTING—2

| | |
|---|---|
| Lincoln | Specter |

The amendment (No. 4071) was agreed to.

Mr. DODD. Mr. President, I move to reconsider the vote and I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. REID. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant editor of the Daily Digest proceeded to call the roll.

Mrs. HAGAN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mrs. HAGAN. I ask unanimous consent to speak on amendment No. 3744.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mrs. HAGAN. Mr. President, payday lending institutions prey on people who find themselves in need of quick cash often for things like a necessary car repair or a medical problem. The lenders charge astronomical interest rates and expect immediate repayment.

By marketing payday loans as short-term advances, predatory lenders gouge borrowers into a cycle of debt. With repayment due in just days, interest rates that reach 400 percent, and because repayments are due in full, borrowers are often forced to take out new loans to repay the old loan.

The lenders themselves recognize that the loans are not for borrowers who intend to use them repeatedly. For example, one lender notes on its website that, "Since a payday advance is a short-term solution to an immediate need, it is not intended for repeated use in carrying an individual from payday to payday. When an immediate need arises, we're here to help. But a payday advance is not a long-term solution for ongoing budget management. Repeated or frequent use can create serious financial hardship."

But the statistics do not add up. Over 60 percent of payday loans go to borrowers with 12 or more transactions per year and 24 percent of payday loans go to borrowers with 21 or more transactions per year.

This startling statistic illustrates just how devastating this problem can be for families.

Take the story of Sandra Harris from Wilmington, NC. She had a job at Head Start and always paid her bills on time. When her husband lost his job, Sandra got a $200 payday loan to pay the couple's car insurance. When she went to repay the loan, she was told she could renew. Sandra ultimately found herself indebted to six different payday lenders, paid some $8,000 in fees.

Now, the payday lending industry will argue that they provide a valuable service. I would simply point out that, whether or not you believe that to be true, my amendment does not prohibit payday loans.

In fact, it allows up to six payday loans to the same borrower. If your business model relies on your ability to rope borrowers into rolling these loans over again and again, even though you are charging 400 percent per loan, I would have some serious questions about your business model.

By reining in payday lenders, we will protect consumers from racking up endless, long-term debt that can ultimately cause a family to declare bankruptcy.

This amendment protects consumers by ensuring that short-term cash advances remain short-term.

It has three parts to accomplish this goal:

First, it limits rollovers by prohibiting creditors from issuing new payday loans to borrowers with six loans in the previous 12 months or 90 days aggregate indebtedness.

Second, it would require lenders to give borrowers the option to repay their loan over a longer time period. Creditors would need to offer an extended repayment plan for borrowers who are unable to meet repayment obligations.

Finally, the bill gives the Federal Reserve Board the authority to require licensing and bonding of payday lenders.

Leading consumer advocates such as the Center for Responsible Lending strongly support this legislation.

This is a commonsense amendment, it will help protect Main Street borrowers from predatory lenders, and I would urge all of my colleagues to join me in supporting it.

I ask unanimous consent to have printed in the RECORD the following letter of support from Michael Calhoun, the president of the Center for Responsible Lending.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

CENTER FOR RESPONSIBLE LENDING,
*May 4, 2010.*

Hon. KAY HAGAN,
*United States Senator, Dirksen Senate Office Building, Washington, DC.*

DEAR SENATOR HAGAN: We are writing to express our support for your bill, the "Payday Limitation Act of 2010," which would help end the cycle of long-term borrowing that traps so many payday borrowers in high-cost debt.

The payday lending debt trap causes families financial harm, with borrowers more likely to become delinquent on their credit cards, face difficulty in paying other bills, delay medical care, and, ultimately, file for bankruptcy. The average borrower has 9 payday loan transactions each year, typically on a back-to-back basis. This results in borrowers paying more in fees than they are extended in credit.

Your bill would codify the Federal Deposit Insurance Corporation's standard, which prohibits new loans to borrowers who have already been indebted 90 days in a given year, the equivalent of six two-week payday loans. This would ensure that these short-term small loans are used as intended, rather than becoming a long-term financial burden for families already living paycheck-to-paycheck.

If enacted, this legislation would represent a key step forward toward our long-term goal of protecting consumers through a 36 percent annual percentage rate cap on small loans. We commend you on your efforts to reduce the incredible damage caused by this industry to low- and moderate-income families and look forward to working with you to pass this legislation.

Sincerely,

MICHAEL P. CALHOUN,
*President.*

Mr. DURBIN. Would the Senator yield for a question?

Mrs. HAGAN. I will yield to the Senator.

Mr. DURBIN. I wish to thank the Senator from North Carolina for her leadership on this issue involving title loans and payday loans. I know she led the fight in her home State of North Carolina before she came here to the Senate.

I wish to ask the Senator from North Carolina, is it not true we passed a law a few years ago to protect military families from being exploited by these same lenders, arguing that, here we are, investing all this money in training and preparing men and women to serve in our military, and then they are ensnared by these payday loan operations, they find themselves at their wit's end, they cannot make their payments, they are facing bankruptcy, and many of them had to take leave or be discharged from the military because of these miserable payday loan operations? Is it not true we passed a law protecting military families from this kind of predatory lending a few years ago?

Mrs. HAGAN. The Senator from Illinois is certainly correct. I believe, instead of anywhere near a 400-percent rate, there are limitations of 36 percent. The Senator is correct.

Mr. DURBIN. So I further ask, through the Chair, the Senator from North Carolina is saying, if we want to protect military families from this outrageous conduct by these lenders, then should not we protect all American families who might be in similar circumstances, ensnared by these people who will continue to roll these loans over and over to the point where a person cannot possibly pay it off?

Does not the Senator's amendment say there has to be a limit to the number of rollovers on the loans, and is not the limit somewhere in the range of six rollovers, six times rolled over as a maximum?

Mrs. HAGAN. The Senator is exactly right. This amendment allows, if a family does need to have a short-term advance, for a short-term advance, renewable six times. They can have six of them within a 1-year period of time. If at that point they cannot repay it, the institution has to give them a longer repayment schedule.

We are not saying these loans cannot be given. But that recurring debt over and over and over again is what should be stopped by limiting it to six a year.

Mr. DURBIN. I thank the Senator from North Carolina for her leadership. These are truly the bottom feeders of the credit industry in America.

Mrs. HAGAN. Mr. President, I ask unanimous consent that the pending

amendment be laid aside, and that I be allowed to call up amendment No. 3744.

The PRESIDING OFFICER. Is there objection?

Mr. DODD. Mr. President, reserving the right to object, and on behalf of—would the Chair please restate the request.

The PRESIDING OFFICER (Mr. BEGICH.) The Senator seeks permission to call up amendment No. 3744.

Mr. SHELBY. I object.

The PRESIDING OFFICER. Objection is heard.

The Senator from North Carolina.

Mrs. HAGAN. Mr. President, I yield the floor.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. DODD. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. DODD. I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DODD. Mr. President, I am about to make a unanimous consent request, and I will describe what I am going to request first so Members are aware of this.

Senators MERKLEY and LEVIN, along with many others, over the past number of weeks have worked very hard to develop an amendment dealing with proprietary trading; that is, to ban the use of depositors' monies for excessive risk taking on the part of financial institutions.

This is a complicated area, we all admit and acknowledge. It takes a lot of work. The Treasury Department has been involved, and many others in this Chamber, who have had a strong interest in supporting the efforts of Senator MERKLEY and Senator LEVIN, have crafted and worked on this.

We wish to have a vote on that amendment, even, in fact, just a 50 vote, up and down. Over the last 3 or 4 weeks, I have been happy to have more amendments. I think some 40 or 45 amendments have been considered in this Chamber, the overwhelming majority on a simple 50-vote margin. Some have required 60 votes, I acknowledge that. But I am being told that even a 60-vote requirement on this amendment would be objected to. I think that is terribly unfortunate. This is a critical piece of financial reform. To exclude it, or even the ability to vote on it, I think would be wrong.

I ask unanimous consent that the pending amendment be laid aside and that amendment No. 4101 be called up.

The PRESIDING OFFICER. Is there objection?

Mr. SHELBY. Mr. President, although I don't necessarily believe I will vote against the Levin-Merkley amendment, if it is brought up and debated, a number of my colleagues are not here on the floor and have asked me to

lodge an objection. So on their behalf, I object.

The PRESIDING OFFICER. Objection is heard.

The Senator from Connecticut.

Mr. DODD. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. DODD. I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DODD. Mr. President, I ask unanimous consent that the next amendments in order be the following: Grassley-McCaskill amendment No. 4072 and Bingaman amendment No. 3892; that the Bingaman amendment be modified with the changes at the desk; that a Lincoln amendment as a side-by-side to the Bingaman amendment also be in order; and that Senators GRASSLEY and MCCASKILL each be recognized for a period of 5 minutes.

The PRESIDING OFFICER. Is there objection?

Mr. DORGAN. Mr. President, reserving the right to object—and I will not object—I want to ask the Senator from Connecticut if he might add to that unanimous-consent request that following that, amendment No. 4109, which I have filed, be considered at that point.

Let me explain. I had filed an amendment. We have modified it. The amendment, properly filed, as I had modified it, is amendment No. 4109. It is the amendment that deals with the issue of naked credit default swaps. As my colleague knows, I have been here for 2 weeks attempting to get it pending.

I ask that the unanimous consent request be modified to include making amendment 4109 pending following the disposition of the other two amendments.

Mr. DODD. I have no objection to that.

First of all, can we get the first unanimous consent agreed to, to deal with those two amendments; that is, Grassley and Bingaman?

The PRESIDING OFFICER. Is there objection?

Mr. SHELBY. I am OK on the first one.

The PRESIDING OFFICER. If there is no objection to the first part, it is so ordered. There is no objection on the first part.

Is there objection to the request of the Senator from North Dakota?

Mr. DODD. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. DORGAN. I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DORGAN. Mr. President, my understanding is that there is a question now about how to proceed with respect to which amendments might be allowed to be offered by the two sides. It appears to me, at least from my perspective, that some have decided we will only allow amendments we prefer to be allowed and others who have amendments will not be allowed to offer amendments from this point on.

My colleagues know I have been here I guess a couple of weeks with an amendment. It is filed, No. 4109. It deals with trillions and trillions of dollars of what are called naked credit default swaps—one of the significant problems that caused part of the near collapse of our economy. I have been here now attempting to get this amendment pending because if there is a cloture vote tomorrow, those amendments that are not pending will not be allowed to be offered and voted upon. I am attempting to get this pending.

What we have appears to me to be gatekeepers who decide we will only allow these amendments through the gate, and someone else, unnamed, unknown, will decide that we have to have somebody else object for them. So the result is that an amendment such as this—and I assume there are others as well—would not be able to be considered. To have the negotiations between the manager and the ranking member now come together and decide, well, only amendments they will allow us to offer will be offered—if that were the standard, maybe we could go back and I could think of half a dozen or a dozen amendments that we already had offered and had to vote on that probably we should have said: Let's not offer those. Those are inconvenient, uncomfortable. I don't want to vote on that. But we have not done that. None of us have done that.

Now, all of a sudden, we have been told: Someone else wants us to object, so therefore you can't offer your amendment. That is just, in my judgment, not an acceptable way to proceed.

While I guess we are waiting, I encourage somebody, if they wonder whether the amendment I have filed, No. 4109, dealing with naked credit default swaps—if they are wondering whether there is an urgency to this issue, read the book "The Big Short" by Michael Lewis. When you are finished, come back to the floor and ask if you can support this amendment or how quickly you can support this amendment. It is unbelievably necessary to do if, in fact, we are going to finish financial reform and claim we have reformed the financial system.

It is pretty hard for me to understand how we proceed if the point is that someone else has decided exactly which amendments will be tolerable to be considered and those of us who have amendments that are a little more difficult, perhaps a little more aggressive in trying to fix those things, shut the door on the kinds of practices that

Case 1:26-cv-02117-PAE    Document 104-5    Filed 06/01/26    Page 13 of 37

caused the near collapse of the American economy, if our amendments are inconvenient to someone, we are told: You will not have an opportunity to do this. We will just pick other amendments that we think are fine, amendments that don't have quite as much bark or bite to them. We will consider those amendments along the way, and when we get to the end, if your amendment is not considered, that is just tough luck.

It is much more than tough luck, it seems to me, for the American people.

I have a series of charts. I would like to offer the amendment and have it pending. I have previously been here asking unanimous consent. It was objected to. I have spoken earlier on the floor and was told it would be considered.

If I may have the attention of my colleague from Connecticut, we didn't get to that second portion of the previous UC. Let me ask unanimous consent that following whatever other business has previously been agreed to, amendment No. 4109, which I have properly filed, be considered pending and that we would be able to consider amendment No. 4109.

The PRESIDING OFFICER. Is there objection?

Mr. SHELBY. I object.

The PRESIDING OFFICER. Objection is heard.

Mr. DODD. Let me say to my colleague, we have been on this bill now for 3 or 4 weeks. We have considered almost 50 amendments. I have a list of about 49 amendments I sent to the minority several days ago, including amendments offered by Democrats, Republicans, some of them bipartisan amendments, that I would be more than willing to accept. I know the minority is looking at them, and they may accept some and reject others. There is that group of amendments. We have a list of about 20 different amendments here, some of which are, like my friend's from North Dakota, controversial amendments that I would like the opportunity to debate and bring up.

The difficulty of managing from this seat is that, obviously, once consent is given for an amendment to be pending, it takes consent then to lay it aside and move forward. Then we turn over to any one Member of this Chamber the ability to veto virtually all other amendments because it takes unanimous consent by this Chamber to agree to proceed to something else. So what it does is allow one Senator to tie up——

Mr. DORGAN. Will the Senator yield for a question?

Mr. DODD. Certainly.

Mr. DORGAN. Has that happened at this point? I don't know of a circumstance where someone, during debate on this bill, has objected to setting the pending amendment aside. I have seen it happen, but that is not what has happened on this bill.

Mr. DODD. As my colleague knows, I happen to be supportive of trying to get to his amendment, trying to negotiate so we can get his amendment up at this point. There are also other amendments we might be able to clear out of the way before we do that. If we stop everything from moving before we get this matter resolved, of course, it deprives others of having a chance to have an amendment considered. That is the effect of it.

Again, the Senator has the right to do it, obviously, objecting to anything going forward. Any one Senator can do that. My colleague has as much right as anyone else to do it, but there is an effect on a lot of other amendments to that. I certainly would not argue about the Senator's right to do it, but the consequence of it is such that other amendments then do not go forward.

Mr. DORGAN. Mr. President, will the Senator yield for a further question?

Mr. DODD. Yes.

The PRESIDING OFFICER. The Senator from North Dakota has the floor.

Mr. DORGAN. It is not just me. It is my understanding that the Levin-Merkley amendment is in the same position. So it is a circumstance, it appears to me, where someone said: Well, now, it is inconvenient for us to vote on things that are a little bit controversial or have a little more bite to address these issues. Because it is inconvenient, we are going to object, so you are not going to be able to offer those amendments. I do not know how we got to this cliff, but falling off that cliff is not acceptable to me. We have been voting for 2 weeks and people have been able to offer amendments. I voted on amendments I did not want to vote on from the other side. They had a right to offer them, and I voted on them. That is fine.

Was there a moment when we decided, all of a sudden, that the other side will have a veto authority over our ability to offer amendments of any consequence? I do not know when that happened, but that is totally inappropriate, given the couple weeks we have been through here.

Mr. DODD. Again, my colleague has a right to object if he decides to do so. I just explained what the consequences are of that decision. That is all.

The PRESIDING OFFICER. The Senator from North Dakota still has the floor.

Mr. DORGAN. Well, Mr. President, listen, my objective is not to obstruct or to try to slow anything down. My objective is to allow people to offer amendments, especially those who have been here for some long while, to offer amendments that are consequential relative to the issue of financial reform.

If from this day forward, we have decided—or from today forward we have decided that if someone on the other side—who is at this point unknown—is going to object to amendments that are uncomfortable, amendments that I think will strengthen the bill, this is not much of a process anymore. We will, I guess, pick out the amendments that deal with tourism or babies or whatever it is that is uncontroversial to everybody and pass those and then go on to final passage. Those who had other amendments of consequence are told: Someone objected. We are not quite sure who.

So I guess what I can do is say that I will object to having people decide we will only deal with noncontroversial amendments and that those amendments of substantial consequence to this bill are not relevant enough to be considered.

So I wish that were not the case. But I am not going to sit here and say: Yes, go ahead and just pass over these amendments and pick out some amendments you like. If everybody can agree on amendments we like, you can offer them and we will have votes and no one will have concern over it. But if there are amendments that somebody does not like, you are not going to be able to offer them because someone is going to object.

It does not make much sense to me.

The PRESIDING OFFICER. The Senator from Missouri.

Mrs. McCASKILL. Mr. President, is there still a unanimous-consent request pending that the Senator from Connecticut made some while back that there was never an objection heard on?

The PRESIDING OFFICER. That consent request was granted.

Mrs. McCASKILL. OK. So based on that consent request, I would like to talk about amendment No. 4072, the Grassley-McCaskill IG amendment. This amendment is about having a cop on the beat. We have talked a lot about a cop on the beat as it relates to a consumer agency. But in internal workings of these agencies, there are people who are very special in our government who have eyes and ears inside agencies who can find problems, who in fact are our inspectors general.

This amendment will strengthen the independence and the working role of the inspectors general in these agencies that have such an important power over our financial sector. In fact, it was the failure, in some ways, of appropriate oversight that got us into this mess in the first place.

Senator GRASSLEY has been a champion of inspectors general for many years, and since I came to the Senate, I have tried to focus on this because I came here from being a government auditor. For 8 years, I did nothing but government auditing, and I have deep and abiding respect for the professional auditors in our Federal Government who are the watchdogs for taxpayers inside the halls of our government.

This amendment will do a couple of important things.

One, it is going to create a council of inspectors general in the financial sector, the SEC and the CFTC and the FDIC, and they will have to meet four times a year. At that meeting, they are going to have a forced opportunity to compare notes, to talk about the investigations they are doing, to make sure

they are not duplicating each other's work, and, most importantly, to talk about systemic risk and are they getting at it in a collective way. It does not cost anything. It is just smart. That is one part of this amendment.

The other part of the amendment has to do with how these inspectors general are selected. There are different kinds of inspectors general in our government. Some are appointed by the President. Some are appointed by the agencies. I will say that anybody who thinks those appointed by the President are the most independent is wrong. Anybody who thinks those appointed by the agencies is the most independent is wrong.

I believe the independence of inspectors general has everything to do with whether someone is selected who is professional and who is going to be independent of any influence.

Here is my reason for supporting this amendment so fully. It is a bad idea to change right now how these inspectors general are selected. We need continuity right now. We need consistency. What we have done in this amendment is change it so these inspectors general will now report to the entire boards they serve and not to just the head of the agency. That is where you can get the cozy relationship and get into trouble. That is why, in fact, this amendment is needed.

It also requires that two-thirds of these boards will be required to fire an inspector general. So this amendment will, in fact, make sure we have continuity, we have a cop on the beat in terms of these inspectors general right now and going forward, and it strengthens their independence and their ability to work with each other.

I will say we have lots of nominations pending, and the notion that we would decide we need five more nominations pending with, I am afraid, secret holds that might come about—we have one inspector general who has a secret hold now—I certainly do not want the inspectors general for these agencies to be held up with secret holds over the next couple years and us have a lack of continuity and certainty in terms of leadership at these important organizations as we move forward to clean up this mess that has occurred in our financial sector.

So I urge my colleagues to support the Grassley-McCaskill amendment, amendment No. 4072.

I yield the floor.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY. Mr. President, the Senator from Missouri, my friend, has given a very good explanation of this bill. Before I give my version of it, which will be similar to hers, I wish to compliment her because she is in a position of jurisdiction over IGs. She has done a very good job of strengthening these positions in other legislation she has sponsored. So I feel very good to be in the company of the Senator from Missouri on this amendment.

Our amendment would correct serious problems in section 989B of the Dodd-Lincoln substitute. This section of the bill would change the way that five inspectors general are hired and fired.

Currently, these five inspectors general are hired and fired by the agency that they oversee, but section 989B would put the President in charge of hiring and firing them. This provision was included because the sponsors of the legislation believe that making inspectors general Presidentially appointed will make them more independent.

However, rather than strengthening oversight over our financial institutions with more independent watchdogs, section 989B could introduce politics into what have traditionally been career, nonpolitical positions.

Under the Inspector General Act of 1978, there are two types of inspectors general, presidentially appointed IGs and designated Federal entity IGs, DFE IGs. Both types of inspectors general are tasked with hunting down waste, fraud, and abuse at Federal agencies. However, there are some major differences in how they are appointed and removed from office and how they operate.

DFE IGs are appointed by the agency rather than the President. The Inspector General Act created 30 of them, not just the 5 addressed in this bill. The agency-appointed IGs typically run smaller offices than Presidential appointees, often with just a handful of employees. Almost all of them oversee agencies that are headed by a bipartisan board or commission.

By contrast, Presidentially appointed IG's generally run much larger offices and employ dozens or hundreds of employees to oversee Departments such as the Department of Defense, the Department of Justice, Health and Human Services, and so on. They are nominated by the President and confirmed by the Senate. They are subject to removal at any time by the President. However, the President must provide Congress 30 days notice and a written list of reasons for dismissing the inspector general.

Agency-appointed IGs have a similar protection requiring that the agency notify Congress in advance of the reasons for any removal.

The sponsors of section 989B argue that because agency-appointed IGs are hired and fired by the agency they oversee, they might be tempted to pull their punches more than someone who could only be fired by the President. I actually agree that this is a potential problem. However, the solution in this bill misses the mark.

Unfortunately, section 989B only attempts to address this independence issue at five of the 30 agency-appointed IGs. In my view, this fix is too narrow. In addition, it attempts to ensure independence by replacing these five IGs with Presidential appointees.

There is no evidence that Presidential appointees will be more independent than their predecessors. There have been problems in the past with Presidential appointees being too cozy with the agency they are supposed to oversee or pulling punches for political reasons.

There is strong evidence that agency-appointed IGs can be fiercely independent despite the possibility of being removed by the agency head. It all depends on the quality of the appointment.

For example, David Kotz, the Securities Exchange Commission inspector general has exposed the SEC's failures in the Madoff and Stanford cases, and is currently looking into the timing of the government suit against Goldman Sachs. Similarly, the Pension Benefit Guarantee Corporation's, PBGC, inspector general aggressively investigated the former head of the agency, Charles Millard, and has challenged the acting director about providing inaccurate information to Congress. Despite the potential risks of being replaced, these IGs have not been timid about challenging their agencies to improve.

Because of the way section 989B is currently drafted, these IGs could be summarily dismissed soon after the bill is signed into law. Under this provision, each IG could continue to serve but only until the President nominates a replacement. Once the President makes a nomination, the IGs would no longer enjoy legal protections for their independence and would become instant lame ducks. In fact, SEC Inspector General Kotz recently stated that if this provision becomes law it will effectively end some of the ongoing investigations his office has at the SEC.

There is a practical problem with Presidential appointments as well. This administration does not have a great track record in filling vacancies in an expeditious manner. Having no watchdog on duty is a concern for all Americans.

There are over a dozen IG positions where there is a vacancy, an acting, or an interim IG. The administration waited 18 months to appoint an IG at the Federal Housing Finance Agency, which oversees Freddie Mac and Fannie Mae. That is 18 months without strong leadership able to direct audits, investigations or examinations of agency policy. That's 18 months without a cop on the beat. Maybe that is the way the administration likes it. I am sure the bureaucrats at these agencies would enjoy life more without an inspector general asking questions. Imagine if the SEC were not held accountable for their failures in stopping the Madoff or Sanford Ponzi schemes.

This bill would create five lame ducks in the IG community and the potential for more extended vacancies unless we fix it. There would be far less oversight during the lengthy transition process under the current bill with no guarantee of vigorous oversight by the new appointees. Essentially, this provision could politicize the positions that

have historically been filled by career public servants.

I know the goal of this provision is to enhance IG independence, but there are better ways to protect the independence of these IGs than by replacing them with Presidential appointees.

We should do it more effectively and make sure that all agency-appointed IGs are more independent, not just the five singled out in the bill. That is why I am offering this amendment. The Grassley-McCaskill amendment simply applies the same sort of protections that have worked for one of the 30 agency appointed IGs to the other 29 agency-appointed IGs. The Postal Service inspector general enjoys enhanced protections and my amendment would extend those protections more broadly.

Our amendment would strike section 989B of the bill and replace it with a system that will bring true reform, independence, and accountability.

It would make the IGs report to the entire bipartisan board or commission heading their agency, and the IG could only be removed for cause by a ⅔ majority vote of the bipartisan board or commission. This would ensure that should an agency make a political attempt to remove an IG, there would be the possibility of dissent among the board or commission members.

These are serious protections from political interference currently enjoyed by the Postal Service IG, but it also allows an IG to be held accountable when necessary. These same provisions have worked for the Postal Service inspector general and it is time to extend them to all the agency-appointed IGs.

It also holds IG's accountable by requiring that they disclose the results of all their peer reviews in the semi-annual reports to Congress, thereby making them public.

This amendment strikes the right balance, improving both independence and accountability of all DFE–IGs. In fact, even the White House has gone on the record telling the Center for Public Integrity, "the administration does not support in any way politicizing the function of the Inspector General and we have not proposed these changes" in the Dodd-Lincoln substitute.

The amendment is supported by the nonpartisan Project on Government Oversight and has bipartisan support from members on the committee with jurisdiction over the IG Act. This important amendment deserves an up-or-down vote at the appropriate time.

In summary, our amendment would correct serious problems in section 989B of the Dodd-Lincoln substitute. This section of the bill would change the way that five inspectors general are hired and fired. Currently, these five inspectors general are hired and fired by the agency they oversee, but this section of the bill would put the President in charge of hiring and firing them. This provision was included because sponsors of the legislation believed that making inspectors general

presidentially appointed would make them more independent.

However, rather than strengthening oversight over our financial institutions with more independent watchdogs, this section could introduce politics into what has traditionally been career, nonpolitical positions. It is important to ensure that this bill does not then hurt the oversight of these designated Federal regulatory agencies by the inspectors general.

I think our amendment corrects the potential to create long-term vacancies at five important regulatory agencies that, quite frankly, cannot afford to have these sorts of vacancies and not have the proper oversight.

The amendment provides true transparency, and with transparency you get accountability among inspectors general. We are going to bring about real independence—or maybe it would be better for me to say maintain the independence these folks have shown already.

We should take steps to make all agency-appointed IGs more independent, not just the five addressed in the bill. These five should not be singled out. The amendment before us makes the IGs report to the entire bipartisan board or commission heading their agency and requires a two-thirds vote to remove an inspector general.

I will not speak about the peer review Senator MCCASKILL has already spoken about. But I think it is important we have semiannual reports to Congress on the effectiveness of the people in their various positions. By reporting to the entire bipartisan board or commission rather than just the chairs, these IGs will be further insulated from political influence. As a consequence, they will be more independent. So in the final analysis, I think this brings the right balance to the independence of it.

As I said, this amendment is supported by the nonpartisan Project On Government Oversight. Because it comes from another committee of jurisdiction, I am glad that through Senator MCCASKILL and other people on the committee, we have bipartisan support from the committee of jurisdiction.

This is an important amendment and deserves an up-or-down vote at the appropriate time.

I yield the floor.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. DODD. Mr. President, first, let me commend my colleagues from Iowa and Missouri for raising an issue of this importance. Senator MENENDEZ of our committee, the Senator from New Jersey, has an interest in the subject matter, I explain to my good friends and colleagues from Iowa and Missouri, and he may want to be heard on this amendment.

I understand the purpose and the intent, and in many respects I agree with my colleagues from Iowa and Missouri. But in fairness to my colleague from

New Jersey, I wish to give him a chance to respond, as a member of our Banking Committee. So if we could just pause for a few minutes and give him an opportunity to come to the floor and say why he believes the existing language in the bill has merit, I would appreciate that.

So I wish to suggest the absence of a quorum and give him a chance to come on over and make his case. Then, hopefully, we can get to a vote. In the meantime, I do not know if Senator BINGAMAN is here or others are here who would like to be heard on the Bingaman amendment and the side-by-side I think being offered as well. That would certainly be a useful use of the time. People could go and discuss that particular proposition while we are waiting to hear from Senator MENENDEZ.

So I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant bill clerk proceeded to call the roll.

Mr. DORGAN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DORGAN. Mr. President, I am going to speak for a few moments about the amendment I just referenced, amendment No. 4109, which was filed and to which there has now been an objection. As I have indicated to my colleague, objections run both ways. I could sit here and object as well to most things that are going to go on here, if we have a gatekeeper or several gatekeepers who decide that two amendments that would get a little tougher on Wall Street are amendments they don't want to vote on; if they don't want to countenance an amendment that would tighten the strings just a little bit.

Let me speak about what this amendment is because it sounds like a foreign language, "naked credit default swaps." "Credit default swaps" by itself sounds like a foreign language. The reason is they haven't been around all that long. This is an exotic financial instrument that was created to allow certain things to happen on Wall Street between banks and big hedge funds and so on. If we have not yet at this point understood the danger of this unbelievable orgy of speculation in credit default swaps—and especially what are called naked credit default swaps—then I guess we are destined to never fully understand what happened, and that is fine. Maybe some people don't want to know what happened.

A naked credit default swap is pretty simple. Someone out there needs some money, so they issue bonds. Someone else buys the bonds. Now they hold the bonds and the person who issued them has the money. The person who bought the bonds wants to make sure the person who issued the bonds won't default, so they want to buy an insurance policy from someone else, a credit default

swap. So for a small amount of money, they buy an insurance policy against the bonds defaulting. It is a relatively recent phenomenon where all of this has been created.

Normally speaking, if someone issued bonds, the other people bought the bonds and they did due diligence on the other side to decide if this is a good risk, and that is the way it worked. Now they buy insurance called credit default swaps.

The difficulty is credit default swaps are now called naked credit default swaps if, in fact, they have no insurable interest at all. That is a credit default swap that bets that someone who issued bonds is going to default, despite the fact that neither party to this transaction ever has purchased any of those bonds. They don't have an insurable interest in the bonds; they just made a bet. They have said: We have not bought those bonds over there. But those bonds were issued, and we would like to make a wager. We think those bonds are probably going to default. Someone else says: I don't think they will. So you have a naked credit default swap with no insurable interest in anything.

Why is that troublesome? Well, I can't buy fire insurance on the house of the Presiding Officer in Alaska. Why would they not allow me to buy fire insurance on his house? Because I don't have an interest in his house, and they don't want about 10 or 15 people having a fire insurance policy on his house. The only way you can get fire insurance is if you have an insurable interest. I can't buy a life insurance policy on someone else's life because I don't have an insurable interest.

Those are rules most of us understand. You can't buy fire insurance against somebody else's house; you can't buy a life insurance policy against somebody else's life. But Wall Street has discovered there is a new way to allow someone to buy insurance policies or speculate in certain kinds of insurance without ever having an interest; that is, allowing two parties to speculate on whether a third party might default on a bond issue they placed with a fourth party, despite the fact that the first two parties have no interest in that at all. It is just as if they went to Las Vegas and one bet on red and the other bet against red on the roulette wheel. It is just a flatout bet. It is not an investment; it is just a bet.

Let me talk about how prevalent this is, just because I think it is important. There was about $10.9 trillion in naked credit default swaps held by commercial banks in the fourth quarter of last year; $10.9 trillion held by commercial banks. Those are institutions, by the way, whose deposits are insured by us, by the American taxpayer, by the FDIC. Up to $19.9 trillion of naked credit default swaps are held by the top 25 holding companies.

It is estimated by one expert that as much as 80 percent of the credit default swap market is traded by firms that don't own the underlying debt. There is also a United Kingdom report shared by the Congressional Research Service that says only 20 percent of the credit default swaps are estimated to be covered. That means 80 percent of all of this paper that is put out there in credit default swaps is so-called naked. It has no insurable interest. It is a bet rather than an investment.

Let me just show what some of the experts are saying about this. One of the editors of the Financial Times says: I can't understand why we are still allowing the trade in credit default swaps—he meant naked swaps—without ownership of the underlying securities. A generalized ban on so-called naked CDS's should be a no-brainer.

It ought to be a no-brainer. It is not a no-brainer in this Chamber, apparently. A naked CDS purchase means someone takes out insurance on bonds without actually owning them. It is a purely speculative gamble. There is not one social or economic benefit.

My amendment is trying to shut this down, but I am being blocked by those who don't want us to get tough on Wall Street.

Charlie Munger, who is the partner of Warren Buffett and who has spoken a lot about these issues, said:

If I were the governor of the world I would eliminate credit default swaps entirely, 100 percent. That's the best solution. It isn't as though the economic world didn't function quite well without it and it isn't as though what has happened has been so wonderfully desirable that we should logically want more of it.

Do we need to go to the edge of a cliff again with this economy, with tens of trillions of dollars of notional value of credit default swaps before we decide this is a problem for our country and for our future?

Again, the associated editor of the Financial Times:

Another argument I have heard from a lobbyist is that naked CDS's allow investors to hedge more effectively. That is like saying that a bank robbery brings benefits to the robber.

Well, I guess so.

George Soros, a pretty good investor I might say, made $3 billion last year, I am told in the reports:

CDS's are toxic instruments whose use ought to be strictly regulated: Only those who own the underlying bonds ought to be allowed to buy them.

Well, those are a few thoughts from some people of consequence: editor of the Financial Times, Charlie Munger; George Soros; and others. But it describes a very significant problem. It describes, in my judgment, a fairly large portion of what caused this country's economy to teeter on the edge of a cliff.

The Treasury Secretary one day comes and leans across a lectern on a Friday and says to us: You need to ante up $700 billion and pass a three-page bill in 3 days or the economy might collapse. Now, a year and a half has passed, a little more, and some, I think, have too quickly forgotten the lessons.

So the question is, Are we going to do something about naked credit default swaps, about the unbelievable orgy of speculation, the bubble of speculation that exists to the tune of tens of trillions of dollars?

Let me read it again:

Up to $10.9 trillion in naked credit default swaps were held by commercial banks in this country in the fourth quarter of 2009.

I am talking about up to $10.9 trillion of naked credit default swaps in the bowels of commercial banks. These are institutions that we guarantee, we underwrite.

I don't understand at all the notion that we should be prevented from addressing this issue. It may be that we have people here willing to shake the pompoms and be cheerleaders for naked credit default swaps. Good for you, if that is the way you feel. It is just you have missed a significant chapter of American financial history. But if you feel that way, vote against my legislation. My legislation would ban the use of naked credit default swaps.

After the phase-in period, they are gone. If you don't have an insurable interest, they are gone. It is a simple enough proposition to say: Why should we have 5 or 10 times the number of insurance policies against bonds than there are bonds to insure? Why should we allow that? We don't allow it in other circumstances.

I understand the offering of this amendment and the shutting down of naked credit default swaps will cost Wall Street a substantial amount of money. They will not get fees on these things. I understand that. This is all about churning and getting fees and making a lot of money. I understand all that. I also understand sometimes this notion of making a lot of money in a short period of time by cutting corners and by doing things that aren't appropriate is the wrong thing.

My colleagues know and I know that we saw banks being robbed in this country. Yes, we saw banks being robbed in the last several years. In the old days, when I used to watch the western movies, you could tell who the bank robber was. They usually had a bandana, they brandished a couple of six-guns. Often they stopped a train or they ran into a bank, and that is the way they robbed things.

In the last several years, there have been some bank robberies going on in this country, and I can refer you to a lot of contemporary writing that describes the way those banks were robbed. Two people driving home from work, each making $20 million, one supervising the other in one of the biggest investment banks, loading that bank up with unbelievably risky investments because they know at the end of the day, somebody is going to lean over a lectern and say: Oh, by the way, we need to bail all these folks out.

The folks who went to the basement of the Securities and Exchange Commission, I believe, in the year 2004—

said: We need you to allow us, the biggest investment banks in the country, to extend our leverage from 12 times to 30 times and more. You need to give us the opportunity to free up some money by exacerbating the leverage capabilities we have. The Securities and Exchange Commission, ever the compliant regulatory agency, said: Yes, sir—saluting handily in the basement of their building—absolutely, go right ahead.

By the way, one of those companies was run by Mr. Paulson who, 2 years later, came back as Treasury Secretary and leaned across the lectern and said: I need $700 billion to bail out these companies.

What was part and parcel of that which caused these companies to almost ruin this economy? Naked credit default swaps, just flatout gaming. Not investing, just betting. The question is, Do we want to continue to do that?

I fear we are going to pass a piece of legislation that does not address too big to fail. At the end of the day, we will have institutions that are still too big to fail. I have an amendment on that, but I haven't bothered because we already did one amendment on too big to fail, the Brown-Kaufman amendment. That got 33 votes, too big to fail. Banning these unbelievable speculative instruments like naked credit default swaps, if we can't do that, it is very hard, it seems to me, to climb on the high step and say we have taken on this subject. We have really made sure this isn't going to happen again. So I have an amendment that is filed, and now I am told that, no; it is inconvenient and uncomfortable for me to offer this amendment and, therefore, someone has objected.

To my colleague from Alabama, I would say I understand. He is required—when people in the caucus say there is an objection, his job is to reflect the objection of someone in his caucus. So my beef is not with him. But I would just say that it is not acceptable to me to, at 5 o'clock on Tuesday, have a process by which we have now decided that if amendments are inconvenient—getting a little too tough on Wall Street; trying to draw the strings a little tighter on things that have to be fixed in this bill—if that is the case, well, then, you know what. We are not going to allow those things to be offered. We will just sit here and offer amendments on tourism or something else equally benign.

If that is the case, then I will just sit here as well and say that is not a process I respect. It seems to me we ought to have the right to bring to this Chamber at this point, given the shadow of what we have been through as a country, the right to bring amendments to this bill that try to address some very significant problems; the right to bring them to the floor, to have a debate, and to offer them for a vote. If that is not going to be the case, then I am going to sit here and object to proceeding until it is the case.

So my colleague, Senator BINGAMAN, I know is here. I have more to say, but I will save it because I fully expect either to get to this amendment or to be sitting here for some long while, and I will have an opportunity again to talk about naked credit default swaps, their danger to this economy, and why, when this bill is done, it ought to include the provisions of amendment No. 4109 which bans the use of naked credit default swaps and says there is a place to gamble in America and it is not in a bank lobby.

If you want to put a Keno table or a blackjack table in a bank lobby, shame on you. We ought to pass this amendment, and, most importantly, we ought to allow amendments to be offered. I will sit here until that is the case.

I yield the floor.

The PRESIDING OFFICER. The Senator from New Mexico is recognized.

### AMENDMENT NO. 3892, AS MODIFIED, TO AMENDMENT NO. 3739

Mr. BINGAMAN. Madam President, I call up amendment No. 3892, as modified, for consideration.

The PRESIDING OFFICER (Mrs. HAGAN). The clerk will report.

The legislative clerk read as follows:

The Senator from New Mexico [Mr. BINGAMAN], for himself, Ms. MURKOWSKI, Mr. REID, Mr. BROWNBACK, Ms. CANTWELL, Mr. CORNYN, Mr. WYDEN, Mr. CORKER, Mr. INOUYE, Mrs. MURRAY, and Mrs. SHAHEEN, proposes an amendment numbered 3892 to amendment No. 3739.

Mr. BINGAMAN. Madam President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To preserve the authority of the Federal Energy Regulatory Commission to ensure just and reasonable electric and natural gas rates and to protect the public interest)

On page 565, between lines 2 and 3, insert the following:

(e) JUST AND REASONABLE RATES.—Section 2(a)(1)(C) of the Commodity Exchange Act (7 U.S.C. 2(a)(1)(C)) (as amended by section 717(a)) is amended by adding at the end the following:

"(vi) Notwithstanding the exclusive jurisdiction of the Commission with respect to accounts, agreements, and transactions involving swaps or contracts of sale of a commodity for future delivery under this Act, no provision of this Act shall be construed—

"(I) to supersede or limit the authority of the Federal Energy Regulatory Commission under the Federal Power Act (16 U.S.C. 791a et seq.) or the Natural Gas Act (15 U.S.C. 717 et seq.);

"(II) to restrict the Federal Energy Regulatory Commission from carrying out the duties and responsibilities of the Federal Energy Regulatory Commission to ensure just and reasonable rates and protect the public interest under the Acts described in subclause (I); or

"(III) to supersede or limit the authority of a State regulatory authority (as defined in section 3(21) of the Federal Power Act (16 U.S.C. 796(21)) that has jurisdiction to regulate rates and charges for the sale of electric energy within the State, or restrict that State regulatory authority from carrying out the duties and responsibilities of the State regulatory authority pursuant to the jurisdiction of the State regulatory authority to regulate rates and charges for the transmission or sale of electric energy.".

(f) PUBLIC INTEREST WAIVER.—Section 4(c) of the Commodity Exchange Act (7 U.S.C. 6(c)) (as amended by section 721(d)) is amended by adding at the end the following:

"(6) If the Commission determines that the exemption would be consistent with the public interest and the purposes of this Act, the Commission shall, in accordance with paragraphs (1) and (2), exempt from the requirements of this Act an agreement, contract, or transaction that is entered into—

"(A) pursuant to a tariff or rate schedule approved or permitted to take effect by the Federal Energy Regulatory Commission;

"(B) pursuant to a tariff or rate schedule establishing rates or charges for, or protocols governing, the sale of electric energy approved or permitted to take effect by the regulatory authority of the State or municipality having jurisdiction to regulate rates and charges for the sale of electric energy within the State or municipality; or

"(C) between entities described in section 201(f) of the Federal Power Act (16 U.S.C. 824(f)).".

Mr. BINGAMAN. Madam President, the amendment that is before the Senate, No. 3892, as modified, is one I talked about at length a week ago last Friday, so it has now been about 11 days ago. I will summarize it again and make some comments about some of the things that have happened since then.

First, let me ask unanimous consent to add Senators SHAHEEN, MURRAY, and INOUYE as cosponsors.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BINGAMAN. Madam President, with the addition of those three Senators, the other cosponsors on the amendment are Senators MURKOWSKI, REID from Nevada, BROWNBACK, CANTWELL, WYDEN, CORNYN, and CORKER.

The amendment preserves the existing authority of the Federal Energy Regulatory Commission and the authority of the States to be sure that electricity and natural gas rates are just and reasonable, while at the same time leaving the Commodity Futures Trading Commission its full authority to police derivatives and futures markets.

First, I applaud the good work Senator DODD and Senator SHELBY have done on this bill. I particularly applaud the provisions that have come from Senators LINCOLN and CHAMBLISS and the Agriculture Committee in setting up a system to get control of derivatives markets.

I am, however, concerned that without this amendment, the law could be interpreted to allow the Commodity Futures Trading Commission to override the jurisdiction the Congress has given to the FERC and that the new provisions included here could make this problem worse.

There is probably not a sector of the economy that is more tightly regulated than the electricity industry. The natural gas industry is not far behind for a claim to that title. FERC regulates wholesale rates and transportation in

interstate commerce for both electricity and gas and must approve mergers of utilities. FERC also has authority to police the manipulation of electricity and gas markets, granted by the Congress in 2005 as a response to Enron's manipulation of electricity markets in the West. The States have that same authority for retail sales both with regard to electricity and natural gas. There are tight rules for transactions among affiliates of holding companies in these industries. There are extensive transparency and reporting requirements for contracts and transactions. This is all intended to be sure that the customers of utilities are getting what they are paying for and that they are paying rates that, in fact, are just and reasonable.

The concern has been that the exclusive jurisdiction of the CFTC under the Commodities Exchange Act could be interpreted to supersede the regulation by FERC of important aspects of these industries.

The amendment I am offering with my cosponsors is a proposed solution that I believe is consistent with the philosophy of consumer protection that underlies other parts of the bill we are considering. The effect is simple. This amendment preserves the authority of both the Federal Energy Regulatory Commission and the individual States to ensure that electricity and natural gas rates are just and reasonable, and in the case of FERC, to prevent market manipulation that could affect prices.

Direct examination of prices is central to each agency's mission. In FERC's case, this authority is longstanding; it was established over 70 years ago. Without this amendment, a critical check on energy prices could be lost, and this is so for two obvious reasons: First, the CFTC's so-called "exclusive jurisdiction" could be interpreted to operate to prevent FERC and State public utility commissions from acting, where their jurisdictions intersect the CFTC's jurisdiction. Second, the CFTC's regulatory mission differs significantly from that of the FERC and the State public utility commissions. The Commodity Futures Trading Commission's mission is to protect market participants and promote fair and orderly trading. It doesn't directly examine commodity prices in its markets, nor does it consider the reasonableness of rates. While properly functioning futures markets are important, the CFTC cannot duplicate the direct ratepayer protections provided by the FERC and by the State public utility commissions.

There are some things this amendment does not do that it has been charged with doing. First, it doesn't give FERC jurisdiction over futures, swaps, or options. FERC has jurisdiction over rates for the sale of electricity and gas and contracts that are associated with those sales. Derivatives that are related are still jurisdictional to the Commodity Futures Trading Commission. Nothing changes in

that regard. We are merely preserving that authority that the Federal Power Act and the Natural Gas Act gave to FERC decades ago and in the Energy Policy Act of 2005. Second, the amendment doesn't give FERC jurisdiction over NYMEX or ICE or any other futures exchanges. They are not public utilities. They do not sell electricity or natural gas.

As I have said, I support this bill generally. I believe it is essential in ensuring that consumers are protected. However, both I and my cosponsors strongly believe it is necessary to preserve enduring consumer protections that might otherwise be lost.

It is a simple, tailored amendment that doesn't create any loopholes in jurisdiction. It also does nothing to diminish the ability of the CFTC to regulate commodity exchanges such as NYMEX or to require public disclosure of swaps or any other public authority they have to regulate the mechanics of commodity markets, including those who trade energy commodities.

We have received letters of support for this amendment from the National Association of Regulatory Utility Commissioners, the FERC, utility industry companies and associations, including Edison Electric Institute, the American Public Power Association, the American Public Gas Association, the Electric Power Supply Association, the American Wind Energy Association, the California Independent System Operator, the American Gas Association, the Large Public Power Council, the Natural Gas Supply Association, Compete, and PJM Interconnection.

I ask unanimous consent to have printed in the RECORD the letters of support I have referred to following my statement.

The PRESIDING OFFICER. Without objection, it is so ordered.

(See exhibit 1.)

Mr. BINGAMAN. Mr. President, I have also been informed that the administration supports this amendment. I advise my colleagues that is the case as well.

Once again, I thank my cosponsors and urge my colleagues to support the amendment. I gather that a time will be found during our deliberations of the bill to consider the amendment.

With that, I yield the floor.

MAY 11, 2010.

Hon. HARRY REID,
*Majority Leader, U.S. Senate,*
*Washington, DC.*
Hon. JEFF BINGAMAN,
*Chairman, Committee on Energy and Natural Resources, U.S. Senate, Washington, DC.*
Hon. LISA MURKOWSKI,
*Ranking Member, Committee on Energy and Natural Resources, U.S. Senate, Washington, DC.*

DEAR LEADER REID, CHAIRMAN BINGAMAN AND RANKING MEMBER MURKOWSKI: We are writing in support of your amendment to S. 3217, the Restoring American Financial Stability Act, which would preserve the authority of the Federal Energy Regulatory Commission (FERC) and the states to ensure just and reasonable rates for electricity and natural gas consumers. The undersigned asso-

ciations represent most of the electricity and natural gas consumers in the United States.

FERC and the states already regulate transactions, products, services and agreements in wholesale and retail electricity and natural gas markets, respectively. In addition, FERC regulates regional transmission organizations (RTOs) and independent system operators (ISOs), which are responsible for the planning and operation of the transmission grid in many areas of the country. There is no regulatory gap that needs to be filled with respect to the transactions, agreements, contracts, products and services that regulated energy companies provide.

The underlying derivatives language in the Senate financial reform bill could cause the Commodity Futures Trading Commission to assert jurisdiction to regulate products offered in wholesale electricity markets, such as financial transmission rights (FTRs), which are used to manage the cost of transmission congestion. This could affect the ability of our member companies and utilities to have continued access to FTRs and other products on reasonable terms and conditions, which is essential to their ability to reliably serve their retail consumers at reasonable rates and with less price volatility.

We thank you and the other co-sponsors of this amendment for recognizing and addressing this issue. While a more clear delineation of FERC's authority would be helpful, we believe this amendment is a significant step in the right direction, and we look forward to passage of the amendment and continuing dialogue on this issue as financial regulatory reform legislation moves forward in Congress.

Sincerely,

American Gas Association; American Public Power Association; American Wind Energy Association; California ISO; COMPETE; Edison Electric Institute; Electric Power Supply Association; Large Public Power Council; Natural Gas Supply Association; PJM Interconnection, L.L.C.

---

FEDERAL ENERGY REGULATORY COMMISSION, OFFICE OF THE CHAIRMAN,
*Washington, DC, May 12, 2010.*
Hon. JEFF BINGAMAN,
*Chairman, Committee on Energy and Natural Resources, U.S. Senate, Washington, DC.*
Hon. LISA MURKOWSKI,
*Ranking Member, Committee on Energy and Natural Resources, U.S. Senate, Washington, DC.*

DEAR CHAIRMAN BINGAMAN AND RANKING MEMBER MURKOWSKI: I write in support of your bipartisan amendment No. 3892 to amendment No. 3739 to. S. 3217, the financial regulatory reform legislation currently being debated by the Senate.

Your amendment preserves existing Federal Energy Regulatory Commission (FERC) authority to protect energy consumers from rate increases and in no way allows FERC to supersede the regulatory jurisdiction of the Commodity Futures Trading Commission (CFTC) with respect to the markets or instruments the CFTC now regulates, especially futures markets. Any suggestion to the contrary flies in the face of the plain language of your amendment.

As you know, FERC is the only federal agency charged with regulating physical electricity and natural gas markets for "just and reasonable rates". But the broad jurisdiction the underlying legislation grants to the CFTC over "swaps" could undermine FERC's ability to regulate the electricity and natural gas markets and thus lead to increased costs to consumers, because CFTC has no ratemaking authority. Your amendment rightly maintains FERC's ratemaking

authority within the physical electricity and natural gas markets while preserving CFTC's role to ensure that the futures markets operate in a fair and orderly manner.

FERC also has an obligation to police the physical electricity and natural gas markets for fraud and manipulation and punish any wrongdoing. In the aftermath of the California energy crisis and the schemes perpetrated by Enron and others, Congress gave FERC under EPAct 2005 more robust authorities to prevent fraud and market manipulation by allowing a penalty of up to $1 million per violation per day. In Fiscal Year 2009, FERC's policing efforts yielded approximately $38.3 million in civil penalties and recovered $38.7 million in ill-gotten gains. We are concerned that the underlying bill could inadvertently undermine those authorities, but your amendment will preserve them.

Finally, I note that the American Gas Association, the American Public Power Association, the American Wind Energy Association, the Edison Electric Institute, the Electric Power Supply Association, the Large Public Power Council, the National Association of Regulatory Utility Commissioners, the Natural Gas Supply Association, California ISO, PJM Interconnection, L.L.C., and COMPETE support your amendment.

Sincerely,

JON WELLINGHOFF,
*Chairman.*

---

NATIONAL ASSOCIATION OF
REGULATORY UTILITY COMMISSIONERS,
*May 10, 2010.*

Re Bingaman, Murkowski, Reid Amendment to the "Restoring American Financial Stability Act" (S. 3217).

Hon. JEFF BINGAMAN,
*Chairman, Committee on Energy & Nat. Resources, U.S. Senate.*
Hon. LISA MURKOWSKI,
*Ranking Member, Committee on Energy & Nat. Resources, U.S. Senate.*
Hon. HARRY REID,
*Majority Leader,*
*U.S. Senate.*

DEAR CHAIRMAN BINGAMAN, RANKING MEMBER MURKOWSKI, AND MAJORITY LEADER REID: On behalf of the National Association of Regulatory Utility Commissioners (NARUC), I write to you today to express NARUC's strong support for your amendment to the "Restoring American Financial Stability Act" (S. 3217) addressing federal and State electric and gas utility rate jurisdiction. Your Amendment correctly confirms State and federal regulatory authority to ensure that retail and wholesale energy consumers pay just and reasonable rates for utility service.

The FERC and the States are the regulatory agencies with the necessary expertise and statutory mandates to oversee electricity and natural gas markets to protect the public interest and consumers. S. 3217 should not preempt FERC and the States from continuing to exercise their authority under existing law to ensure consumers pay just and reasonable rates for reliable utility service. These markets that are already regulated by FERC and the States under accepted tariffs or rate schedules should remain subject to this existing regulation, which includes jurisdiction over physical and financial transmission rights and market oversight.

NARUC thanks you and your colleagues for offering this important amendment. By continuing FERC and State authority, under S. 3217, to oversee any agreement, contract, transaction, product, market mechanism or service offered or provided pursuant to a tariff or rate schedule filed and accepted by the FERC and/or the States, we believe this amendment ensures that the consumers and the public interest will be protected.

Sincerely,

CHARLES D. GRAY,
*Executive Director.*

---

AMERICAN FARM BUREAU FEDERATION,
*Washington, DC, May 14, 2010.*

DEAR SENATOR: On May 13, the American Farm Bureau Federation (AFBF) wrote you in opposition to Senate Amendment #3892 to be offered by Senator Jeff Bingaman (D–N.M.) to S. 3217, the Senate financial markets reform package. Sen. Bingaman has modified the amendment since that time and we wish to notify you that we can now support it.

The amendment acknowledges and protects continued Federal Energy Regulatory Commission (FERC) jurisdiction over physical natural gas and electricity transactions. In addition, the amendment acknowledges continued Commodity Futures Trading Commission (CFTC) jurisdiction over energy futures and options contracts traded on CFTC-regulated exchanges. The CFTC has long had regulatory authority over exchange-traded futures and options transactions, and this has worked well to maintain the price discovery function of these markets.

Finally, the amendment provides that the new CFTC jurisdiction over "swaps" (contained in S. 3217) does not change this status quo allocation of jurisdiction between FERC and the CFTC. Rather, the amendment now sets forth an expedited and cooperative exemption process to allow both regulatory agencies to fulfill their obligations to the American public.

We appreciate your work on this important legislation.

Sincerely,

BOB STALLMAN,
*President.*

Mr. BINGAMAN. Madam President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. GRASSLEY. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT NO. 4072 TO AMENDMENT NO. 3739

Mr. GRASSLEY. Madam President, I ask unanimous consent to set aside the pending amendment for the purpose of calling up amendment No. 4072.

The PRESIDING OFFICER. The clerk will report the amendment.

The Senator from North Dakota.

Mr. DORGAN. Madam President, I object.

The PRESIDING OFFICER. The Senator has the right to call up his amendment under the previous order.

The clerk will report the amendment.

The assistant editor of the Dailey Digest read as follows:

The Senator from Iowa [Mr. GRASSLEY] proposes an amendment numbered 4072 to amendment No. 3739.

Mr. GRASSLEY. Madam President, I ask unanimous consent to waive the reading of the amendment in the whole.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To provide for the independence of Inspecters General of certain designated Federal entitites, and for other purposes)

Strike 989B, insert the following:

SEC. 989B. DESIGNATED FEDERAL ENTITY INSPECTORS GENERAL INDEPENDENCE.

Section 8G of the Inspector General Act of 1978 (5 U.S.C. App.) is amended—

(1) in subsection (a)(4)—

(A) in the matter preceding subparagraph (A), by inserting "the board or commission of the designated Federal entity, or in the event the designated Federal entity does not have a board or commission," after "means";

(B) in subparagraph (A), by striking "and" after the semicolon; and

(C) by adding after subparagraph (B) the following:

"(C) with respect to the Federal Labor Relations Authority, such term means the members of the Authority (described under section 7104 of title 5, United States Code);

"(D) with respect to the National Archives and Records Administration, such term means the Archivist of the United States;

"(E) with respect to the National Credit Union Administration, such term means the National Credit Union Administration Board (described under section 102 of the Federal Credit Union Act (12 U.S.C. 1752a);

"(F) with respect to the National Endowment of the Arts, such term means the National Council on the Arts;

"(G) with respect to the National Endowment for the Humanities, such term means the National Council on the Humanities; and

"(H) with respect to the Peace Corps, such term means the Director of the Peace Corps;"; and

(2) in subsection (h), by inserting "if the designated Federal entity is not a board or commission, include" after "designated Federal entities and".

SEC. 989C. STRENGTHENING INSPECTOR GENERAL ACCOUNTABILITY.

Section 5(a) of the Inspector General Act of 1978 (5 U.S.C. App.) is amended—

(1) in paragraph (12), by striking "and" after the semicolon;

(2) in paragraph (13), by striking the period and inserting a semicolon; and

(3) by adding at the end the following:

"(14)(A) an appendix containing the results of any peer review conducted by another Office of Inspector General during the reporting period; or

"(B) if no peer review was conducted within that reporting period, a statement identifying the date of the last peer review conducted by another Office of Inspector General;

"(15) a list of any outstanding recommendations from any peer review conducted by another Office of Inspector General that have not been fully implemented, including a statement describing the status of the implementation and why implementation is not complete; and

"(16) a list of any peer reviews conducted by the Inspector General of another Office of the Inspector General during the reporting period, including a list of any outstanding recommendations made from any previous peer review (including any peer review conducted before the reporting period) that remain outstanding or have not been fully implemented.".

SEC. 989D. REMOVAL OF INSPECTORS GENERAL OF DESIGNATED FEDERAL ENTITIES.

Section 8G(e) of the Inspector General Act of 1978 (5 U.S.C. App.) is amended—

(1) by redesignating the sentences following "(e)" as paragraph (2); and

(2) by striking "(e)" and inserting the following:

"(e)(1) In the case of a designated Federal entity for which a board or commission is the head of the designated Federal entity, a removal under this subsection may only be made upon the written concurrence of a ⅔ majority of the board or commission.".

### SEC. 989E. ADDITIONAL OVERSIGHT OF FINANCIAL REGULATORY SYSTEM.

(a) COUNCIL OF INSPECTORS GENERAL ON FINANCIAL OVERSIGHT.—

(1) ESTABLISHMENT AND MEMBERSHIP.—There is established a Council of Inspectors General on Financial Oversight (in this section referred to as the "Council of Inspectors General") chaired by the Inspector General of the Department of the Treasury and composed of the inspectors general of the following:

(A) The Board of Governors of the Federal Reserve System.

(B) The Commodity Futures Trading Commission.

(C) The Department of Housing and Urban Development.

(D) The Department of the Treasury.

(E) The Federal Deposit Insurance Corporation.

(F) The Federal Housing Finance Agency.

(G) The National Credit Union Administration.

(H) The Securities and Exchange Commission.

(I) The Troubled Asset Relief Program (until the termination of the authority of the Special Inspector General for such program under section 121(k) of the Emergency Economic Stabilization Act of 2008 (12 U.S.C. 5231(k))).

(2) DUTIES.—

(A) MEETINGS.—The Council of Inspectors General shall meet not less than once each quarter, or more frequently if the chair considers it appropriate, to facilitate the sharing of information among inspectors general and to discuss the ongoing work of each inspector general who is a member of the Council of Inspectors General, with a focus on concerns that may apply to the broader financial sector and ways to improve financial oversight.

(B) ANNUAL REPORT.—Each year the Council of Inspectors General shall submit to the Council and to Congress a report including—

(i) for each inspector general who is a member of the Council of Inspectors General, a section within the exclusive editorial control of such inspector general that highlights the concerns and recommendations of such inspector general in such inspector general's ongoing and completed work, with a focus on issues that may apply to the broader financial sector; and

(ii) a summary of the general observations of the Council of Inspectors General based on the views expressed by each inspector general as required by clause (i), with a focus on measures that should be taken to improve financial oversight.

(3) WORKING GROUPS TO EVALUATE COUNCIL.—

(A) CONVENING A WORKING GROUP.—The Council of Inspectors General may, by majority vote, convene a Council of Inspectors General Working Group to evaluate the effectiveness and internal operations of the Council.

(B) PERSONNEL AND RESOURCES.—The inspectors general who are members of the Council of Inspectors General may detail staff and resources to a Council of Inspectors General Working Group established under this paragraph to enable it to carry out its duties.

(C) REPORTS.—A Council of Inspectors General Working Group established under this paragraph shall submit regular reports to the Council and to Congress on its evaluations pursuant to this paragraph.

(b) RESPONSE TO REPORT BY COUNCIL.—The Council shall respond to the concerns raised in the report of the Council of Inspectors General under subsection (a)(2)(B) for such year.

Mr. GRASSLEY. Madam President, I yield the floor, and I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant editor of the Daily Digest proceeded to call the roll.

Mr. MENENDEZ. Madam President, I ask unanimous consent the order for the quorum call be rescinded.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mr. MENENDEZ. Madam President, I rise to speak on the pending amendment, the amendment by Senator GRASSLEY. I have a great deal of respect for the Senator from Iowa. Actually, there is a series of things I propose that are in the underlying bill that go to the heart of much of what that amendment is going to do.

I would start off by saying I agree with most of what my colleagues are proposing. I agree we need to make sure we have a strong regulatory agency to act as cops on the beat. We need to make sure those cops on the beat are doing their job.

I agree we should require financial regulators to respond when inspectors general identify deficiencies in their agencies—either by taking corrective action or explaining to Congress why they are not taking those actions.

I agree we should require inspectors general to report to the board of the organization rather than the head of the organization.

I agree we should require publication of any negative recommendations from the inspector general's peer review of the work of other inspectors general.

I also agree inspectors general should not suffer any reduction in pay and that current inspectors general should keep their jobs until the new Presidential appointment system I included in the legislation kicks in.

I think those are great ideas and I proposed them myself. But here is where we have a disagreement. That is that this amendment takes away something I think is incredibly important in the underlying bill. It takes away making these inspectors general at these financial institutions Presidential appointments with Senate confirmation of inspectors general at financial regulatory agencies. In its place, it wants to let the heads of the agencies appoint their own inspectors general.

I think that inures to the possibility of conflicts of interest. Look, if I am the head of an agency and I am going to put in the cop on the beat who is going to supervise me, the inclination is to pick someone who is going to give me a lot of flexibility at the end of the day.

I want a robust cop on the beat. The way I ensure there is a robust cop on the beat, in terms of the inspector general, is having a Presidentially appointed one, one confirmed by the Senate, to know that in fact this person is worthy of pursuing all of the actions of that particular agency in a robust way

so they are independent of the agency, not appointed by the very head of the agency they are now going to supervise and review.

I think that is a fundamental weakness, which is why the Banking Committee agreed with me and put the Presidential appointment there and Senate confirmation of inspectors general at financial regulatory agencies.

It seems to me what we want an inspector general to do is make sure the agency is doing its job. Being appointed by the head of the very agency I have to criticize, that I have to critique, that I may raise actions about, means it is a lot less likely the inspector general is truly independent. It is like going to court and saying let me pick the judge who is going to decide on my case. We wouldn't tolerate that in a courtroom and I do not see this as being any different.

I have so much with which I am in agreement with my distinguished colleague, as I mentioned at the beginning—all of those elements. I think we need to make sure when an inspector general identifies efficiencies, either by taking corrective action or explaining to Congress why they are not, that needs to be responded to by the regulators. I agree we should require inspectors general to report to the boards of organizations rather than the head of the organization. I agree we should require publication of any negative recommendation from the IG peer review of any other inspector general's work. I agree the inspectors general should not suffer any reduction in pay and that those who are there should be able to keep their job until the new Presidential appointment system kicks in.

But at the end of the day, if we want a true cop on the beat who is independent of the very agency he or she has to review, I would not want them appointed by the head of the agency and say to themselves, who am I appointing? Am I appointing a robust cop on the beat or am I appointing someone who is far less than robust?

We have forum shopping in the court. Trial lawyers try to pick the best judge from their perspective as to who can best look at their case. I want to be honest. I don't think we should be having the agency heads picking the IG and looking at who is going to treat them most lightly.

I think that is what is at stake. The underlying bill permits the Presidentially appointed, Senate confirmed. I think we should have that right. I think we need a robust cop on the beat and that is why in that one respect I oppose the Grassley amendment.

I hope we can work something out so we can keep the Presidential appointment and Senate confirmation and have all of the other safeguards, many of which I already offered in the bill to be included, and we would have a harmony of view and a robust inspector general regime.

If we are going to have an up-or-down vote on the existing amendment without any changes, then I urge a ''no'' vote. But I do hope we can make a change that permits the inspector general to be Presidentially appointed, confirmed by the Senate. That confers the ultimate independence, the ultimate vigilance, the ultimate vigor in pursuing the very same things my colleague from Iowa and I want to see happen.

I yield the floor.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY. Madam President, I appreciate very much the words of my colleague from New Jersey. He is a very thoughtful Senator. He is a member of the Finance Committee so I have a lot of relationships with him. I am glad he spoke highly of some of the changes we have suggested in the IG system generally through our amendment. But I think the real difference for Senator MCCASKILL and this Senator is the fact of whether they should be Presidentially appointed. That is probably a difference that is going to be hard to bridge. So I will speak to that point and also say I hope Senator MCCASKILL will be able to come over here and rebut Senator MENENDEZ because she is on the committee that has jurisdiction over IGs, and she has been very much involved over her recent tenure in the Senate on strengthening the system of IGs.

She will probably speak with more authority on this issue than I can, from the standpoint that I am not on that committee—even though I am involved very deeply in strengthening IGs because I think they are an extension of the checks and balances of government, particularly the extent to which they work with those of us involved in the constitutional responsibility of oversight performed by the Congress.

I wish to say flat out I do not accept the argument that Presidentially appointed IGs are always more independent. I think Senator MCCASKILL spoke on this point earlier when she was presenting our amendment. In fact, Presidential appointments raise another problem. President Obama has had a problem with filling IG vacancies. It took the President 18 months to appoint the IG at the Federal Housing Finance Agency. That is one example. Eighteen months without a cop on the beat would be a disaster at these financial agencies. Just think, if the SEC, Securities and Exchange Commission, did not have an IG for 18 months, how many more Madoffs would there be, how many more Sanford Ponzi schemes would there be.

Our amendment provides flexibility with accountability and transparency by reporting to the entire board or commission. The IG is not beholden to one person.

That brings up the point, for 80 years now, since independent agencies have been set up—well, I suppose for 130 years, going back to the setting up of the Interstate Commerce Commission, as an example—they have been meant to be a fourth branch of government, pretty much immune to any one President due to the fact they are appointed to overlapping terms and there has to be representation of both political parties on a commission. Just from the history and purpose of independent agencies, you would also want to make sure that inspector general was independent from the chief executive; not totally independent—because the President appoints them—but at least more independent than inspectors general in Treasury and State and the Justice Department—name any of the Cabinet positions you want.

Also, it provides for accountability by requiring a two-thirds vote to remove an inspector general. If the inspector general were appointed by the President, the IG could be removed, then, by one person. This takes politics out of the equation. Our amendment takes politics out of the equation. It strengthens the IG's independence and obviously that is why we are offering the amendment.

I suppose we are offering the amendment from the standpoint that we want that independence to be there because it has accountability with independence; also, because we think there can be a lapse in the work of an inspector general when a President takes a long time to appoint somebody.

In further response to the reasons Senator MENENDEZ has given, I wish to say that the underlying language in the bill would allow the IGs to serve, yes, until the President appoints someone.

But this means once the President nominates someone, the current IG is removed because there is a long lapse between appointment and Senate confirmation. This means the entire time the Senate debates the nominee, the agency does not have an IG. This is an invitation to allow waste, fraud, and abuse and mismanagement in agencies.

So we come to you—when I say ''we,'' I mean Senator MCCASKILL and myself—with a sincere desire that if something is not broken, do not fix it. We come with a desire to say these agencies are so important there should not be any lapse in time between what they are doing now and some new process of bringing somebody aboard.

I have seen the independence of these IGs to do their job and to help us uncover a lot of things that are wrong, particularly, as I think I have been able to point out with the Securities and Exchange Commission, not only under this administration but under the previous administration.

Probably in the last couple of years of the Bush administration, we were able to, working with IGs, make sure the job was done right and exposed a lot of things that were wrong.

I yield the floor.

The PRESIDING OFFICER. The Senator from New Jersey.

Mr. MENENDEZ. Madam President, I appreciate the statement of my col-

league from Iowa. I will just make one or two observations. First, if we are talking about someone being beholden to one person, well, under the Senator's view that person is going to be beholden to the department authority that appoints him, the very same department authority that person is going to supervise and review. So it seems to me to the extent that there is always going to be an appointing authority, I would rather have the President of the United States, with the interests of the American people, whatever President that might be, be the appointing authority over an agency where the IG is not going to be beholden to the agency that appointed them.

I think that is a much more compelling issue. As it relates to the time, the lapse of time, I would just simply say, well, first of all, if we do not have filibusters and have up-or-down votes on people, then we will not have much of a lapse in time in terms of having an IG come before the Senate for confirmation.

I do not know why Senators would want to give up the right they would have under the bill to confirm inspectors general and make sure that person has a robust quality to them, the integrity and the background and the history to make sure they are going to go after this agency when it is appropriate to do so.

I would say, to the extent that any lapse of time versus the robust nature of how this person gets appointed is worthy of consideration. So I do not find, while I agree with my colleague on so many of the other points I have already mentioned, this one fundamental issue is one that I find difficult to understand how, when it is like—sort of like having the fox be appointed to watch the chicken coop. If I appoint someone to watch over me, I would like to believe I am going to have the most robust, tough cop on the beat do it. But human nature being what it is, I am not so sure that agency heads are going to do that. I am not so sure they are going to pick the toughest cop on the beat versus actually someone who might have a less vigilant view. I think maybe we can agree that inspectors general have to come for an immediate vote on the Senate floor and not be subject to being filibustered, and this way we could have an up-or-down vote on them and the issue of lapsing time would be taken care of.

With that, I yield the floor.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY. Madam President, this will be the last time I will speak on it, and just for a couple of minutes. I hope the Senate would give some discretion to the fact that when Senator MCCASKILL comes over, that she would be able to speak for 2 or 3 minutes on this issue so that people can hear from the other side of the aisle on the importance of this amendment.

We appear to have a fundamental difference regarding how independent

Case 1:26-cv-02117-PAE    Document 104-5    Filed 06/01/26    Page 22 of 37

Presidential appointees are. If I were an inspector general, I would feel more independent with a two-thirds vote of a bipartisan panel, meaning commission appointees, as opposed to one person. Our amendment assures IGs, if they are terminated, it will be in a public forum and not the back room of the White House, if they are Presidentially appointed.

I yield the floor.

The PRESIDING OFFICER. The Senator from North Dakota.

AMENDMENT NO. 4114 TO AMENDMENT NO. 4072

(Purpose: To ban naked credit default swaps and for other purposes.)

Mr. DORGAN. Madam President, I send a second-degree amendment to the desk to the Grassley amendment.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from North Dakota [Mr. DORGAN] proposes an amendment numbered 4114 to amendment No. 4072.

Mr. DORGAN. I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

(The amendment is printed in today's RECORD under "Text of Amendments.")

Mr. DORGAN. Madam President, the second-degree amendment that I have just sent to the desk to the Grassley amendment is the amendment that there has been an objection to my offering. So it is the only way, apparently, I can offer the amendment. It is the amendment dealing with naked credit default swaps.

We cannot possibly end this discussion without addressing the central issues that caused the near collapse of our economy, one of which is the unbearable speculation, the speculation in exotic financial instruments such as credit default swaps that, by the way, now is on the rise. It is not receding, it is on the rise.

The fourth quarter of last year the credit default swaps were up by 8 percent, $14 trillion in notional value, up 8 percent in the fourth quarter of last year alone. I also feel very strongly that the issue of too big to fail is a real issue. We cannot just brush it away saying: I wish it was not an issue.

The too-big-to-fail companies have gotten bigger, much bigger. Well, that is not a solution for this country's economy. The issue of betting in the lobby of our banks, as I have said, they might as well put in a Keno table or a blackjack table and wager that way. These are bets, not investments.

There are tens of trillions of dollars' worth of these bets. Because we want to tighten the laces a little on this, this amendment would ban naked credit default swaps over a period of time. Because we want to tighten the laces a bit, we have folks who object to even offering this because it would take on Wall Street. Well, you know what. That is what this legislation is about. If we go back to 2008 when Wall Street

lost—I think, $36 billion net loss—and they paid out bonuses of $17 or $18 billion. They were having a carnival.

What was it all about? It was about big fees, trading all of these unbelievably speculative instruments, things that we had never heard of before—and, by the way, instruments in which they had no insurable interest. I said before you cannot buy fire insurance on someone else's house. You cannot buy life insurance on someone else's life. But what is happening is the biggest financial institutions in this country are buying and selling credit default swaps, are selling insurance policies against bonds that they will never own and have never owned.

It is like buying things they will never get from people who never had it and making fees on both sides of the transaction, except it is building a pyramid of speculation. At some point that pyramid came down and nearly took the entire American economy with it. So we now do something called financial reform.

The central question is, are we going to do it right? Are we going to be tough? Are we going to make sure we get rid of these things, the unbelievable speculation that injured this country's economy? There are trillions of dollars of them out there. And, by the way, the five largest commercial banks in this country hold 90 percent of the total credit derivatives, the $13.2 trillion of credit derivatives. They are owned by the five largest commercial banks.

Somebody said: Well, you cannot ban these things. The banking industry needs them. Oh, really? Well, if that is the case, why are only five companies doing 90 percent of the business in what are called naked credit default swaps?

I will speak about this at another time. I promised my colleague from Maine I would be a minute. I have gone well over the minute. But I will speak about the second-degree amendment at much greater length. It is the only way, apparently, I can offer an amendment.

So I believe that method, using a parliamentary technique that is perfectly legitimate, gives me an opportunity to force a vote on this amendment at some point.

It is an amendment that should have been able to have been offered as a result of an agreement on both sides to deal with real issues, in real time, on one of the most significant challenges that confront our country: how to put this financial system back together again in which the financial industry plays a very important role in the expansion of this country, as opposed to building more and more and more speculation and seeing that too-big-to-fail institutions get builder and bigger and bigger.

I yield the floor, and I will come back and speak on the second-degree at some point later.

The PRESIDING OFFICER. The Senator from Maine.

AMENDMENT NO. 3883

Ms. SNOWE. Madam President, I rise again to speak on the amendment that is pending that I had offered last week, No. 3883, which I have introduced with my good friend and colleague, Senator PRYOR.

Our amendment would ensure fairness and regulatory transparency for small business in the financial regulatory reform measure that we are now considering. This bipartisan amendment was also cosponsored by my colleagues, Senator GRAHAM, Senator MENENDEZ, Senator FRANKEN, Senator BOND, Senator BURRIS and Senator THUNE.

Our amendment would ensure that this newly created bureau in the bill, the Consumer Financial Protection Bureau, would, before it promulgates proposed rules, fully consider the economic effect that those rules and regulations would impose on our Nation's approximately 30 million small businesses that create 64 percent of all of the net new jobs in America. That certainly has been the case over the last 15 years, and they are the ones that we are depending on to lead us out of this jobless recovery.

Our amendment would designate the Consumer Financial Protection Bureau as a "covered agency" under the Regulatory Flexibility Act—so that small business review panels would apply to the Bureau's rulemaking process. Now, it is critically important to have these advisory small panels that currently only apply to EPA and to OSHA. They have been extremely successful in helping to shape more workable regulations at those agencies for small businesses to be much more attentive to the impact that these statutes are going to have on the well-being of small businesses.

Since 1996, when these small business panel provisions were passed—unanimously, I might add, in the Senate as part of the Small Business Regulatory Enforcement Fairness Act, SBREFA—and signed into law by then-President Clinton, the EPA has convened 35 panels and OSHA has convened 9 panels. The findings of these panel reports have helped EPA and OSHA improve their proposed rules by tailoring regulatory approaches and alternatives to the unique situations of small businesses. And that is very important.

As we look over the number of panels that have been convened over the last 14 years, we have seen there have been rules regarding groundwater, radon in drinking water, arsenic in drinking water, tuberculosis, ergonomics, and the list goes on and on. It has worked exceptionally well in this process for those agencies that obviously could have a tremendous effect on small businesses by creating unintended consequences.

So is it not better to know potential small business effects at the forefront of the regulatory process, not afterwards, in which the small businesses are consumed not only with time but

energy and money in order to fight the regulatory process once it has taken effect?

So our amendment would specify very clearly the same process that has applied to EPA and OSHA for the last 14 years has been supported by the Senate unanimously when SBREFA was adopted; that the bureau must consider the economic effect that these rules will have on the cost of credit for small businesses. This is critical because, as we know, and according to the National Federation of Independent of Business, NFIB, which is the largest voice for small business in this country, 42 percent of small business owners use a personal credit card for business purposes.

So it is absolutely vital that small business interests are fully considered before the bureau issues regulations on consumer credit cards, so that however well intentioned those rules and regulations are, we want to make sure the bureau does not inadvertently cut off or suspend vital small business credit sources, especially during these fragile economic times when, as a recent Federal Deposit Insurance Company survey noted, banks posted their sharpest decline in lending since 1942.

I want to add that there are some fundamental misconceptions about the pending amendment. I would like to address them because I think it is critically important that we sort through the misperceptions and mischaracterizations and get to the truth of what this amendment is all about.

First and foremost, this is a tried-and-true proposal. It has been the law for the last 14 years for EPA and OSHA.

Some, including the Treasury Department, have argued that my amendment would compromise the independence of the new bureau by holding it captive the very businesses it is set to regulate. This argument is flawed for many reasons. Given how many months—in most cases, years—it takes Federal agencies to promulgate new rules under the notice and comment process, how does 60 days built into the process undermine key consumer protections the underlying legislation seeks to achieve? I really don't understand exactly what the Treasury Department is so concerned about, let alone afraid of.

If there are going to be adverse economic effects on small firms, our Nation's primary job creators—at this key juncture when unemployment is at virtually 10 percent and 15 million Americans are unemployed, and we are depending on small businesses to be the job generators—wouldn't we want to know what effect any rules and regulations this bureau is about to promulgate would have on small businesses? Why not know that ahead of time, set up a small business review panel, which has been done in so many instances in the past and worked effectively and successfully, to ascertain exactly what might affect small businesses' well-being so that we can address it at the forefront of the regulatory process and not afterward? That is what this is all about. Wouldn't we want to know before an agency proposes a rule as opposed to afterward? That is what we do with EPA as well as OSHA.

Secondly, it is the bureau itself—not SBA, not OMB or any other agency within government—that is overseeing the small business advisory panel process as well as the report and recommendations. The bureau does this with the input of small business stakeholders that the bureau, in consultation with the independent SBA Office of Advocacy, chooses to include. So the bureau has flexibility in this process.

The bureau gets to choose what small businesses participate, what information it shares with the panel, and it overseas the process and the writing of the report. I ask my colleagues again, how would the bureau be controlled by the regulating community, unless the bureau allows itself to be controlled?

I went back to look at the SBA Office of Advocacy to determine how they view this process and how well it has worked. They said: Invariably, the participation of these panels provides extremely valuable information on the real-world impacts and compliance costs of agency proposals.

The purpose of the panel process is threefold. This is from the independent office within the Small Business Administration. The Office of Advocacy has authored their own independent assessment, separate and apart from the SBA, to determine what works and what does not work. First, the panel process ensures that small entities that would be affected by a regulatory proposal are consulted about the pending action and offered an opportunity to provide information on its potential effects. Secondly, a panel can develop, consider, and recommend less burdensome alternatives to a regulatory proposal when warranted. Finally, the rulemaking agency has the benefit of input from both real-world small entities and analysis prior to publication. Wouldn't we want to know the real-world effect? Certainly, we would. We can act theoretically when we pass legislation that becomes law, but ultimately, how is it going to affect the real world? What is it going to do to small businesses on Main Street?

Now I am hearing from the Treasury Department that they simply don't want to know the truth. It is too invasive. It is taking too much time. They want to put all these regulations by this new bureau within the act, this Consumer Financial Protection Bureau that essentially comprises more than 300 pages out of this 1,500-page bill, that is obviously going to have a host of rules and regulations. They are saying: No, it is too invasive. We can't take that kind of time. It might hold us up.

We are saying a 60-day process. It is a 60-day review process. This panel would be convened if the bureau itself determines that, yes, in fact, some of the rules they may propose will have an effect on small businesses. So then they convene a panel. They choose the particular stakeholders across the board within the agencies and with the small business community. They convene for 60 days. Within 60 days, the bureau completes the report and submits it to the bureau. It contains recommendations that are advisory, not mandatory. Then the bureau considers these recommendations as it proposes its rules and regulations. I think that is a pretty logical process. I can't understand why the Treasury Department would be so adamantly opposed to this very logical, straightforward approach that has already been utilized time and again for EPA and OSHA. It is mystifying to me.

The attorneys at the Treasury Department say it could take 6 months to do these panels. Our amendment would adhere to the Regulatory Flexibility Act requirements that specify 60 days. How the bureau handles that 60-day report is obviously up to them. There is list after list of panels where these review panels have been used time and again under OSHA and EPA. It has been very effective—understandably so. We want to make sure these rules work.

Why wouldn't the Treasury Department want to know whether these rules and regulations will work for small businesses? Thirty million small businesses in this country generate two-thirds of all the net new jobs each year. We are surely depending on them to create the jobs in this jobless recovery. I've said it before and I will say it agin: A jobless recovery is not a true recovery. We need jobs. But we are saying: No, we don't want to bother with this 60-day review panel. We don't want to bother with that because it could interfere with our process. We want to put everything on a fast track. We will figure out later whether it works for small businesses.

That is unacceptable and objectionable. That is why there is so much anger and frustration across America. Go up and down Main Streets and see what is happening to small businesses. Now we are saying, with this new Consumer Financial Protection Bureau, that we don't want to take the time to consider anything that would have an effect on small businesses. We will find out about it later. Let them pay the price of whether they can survive. Let them pay the price as to whether they can afford these regulations, that it makes sense, that it is workable, or to fight the regulatory process.

Anybody been through that process? We know what it is all about. It is time-consuming, complex, and bureaucratic. It is simply unaffordable for most small businesses. Ultimately, they will have to close their doors or they will not hire or they are going to lay off people. That is what the net result of all this will be. Yet we have had a demonstrable approach with this by

virtue of what has happened to EPA and OSHA.

According to the independent SBA Office of Advocacy report:

[t]he panel process does not replace, but enhances, the regular notice-and-comment process.

The Office of Advocacy has also found that these small business review panels have facilitated "revisions or adjustments to be made to an agency draft rule that mitigated its potentially adverse effects on small entities, but did not compromise the rule's public policy objective."

It makes good sense that they would be able to consider less burdensome alternatives in the event this 60-day review process by a small business panel, which would be established and appointed by the bureau itself, would determine they would be more preferable than the ones that originally were being considered.

I understand the majority intends to offer a side-by-side amendment that astoundingly does not have the support of the small business community. An abundance of organizations support this amendment offered by Senator PRYOR and others, along with myself. We have more than 23 organizations that have supported this legislation.

Let's look at the alternative that may be offered. And I truly hope it isn't offered. As this chart reveals, the side-by-side my colleagues are proposing on behalf of the Treasury Department would be a diluted version of the amendment I am offering.

My amendment with Senator PRYOR would permit the small business voice to be heard before a rule is actually proposed. It certainly makes sense to know the consequences of any potential rules before they take effect, before they go through the rulemaking process.

The side-by-side that my colleagues may be offering includes a loophole under which the bureau could evade entirely its small business panel requirements, so the small business voice would never be heard if their amendment is adopted.

Mind you, the language in their amendment would take 90 days for the small business panel to make its report. My amendment would take 60 days. Their process would take 90 days, and it would be a permanent panel. I am not asking for a permanent panel. I am saying that whenever the bureau determines they will be proposing rules that would have a significant impact on a substantial number of small businesses, that the Bureau convene a small business panel in which they would have to complete their work within 60 days, the bureau would submit their report for consideration, and the bureau would have to consider the small business panel report as they develop their proposed rule, before they promulgate it.

The difference between my amendment and the side-by-side that could potentially be offered is they create a permanent board and it is not even tied to rulemaking. They create a board that will meet four times a year. Now it is a bureaucracy within a bureaucracy. That is essentially what it is all about. It would create a bureaucracy within the bureau to meet four times a year for no particular purpose. Maybe they could consider small business economic effects from a potential rulemaking but maybe not, under this amendment. It clearly doesn't make any sense. And then it is an additional cost to the taxpayers. And it doesn't require, most importantly, the panel recommendations before the rules are actually proposed in the federal register. But even worse than that, they are not even required to consider any of the panel's recommendations, if they have any, before the final rule is issued. So that is a fairly major loophole in their amendment.

So here we are. We have the amendment Senator PRYOR and I have offered that would create a 60-day process that has been utilized time and again for the last 14 years and worked exceptionally well. They submit their proposal to the bureau. It is a panel established by the bureau. They can determine who will be represented in that panel. They can consider the recommendations as they draft their rules for the rulemaking process, at the outset before a rule is proposed.

In this case, on the other hand, the amendment my colleagues intend to offer—I know it is the Senator from Louisiana, Ms. LANDRIEU contains a loophole under which the Bureau would never have to consider the recommendations of the small business panel. They will meet four times a year for no particular purpose. It is not even tied to a rulemaking process.

I hope our amendment will be adopted. It really has already been established in precedent, in practice, not in theory. It is not conceptual; it is very real. Certainly, it will be real to small businesses in terms of whether it is going to have a major effect on their ability to conduct their business.

Our amendment builds on the current requirements under the Regulatory Flexibility Act. Since the Regulatory Flexibility Act was amended by the Small Business Regulatory Enforcement Fairness Act, SBREFA, back in 1996, to include these small business review panels, EPA has convened 35 panels and OSHA has convened 9 panels. It has worked very well.

Our amendment will ensure transparency in the regulatory process because the small business panel reports would be included in those proposed rules. It will allow the voice of small businesses to be heard at the front end of a regulation, before the proposed regulation has been published in the Federal Register. In contrast, the side-by-side amendment that potentially will be offered would expedite the bureau's rulemaking process and allow it to finalize onerous regulations that could crush small businesses without considering first the small business effects either during the proposed or the final rule stage of the regulatory process.

I urge my colleagues to oppose the side-by-side amendment. It would establish a dangerous precedent of diluting not only current law in the way it now functions with respect to EPA and OSHA but also how it has been extremely successful. My amendment is an extension of current law as it applied to the Consumer Financial Protection Bureau.

As you will see on the next chart, we have strong support from a broad cross section of 23 stakeholders, representing millions and millions of small businesses across the spectrum—of course, the National Federation of Independent Business, known as NFIB; the Associated Building and Contractors; the National Restaurant Association; the National Lumber and Building Material Dealers Association; S Corporation Association; the U.S. Chamber of Commerce; the United States Black Chamber; the United States Hispanic Chamber of Commerce; Women Impacting Public Policy; the International Franchise Association, the Independent Electrical Contractors; the Hispanic Leadership Fund.

The list goes on, and rightfully so, because they understand what is at stake. They understand the effects it will have on small business. We want to make sure we have a very practical, real process that is going to work for small businesses.

I hope we are not going to disregard the invaluable voices of small businesses to have the ability to have input at the forefront of the regulatory process, and utilizing a process that has worked so well. I hope we would reject any other watered-down, side-by-side amendment because, as I have already pointed out, it has a number of weaknesses and a loophole. It establishes a permanent panel for no apparent reason and that is not necessarily tied to the rulemaking. But more critical is the fact that, under the side-by-side amendment, the Bureau can totally ignore and disregard the input. Even if they created one of these panels for a rule-making process, they do not have to consider it, either before the proposed rule is published or before the final rule is promulgated in the Federal Register.

Something does not make sense. The bottom line is, the side-by-side amendment would be a job killer for small business. So if we are talking about jobs, jobs, jobs—and I hope we are going to get to a small business tax relief bill. I have been hoping since January we are going to get to it because it is so critically important. I know there are a lot of things to consider here on the floor of the Senate, but primary of which should be about creating jobs. So while we are saying we want to create jobs on the one hand, and we are concerned about small businesses' economic well-being on the other hand, we

are doing things that are going to undermine the status of small businesses in America, as they are struggling to survive. They are struggling to survive. We know that. We have had an abundance of hearings in the Small Business Committee. As ranking member of the Small Business Committee, I can tell you, we hear it time and again repeatedly. They are desperate. They need our support. We cannot hinder their ability to survive in this very tough, unprecedented environment.

So if we are depending on them to create jobs, then I think we better think very seriously about whether to support my amendment. I hope it would not be rejected. I hope it will be supported. There is no reason, there is no rationale, there is no logical explanation as to why the Treasury Department—of all the Departments, frankly, we are here because the Treasury Department did not provide the necessary and effective oversight of financial institutions—we are dealing with a financial regulatory reform bill, so I cannot imagine rejecting something that has been tried before and has worked so effectively.

That is what I am asking, that we would allow my amendment to be adopted. Because, as you can see, this amendment is supported overwhelmingly by critical small business organizations, because they understand the reality. They understand the net effect of what is going to happen. They need this support. This is not a minimalist amendment. It has real consequences, if we fail to adopt it. That is the fact. That is reality that small businesses are facing all across America.

So when we are creating this new entity, this Consumer Financial Protection Bureau, that literally consumes hundreds of pages in the pending legislation, are we not saying we want to make sure, when they are drafting those rules, we are going to consider how it will affect small businesses on a day-to-day basis? Because that is what they are going to live with.

By the way, I think we all know who pays more for regulatory compliance. It is not the large corporations. It is the small business.

In the past, we think about Sarbanes-Oxley. I know there is an amendment that has been filed that has been offered by the Senator from Texas and the Senator from Louisiana that will "spare," as it says in this Wall Street Journal editorial, "the smallest public companies from the worst bureaucratic horrors of the 2002 Sarbanes-Oxley law." They said:

This is one reason the two Senators aim to exempt companies with less than $150 million of shares held by the public from "internal-controls" audits.

Because of the indirect costs, as well as the direct costs, they said that:

[T]he average public company pays more than $2 million per year complying with the law's Section 404. The indirect costs may be much greater . . .

The indirect costs are even greater from Sarbanes-Oxley. Small firms pay 45 percent more in regulatory compliance costs than larger firms, according to the Office of Advocacy within the Small Business Administration.

That is the point. So on one hand, we are saying: Well, in financial regulatory reform, we should exempt small public companies because of the bureaucratic hindrance that Sarbanes-Oxley has provided. So there is another example of what the effects are, the unintended consequences, when rules have a disproportionate effect on small businesses. That is what has happened in that instance.

So these are legitimate and valid issues based on reality, based on the experiences of small businesses, what they have had to already endure. So why compel them to have to further endure another regulatory nightmare and quagmire that might ensue as a result of this bureau? We are asking to take an intermediate step: 60 days. Somebody is saying 60 days is too much time to give consideration to the well-being of small businesses in America?

Well, we are offering amendments that say: Gee, we ought to exempt the smallest companies because of what occurred under Sarbanes-Oxley, what it has done with the unintentional effects. We all know the adverse consequences that can emanate and result from legislation that becomes law. So let's be attentive and sensitive to those issues at the forefront of this process. That is what this amendment is all about. I would hope there would be strong support for my amendment because there truly is overwhelming support from all of these organizations and more that are represented on these charts.

I ask unanimous consent to have printed in the RECORD a list of organizations in support of my amendment, as well as a number of letters that have been sent from small business organizations declaring that it is an imperative that this amendment be accepted because of the concern, the abiding concern, of the small businesses community across this country that they are going to suffocate under this rulemaking process if they do not have a voice.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

ORGANIZATIONS IN SUPPORT

Associated Builders and Contractors; Association of Kentucky Fried Chicken Franchisees; Hearth, Patio & Barbecue Association; Hispanic Leadership Fund; Independent Electrical Contractors; Institute for Liberty; International Franchise Association; National Association for the Self-Employed; National Federation of Independent Business, which is "key-voting" in support of our amendment and opposing the majority's side-by-side; National Lumber and Building Material Dealers Association; National Restaurant Association; National Roofing Contractors Association; National Small Business Association; Printing Industries of America; S Corporation Association; Small Business & Entrepreneurship Council; Society of American Florists; Society of Chemical Manufacturers & Affiliates; Tire Industry Association; U.S. Chamber of Commerce; United States Black Chamber; United States Hispanic Chamber of Commerce; and Women Impacting Public Policy.

———

MAY 12, 2010.

Hon. HARRY REID,
*Majority Leader, U.S. Senate,*
*Washington, DC.*
Hon. MITCH MCCONNELL,
*Minority Leader, U.S. Senate,*
*Washington, DC.*
Hon. CHRIS DODD,
*Chairman, Committee on Banking, Housing & Urban Affairs, U.S. Senate, Washington, DC.*
Hon. RICHARD SHELBY,
*Ranking Member, Committee on Banking, Housing & Urban Affairs, U.S. Senate, Washington, DC.*

DEAR MAJORITY LEADER, MINORITY LEADER, CHAIRMAN DODD, AND RANKING MEMBER SHELBY: The undersigned organizations representing millions of American small business owners are writing to urge that the Senate consider the Small Business Fairness and Regulatory Transparency Amendment (S. Amdt. 3883) sponsored by Senator Pryor and Senator Snowe as part of the Senate's deliberations on S. 3217, Restoring American Financial Stability Act of 2010.

As you know, new jobs primarily come from the small business sector of our economy. Small business has created about two of every three net new jobs in the United States since at least the early 1970s. And nearly all job creation since 1980 has occurred in firms less than five years old. In fact, data from the 1990's show small business are the only sector producing jobs coming out of a recession. The amendment offered by Senators Pryor and Snowe is an effort to prevent unintended consequences by a new agency that could harm the small business sector.

According to the U.S. Small Business Administration, small firms shoulder a 45 percent higher burden to comply with federal regulations than their larger business competitors. This economic distortion can be eased when agencies carefully consider how their regulations will impact small firms, which is why delegates to the 1995 White House Conference on Small Business called for direct small business participation in the rulemaking process. That recommendation from the White House Conference was a key provision in the Small Business Regulatory Enforcement Fairness Act (SBREFA), signed by President Clinton in 1996. The amendment offered by Senators Pryor and Snowe applies the same standards of transparency and small business consultation found in SBREFA to the Consumer Financial Protection Bureau (hereinafter referred to as the "Bureau").

Additionally, S. Amdt. 3883 calls upon the Bureau to consider how its rules will impact small business access to credit. Almost 90 percent of the nation's 26 million small businesses use some form of credit. And, economists have raised concerns that actions by the Bureau will tighten the credit squeeze, raising interest rates and curbing job growth. The amendment offered by Senators Pryor and Snowe provides assurance that small business access to credit is a top consideration by Bureau officials as they take on the important task of overseeing our financial sector.

Small business is a critically important sector. America needs their job creation strength to bring down unemployment and their innovative strength in a global marketplace. We know you share our desire to take every step necessary to protect Main Street while you are trying to fix the practices on

Wall Street and we urge you to include S. Amdt. 3883, the Small Business Fairness and Regulatory Transparency amendment, as part of the Senate's debate on S. 3217. Once the amendment is under consideration, we urge your support for its passage.

Associated Builders and Contractors; Association of Kentucky Fried Chicken Franchisees; Hearth, Patio & Barbecue Association; Hispanic Leadership Fund; Independent Electrical Contractors; Institute for Liberty; International Franchise Association; National Association for the Self-Employed; National Federation of Independent Business; National Lumber and Building Material Dealers Association; National Restaurant Association; National Roofing Contractors Association; National Small Business Association; Printing Industries of America; S Corporation Association; Small Business & Entrepreneurship Council; Society of American Florists; Society of Chemical Manufacturers & Affiliates; Tire Industry Association; U.S. Chamber of Commerce; United States Black Chamber, Inc.; United States Hispanic Chamber of Commerce; Women Impacting Public Policy.

---

NATIONAL SMALL BUSINESS
ASSOCIATION,
*Washington, DC, May 18, 2010.*
Hon. CHRISTOPHER J. DODD,
*U.S. Senate,*
*Washington, DC.*

DEAR SENATOR DODD: The National Small Business Association (NSBA) is urging you to support the Ensuring Small Business Fairness and Regulatory Transparency Amendment (S. Amdt. 3883)—or the Snowe/Pryor amendment—to the Restoring American Financial Stability Act (S. 3217). This critical amendment, supported by a very broad, bipartisan group of Senators, will ensure that the Consumer Financial Protection Bureau considers how its rulemakings affect America's small businesses. Reaching 150,000 small firms across the nation, NSBA is the country's oldest small-business advocacy organization.

As the Consumer Financial Protection Bureau likely is to be established as an independent agency with rulemaking authority, it should be required to consider the unique needs and constraints of small firms as it promulgates its rules.

NSBA strongly supports requiring the Bureau to conduct Regulatory Flexibility Analyses in conjunction with its rulemaking. It is critical that the Bureau provide the public with transparent information on how its proposed rules would affect small firms. NSBA also supports requiring the Bureau to consult with a Small Business Advocacy Review Panel prior to the publication of any proposed rule, with the Review Panel's recommendations published in any eventual proposal.

Small businesses bear a disproportionate burden of federal regulations. In fact, the smallest firms—those with fewer than 20 employees spend 45 percent more per employee than larger firms to comply with federal regulations. Incorporating the Snowe/Pryor amendment in S. 3217 will take the important steps toward alleviating this gross inequity.

Increased transparency is a stated goal of the current administration and Congress. This is a perfect opportunity to achieve progress towards that objective. This amendment will ensure a public exchange of data, analysis, and recommendations, detailing the potential benefits and costs to small businesses of any proposed regulations. This is a welcome achievement.

I urge you to consider the many pitfalls caused by the absence of such language in other sweeping pieces of legislation, namely Sarbanes/Oxley, which has constituted a major burden for America's small businesses. On behalf of the many struggling small businesses in the U.S. today, I am calling upon you to do everything in your power to prevent any roadblocks for future entrepreneurs, and urge your support of the Snowe/Pryor amendment.

Sincerely,
TODD O. MCCRACKEN,
*President.*

---

U.S. BLACK CHAMBER, INC.,
*Washington, DC, May 11, 2010.*
The US Black Chamber, Inc. represents over 30% of all the Black owned business nationwide. We have united to ensure that our voice is heard. Black business owners are a strong economic force in the United States, and increasingly throughout the world. Their contributions extend beyond the number of firms they own, the people they employ and the revenues they generate. Their economic influence is multiplied many times through the direct and indirect economic impact they generate through their business ownership.

We are writing you to urge that the Senate consider the Small Business Fairness and Regulatory Transparency Amendment (S. Amdt. 3883). Small business develop the majority of the jobs that have been created in the United States. The recession has shown that small businesses are in fact the only sector that is creating new jobs.

S. Amdt. 3883 calls upon the Bureau to consider how its rules will impact small business access to credit. Black-owned firms are less likely to receive loans than non-white firms (23% of non-minority firms receive loans compared to 17% of minority firms.) Black owned firms receive lower loan amounts than white firms. Black-owned firms are more likely to be denied loans (42% denial rate for Black and 16% denial rate for whites). We feel actions by the Bureau will tighten the credit squeeze, raise interest and slow job growth.

S. Amdt. 3883 provides assurance that our members and small business access to credit is a top consideration. We urge your support for its passage.

Thank you, and we look forward to working together with you and our membership, to bring this plan into reality.

In the Spirit of Success,
RON BUSBY,
*President & CEO.*

Ms. SNOWE. I urge adoption of this amendment.

I thank the Presiding Officer and yield the floor.

The PRESIDING OFFICER (Mr. UDALL of Colorado). The Senator from Delaware is recognized.

Mr. KAUFMAN. Mr. President, I am on the floor here incredibly disappointed by the decision by my friends across the aisle to block a vote on the Merkley-Levin Volcker rule amendment and the Dorgan amendment to ban naked credit default swaps.

We have had good comity on this bill. I think both sides have taken amendments for a vote they did not like based on how the vote turned out, where you have votes where a majority of the Republicans voted for an amendment they put forward and a majority of the Democrats voted against it or a vast majority of Democrats voted

against it, but we allowed it to come to a vote.

I think we are getting late in the processing of the bill. It would have been nice if we could have gone through the whole process the way we started and the way we were in the middle and allowed these important issues to come up, especially issues as important as this one.

I want to praise Chairman DODD—and I mean it—for an incredible piece of work and all my colleagues who have worked diligently on this bill. It has been incredible in holding this together. There are many provisions in this bill I strongly support.

However, there is one portion of the bill that many of my colleagues and I have discussed on the floor extensively, and that is the question of how we prevent systemic risks from manifesting themselves among our largest Wall Street banks—those that have been deemed too big, too big, too big to fail due to their tendency to engage in highly leveraged and extremely risky speculative trading activities.

As my colleagues know, Senator BROWN and I, along with others, offered an amendment to tackle this problem directly and preemptively. The Brown-Kaufman amendment would have scaled down the size and risk of our megabanks through limits on leverage and on unstable nondeposit liabilities. While I am disappointed the amendment did not pass, I know the debate will persist as long as too-big-to-fail banks continue to exist. For as long as we still have banks so large they are too big to fail, they will pose mortal risks—mortal risks—to the American economy.

Within days of the Senate's consideration of Brown-Kaufman, we saw the EU and IMF scramble to put together an almost $1 trillion emergency package to forestall a full-blown series of sovereign debt crises throughout the continent. While ostensibly reported in the press as a rescue package for overleveraged and embattled sovereign nations such as Greece and Spain, it was actually a bailout of Europe's megabanks, not to mention our own. That is what it was about. It was about bailing out Europe's megabanks. German and French banks alone have more than $900 billion in exposure to Greece and other vulnerable Euro countries, including Ireland, Portugal, and Spain.

Meanwhile, our top five banks have an estimated $2.5 trillion in exposure to Europe. That is $2.5 trillion in exposure to Europe.

So long as we have too-big-to-fail institutions, we will continue to go through the "doomsday" cycles of booms, busts, and bailouts. There are two amendments left that address this critical question directly, two others that would help. I believe at least one of the two represents a critical test of whether we as a body are serious about curbing systemic risk. While I would prefer we pass the Cantwell-McCain

amendment, which would restore the Glass-Steagall Act's 60-years-long separation between commercial and investment banking activities—which I have spoken on the floor many times about—I believe very strongly that, at a minimum, we must pass the Merkley-Levin amendment that would ban proprietary trading activities by commercial banks.

This is not a radical amendment. After all, it is President Obama's proposal, which he has named the Volcker rule, after the most respected bank regulator in the last half century, former Federal Reserve Chairman Paul Volcker. It has been represented to us for many weeks that even the current version of the bill includes a mandatory imposition of the Volcker rule after a 6-month study. The Merkley-Levin amendment would remove any doubt about whether the new council could, after its review, recommend modifications to the rule.

Merkley-Levin, in my view, is where the rubber hits the road. It is a true test of whether the administration and the Congress are serious about imposing limitations on the activities of the government-guaranteed part of our financial system—in short, so that casino-like activities can no longer remain centered at the heart of too-big-to-fail institutions.

I also believe that a strong financial reform bill must retain the key provisions on too big to fail that are already in the bill, particularly Senator Lincoln's provision to prohibit banks with swap dealers from receiving emergency Federal loans, and an amendment to the bill, Senator Dorgan's amendment, which bans naked credit default swaps.

As I said, I am proud to support Senator Merkley's and Senator Levin's amendment to include a more robust version of the Volcker rule ban on proprietary trading within commercial banks in the bill.

Specifically, the amendment would bar banks and their affiliates from engaging in proprietary trading and from owning a hedge fund or private equity fund. To avoid regulatory arbitrage, it would also increase capital requirements on large nonbank financial institutions engaged in proprietary trading.

The Merkley-Levin amendment would minimize the potential procedural roadblocks to the Volcker rule contained in the current bill by specifically directing the regulators to develop rules to implement the Volcker rule restrictions. It would not give unnecessary discretion to the same regulators who have long had the authority to prohibit speculative activities at banks but never opted to do so.

I have heard some proposals call for so-called de minimis exceptions and other loopholes to a ban on proprietary trading at banks. Loopholes of this kind, however, undermine the very spirit of the Volcker rule and would allow banks that benefit from federally insured deposits and access to the Fed window to continue to engage in activi-

ties that are speculative in nature. Importantly, this amendment would also build upon the work of Senator Levin's Permanent Subcommittee on Investigations to address conflicts of interest within the modern investment banking model. The PSI subcommittee hearings, in which I had the privilege to participate, demonstrated how Wall Street firms sold clients securities without disclosing their financial interests in seeing such securities fail or perform poorly—basically betting against the very securities they were selling to their clients. Talk about a conflict of interest. This amendment would address this problem by prohibiting underwriters of an asset-backed security from engaging in transactions that create material conflicts of interest with respect to the securities being sold—something I think everyone, on observation, agrees should be the case.

I strongly urge my colleagues to support Merkley-Levin so we can say to the American people we have acted in Congress to prevent another crisis. I do not want to put my faith in a stability council of regulators detecting "early warning signals" of financial instability. I would rather we move our largest banks off of the San Andreas Fault of leverage and speculation on which they now sit.

I also support strongly Senators Cantwell's and McCain's amendment to break up the largest banks by reimposing the Glass-Steagall Act. Unless we break the megabanks apart, they will remain too large and interconnected for regulators effectively to control. Once the next inevitable financial crisis occurs and the contagion spreads too quickly for the government to believe that a failing firm won't take down others as well, the American taxpayer—the good old American taxpayer—will again be forced into the breach.

By statutorily splitting apart massive financial institutions that house both banking and security operations, we will both cut our megabanks down to reasonable and manageable sizes and rightfully limit government support to traditional banks. This worked for nearly 60 years and once again will ensure the soundness of commercial banks while placing risky bank investment activities far beyond any government safety net check.

If Congress fails to impose needed structural changes like Glass-Steagall, the same systemic risks to our financial system remain and grow bigger and bigger and bigger. When the next crisis occurs, however, the legislative pendulum will suddenly shift direction and will fall hard on Wall Street in the form of Glass-Steagall and far more Draconian reforms.

I also believe we must preserve section 716 of the current Senate bill. The provision included in the bill by Senate Agriculture Committee Chairman Lincoln would prohibit banks with swap dealers from receiving emergency assistance from the Federal Reserve or

FDIC. By forcing megabanks to spin off their swap dealers into an affiliate or separate company, this section would help restore the wall between the government-guaranteed part of the financial system and those financial entities that remain free to take on greater risk.

It would also help address the enormous concentration of power among a few too-big-to-fail institutions. As has been quoted many times on this Senate floor over the last several weeks, the five largest banks—Goldman Sachs, Morgan Stanley, JPMorgan Chase, Citigroup, and Bank of America—control over 90 percent of the over-the-counter derivatives market. That is nine zero, 90 percent, our 5 largest banks. Yet there are those who say that forcing these megabanks to spin off their swap dealers to affiliates in only a few years' time would disrupt the derivatives market. The historical record shows repeatedly that financial institutions can adapt to regulatory changes quite quickly. Look at Goldman Sachs. Goldman Sachs has been a bank holding company for fewer than 2 years. Within that time, it has used its newly formed bank, which is just one-tenth the size of the overall holding company, to source the vast majority of its derivatives transactions. That is just in the last 2 years. Amazingly, Goldman Sachs has a $41 trillion derivatives book attached to a $91 billion bank. Do you have that? A $91 billion bank with a $41 trillion derivatives book attached to it.

Unfortunately, allowing massive derivatives dealers to be housed within banks creates moral hazard, a term often invoked by my conservative colleagues. This was true of AIG, which rented out its AAA rating and the financial strength of its insurance subsidiaries, to write credit default swap contracts that systemically underpriced risk. It is also true of dealer banks whose access to federally insured deposits and the government backstop of emergency lending allows them to underprice risk on swap contracts. Notably, this government subsidy allows these institutions to be lax in their collateral and margin requirements on derivatives transactions.

Some complain that requiring the megabanks to spin off their derivatives dealers would require these dealers to raise extra capital as affiliates. I say that is precisely the point. Housing a large derivatives dealer book in a bank, even a small one, allows these institutions to arbitrage capital requirements. Requiring them to spin off their dealer to a separate broker-dealer affiliate would appropriately require them to raise more capital based upon the riskiness of their derivatives book. This is good. Currently, these institutions are undercapitalized.

Yet Fed Chairman Bernanke claims:

Forcing these activities out of insured depository institutions would weaken both financial stability and strong prudential regulation derivative activities.

I beg to differ. Spinning off large derivatives dealers would force these institutions to adequately price and capitalize the risks associated with these activities. By ending the aforementioned moral hazard, we are only strengthening financial institutions. By requiring derivative dealers to hold capital commensurate with the risk of their business, we are only strengthening prudential regulation.

Meanwhile, FDIC Chair Bair states that derivatives:

do have legitimate and important functions as risk management tools and ensure banks play an essential role in providing market-making functions for these products.

Requiring banks to spin off their derivatives, however, would not preclude them from using derivatives as risk management tools or as products to service client needs. For example, if a client wanted to hedge the interest rate risk on a floating loan through a swap, the bank would still be able to execute that transaction. Senator LINCOLN's provision doesn't ban banks from using derivatives. Instead, it says that it is inappropriate for a commercial bank to have an almost $80 trillion derivatives book, as some do.

Of course, anyone can come up with a reason for maintaining the status quo—of saying, for example, that Senator LINCOLN's inspired solution simply goes too far. But after the crisis we just suffered, I would ask my colleagues to support these proposals which represent real reform and change. I would ask my colleagues to see the wisdom of building an enduring structure of laws instead of investing our hopes in unelected regulatory discretion. We have seen the effects of regulators neglecting their duties and banks left to self-regulation.

Instead of trusting our financial stability solely to unelected financial guardians, these amendments and provisions would all address preemptively the persistent problem of too big to fail. They all say speculative securities activity should not be covered by the government's deposit safety net. By reducing the size and scope of our largest banks, we will limit their risky behavior and minimize the possibility of one institution's failure causing an industrywide panic and a subsequent bailout of several failing megabanks.

By adopting these commonsense proposals, we can go a long way toward stabilizing our economy, restoring confidence in our market, and protecting the American people from a future bailout. America cannot afford another financial meltdown. The American people are looking to Congress to assure that it does not happen. We have a precious few remaining days on this bill to follow through on that commitment.

As I started out, I wish to commend Chairman DODD and the committee for the excellent work they have done on this bill. I also commend Chairman DODD for the fact that we have had such good comity and such good relations between both sides of the aisle on

this bill. That is why I am so concerned about the decision by the other side to block the Merkley-Levin amendment. This is at the heart of this bill. If you had to look at one of the things that is very important and that everyone commends, it would be this amendment. We have voted for a lot of Republican amendments and accepted a lot of Republican amendments that Democrats were not in favor of. This seems like the wrong time in the process toward the end to do this.

I hope my friends on the other side of the aisle will rethink what we are doing and that we get a chance to vote, because it is absolutely essential to this bill that we have a vote on the Merkley-Levin amendment.

I yield the floor and suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant bill clerk proceeded to call the roll.

Mr. BINGAMAN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT NO. 3892, AS FURTHER MODIFIED, TO AMENDMENT NO. 3739

Mr. BINGAMAN. Mr. President, I have an amendment No. 3892, as modified, and I ask unanimous consent to further modify it.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered. The amendment is further modified.

The amendment, as further modified, is as follows:

On page 565, between lines 2 and 3, insert the following:

(e) JUST AND REASONABLE RATES.—Section 2(a)(1)(C) of the Commodity Exchange Act (7 U.S.C. 2(a)(1)(C)) (as amended by section 717(a)) is amended by adding at the end the following:

"(vi) Notwithstanding the exclusive jurisdiction of the Commission with respect to accounts, agreements, and transactions involving swaps or contracts of sale of a commodity for future delivery under this Act, no provision of this Act shall be construed—

"(I) to supersede or limit the authority of the Federal Energy Regulatory Commission under the Federal Power Act (16 U.S.C. 791a et seq.) or the Natural Gas Act (15 U.S.C. 717 et seq.);

"(II) to restrict the Federal Energy Regulatory Commission from carrying out the duties and responsibilities of the Federal Energy Regulatory Commission to ensure just and reasonable rates and protect the public interest under the Acts described in subclause (I); or

"(III) to supersede or limit the authority of a State regulatory authority (as defined in section 3(21) of the Federal Power Act (16 U.S.C. 796(21)) that has jurisdiction to regulate rates and charges for the sale of electric energy within the State, or restrict that State regulatory authority from carrying out the duties and responsibilities of the State regulatory authority pursuant to the jurisdiction of the State regulatory authority to regulate rates and charges for the transmission or sale of electric energy.

"(vii) Nothing in clause (vi) shall affect the Commission's authority with respect to the trading, execution, or clearing of any agree-

ment, contract, or transaction on or subject to the rules of a registered entity, including a designated contract market, derivatives clearing organization, or swaps execution facility.".

(f) PUBLIC INTEREST WAIVER.—Section 4(c) of the Commodity Exchange Act (7 U.S.C. 6(c)) (as amended by section 721(d)) is amended by adding at the end the following:

"(6) If the Commission determines that the exemption would be consistent with the public interest and the purposes of this Act, the Commission shall, in accordance with paragraphs (1) and (2), exempt from the requirements of this Act an agreement, contract, or transaction that is entered into—

"(A) pursuant to a tariff or rate schedule approved or permitted to take effect by the Federal Energy Regulatory Commission;

"(B) pursuant to a tariff or rate schedule establishing rates or charges for, or protocols governing, the sale of electric energy approved or permitted to take effect by the regulatory authority of the State or municipality having jurisdiction to regulate rates and charges for the sale of electric energy within the State or municipality; or

"(C) between entities described in section 201(f) of the Federal Power Act (16 U.S.C. 824(f)).".

Mr. BINGAMAN. Mr. President, the further modification clarifies that each agency—that is, the FERC and the CFTC—will retain its legitimate authority, whether to review derivatives or to review rates and charges and prevent manipulation, without one agency knocking the other agency out of the box of its respective mission. It is a good improvement.

I believe this amendment is now without substantial objection. I ask that we proceed to a voice vote on the amendment.

The PRESIDING OFFICER. If there is no further debate on the amendment, the question is on agreeing to the amendment.

The amendment (No. 3892), as further modified, was agreed to.

Mr. DODD. Mr. President, I move to reconsider the vote and I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. DODD. Mr. President, our colleague from North Dakota is going to speak over the next several minutes. At the conclusion of that, I will make some remarks, and then there will be a tabling motion of the Dorgan amendment. To make colleagues aware, that is what will happen.

The PRESIDING OFFICER. The Senator from North Dakota.

Mr. DORGAN. Mr. President, I have spoken on this amendment previously and have waited patiently for several weeks to be able to have an opportunity to vote on it. We have not been able to get it pending. I now have it pending because I offered it as a second-degree amendment to the Grassley amendment.

This is an amendment that would ban the use of naked credit default swaps. You ask, how does a credit default swap get naked? It is an exotic, new financial instrument that has been developed over recent years to be traded back and forth by the big financial

institutions. In fact, 90 percent of them are traded by the five biggest financial institutions. When people say you need these—banks need these—just a handful of banks trade most of these.

What is a naked credit default swap? It means someone is buying insurance against some other instrument that they have no interest in, except they want to make a wager. I have said before that I can't buy fire insurance on the house that the Presiding Officer owns in Colorado. Why? Because I don't have an insurable interest in that house. If I went to somebody and said: I would like to buy some insurance against fire for that house, they would say: You don't own that house, so I cannot possibly sell you that policy. Also, I cannot buy a life insurance policy against my colleague from Connecticut because I don't have an insurable interest either.

But I can go buy $100 million worth of insurance, right this second, on a bond issue that was issued by some company yesterday, even though I never, ever intend to own the bond, have no interest in the bond, and don't know much about the company. I just want to bet someone who will take the opposite side of the wager. I believe the bonds will not be repaid, and the counterparty says: No, you are wrong about that. I think that company will repay its bonds. So we make a friendly wager—kind of like one of those Saturday sports wagers. We bet. I am betting this person about the question of whether the bonds will default. It is called synthetic when it is not real or naked when it has no interest. So this would be a synthetic or a naked credit default swap.

It is a different story if I have an interest, where I actually bought those bonds—some company let the bonds and I bought them, so I am the investor in the bonds. But I want to make sure the default doesn't take me down with it, so I buy an insurance policy. That is a credit default swap that is covered. Naked means you have no interest, just a bet. Covered means it is an investment you made to try to hedge your risk on the default of the bonds.

Here is what is interesting. We expect, based on what we know to be the case, that about 80 percent of all credit default swaps are not covered or what are called naked swaps—80 percent. Some people say to us: Well, we can't get rid of these financial instruments. These are very important for normal hedging. That is absolutely absurd, total rubbish.

My amendment would say that at some point we have to ban naked credit default swaps. Mr. Pearlstein, who writes for the Washington Post, asked the question many months ago:

Why should there be more insurance policies sold on a bond issue than there are bonds to be insured?

Why should you have 20 times more insurance policies than you do bonds? Because it is wagering, not investing.

I find myself fairly disappointed by what is happening. This is a moment of substantial consequence for our country. We came very close, they say, to a meltdown of our economy. Trillions of dollars were lost. I guess there was about $14 trillion or $15 trillion in lost value for the American people. Millions of people lost their jobs. Millions of people have lost their homes. By the way, at graduation time, when colleges all across the country are graduating these bright, young men and women who have now gotten their college diploma—they are out looking for work, and way too many of them cannot find a job because of what happened to this economy in recent years.

What happened? We created a casino economy. You didn't have to read the newspapers very much to understand what was going on. This unbelievable speculation, a bubble of speculation, occurred in virtually every single area, and there were new financial products on steroids—securitizing everything. Are you loaning somebody some money? Well, put it into a security, wrap it up and sell it to a hedge fund or an investment bank. Securitize everything. By the way, you can get some very bad stuff that is rated AAA. So sell it up. By the way, once you start selling things, you don't ever have to worry about whom you are issuing credit cards to or that you are wallpapering the room of people who don't have jobs with more credit cards. You don't have to do normal underwriting or sit across from somebody who wants to buy a house and look into their eyes and say: Tell us your income. How are you going to repay the loan if we loan you the money? You can put out liars' loans, no-doc loans. Don't document your income because we don't care. Don't pay any interest or principal now; we will put that on the back side. We will make the first 12 months of payments for you. If you have no credit or low credit, come to us—I will show you the advertisements that were on the radio, television, and newspapers: Slow credit, no credit, bad credit? We want to loan you money.

They said: Let's securitize it and we will ship it upstream and we will all make big profits and fees and we will create credit default swaps and CDOs and we will all have a great time. When the whole thing crashes down, "Wall Street" will have lost about $36 billion in 1 year and paid $17 billion in bonuses at the very same time.

Do you think this wasn't a carnival of greed? Of course it was. There are a number of things we ought to do and too many that we will not do in this legislation. Too big to fail ought to have meant to all of us that you are simply too big. By the way, those who were judged too big to fail and would cause a grave risk to this entire economy if that firm should fail, they have now become much larger by the actions of the Federal Government arranging marriages of companies that weren't making it. So the too-big-to-fail com-

panies are actually much larger now, and the underlying legislation doesn't do a thing about too big to fail in terms of paring it away and deciding if you are too big to fail, you are too big and you must divest until you don't cause a grave risk to the entire economy.

In addition to the issue of too big to fail, there is the Glass-Steagall reconnection. My colleague has an amendment on that. There is this issue I am raising on naked credit default swaps. If we have decided we are not going to get rid of these financial curveballs—financial instruments on steroids that took this country for a huge ride and stuck the American people with trillions and trillions of dollars of loss and bad debt—if we don't do that, let's not crow about what we did because this is essential, in my judgment.

This is what I think happens, as is always the case when it comes to Wall Street versus the rest of us; it is let's pretend time. This is a case of whose side are you on? Are you going to try to see if you can shut the door and deal with those issues that helped cause this near collapse of our economy or are we just going to buff it up a little bit around the edges? I am trying to tighten this bill.

I have not been able to get this amendment up, except by offering it as a second-degree amendment. My understanding is, there will be a tabling motion. Those who decide they want to table it don't want to tighten this bill, don't want to take on Wall Street on these issues. They say: No, let's let Wall Street prance around and trade naked credit default swaps. They were up 8 percent in the fourth quarter of last year. You would think somebody would learn a lesson. They had a $700 billion bailout fund and so on, so you would think they would tone it down. No. In the fourth quarter of 2009, the use of credit default swaps was up 8 percent. If one wonders how much money is involved in all these things— I have spoken before about John Paulson, whose name came up recently with Goldman in the scandal that was the subject of a congressional hearing. In 2007, he was the highest income earner on Wall Street, earning $3.6 billion—one person. When he came home and his spouse said: Honey, how are we doing? If she wanted it by the month, he could say that this month we made $300 million. If she wanted it by the day, he could say: Pretty good. It is Saturday and I made $10 million—$10 million a day, $3.6 billion a year.

There was so much money involved in all these issues, and the reason there was so much was this unbelievable binge of speculation. We can pass financial reform, and we can call it whatever we want, but if we pass it and don't put a cork in this bottle, and we fail to deal with this issue, I will tell you, we will be back and we will find a way to have to confront, once again, the creation of these unbelievable speculative issues—naked credit default

Case 1:26-cv-02117-PAE    Document 104-5    Filed 06/01/26    Page 30 of 37

swaps—that have no insurable interest. We will regret the day we didn't address this issue head on.

I understand why there is pushback from Wall Street and why some will be nervous about voting for this. They will want to table it because they are getting pushback from Wall Street. Wall Street is wrong—dead wrong. They don't need, nor do American banks need, to be trading credit default swaps in order to make money. Yet, as I indicated to you, five of the largest financial institutions in this country have 90 percent of the credit default swaps. We think about 80 percent of them are without any insurable interest in anything. That is wagering, not investing.

This country deserves better, and the American people deserve for the Congress to stand up to Wall Street and say: You know what, the creation of these instruments exacerbated the economic troubles of this country in a significant way, and at long last it is time to put an end to it. This amendment simply bans the use of naked credit default swaps. It has a provision that says, if such a ban in a certain timeframe would cause undue—Mr. President, the Senate is not in order.

There is a provision in this legislation that, as opposed to a ban on a date certain, if that would prove to be troublesome, it would stretch out for an 18-month period by which such a ban could take effect.

Let me say this. I understand the tabling motion will be made. My hope is that colleagues who believe we ought to take on Wall Street on these issues will stand up for the American people on these issues and do the right thing on these issues, especially since we are living in the shadow of a near collapse of this economy.

My hope is that my colleagues will vote against tabling this amendment and, thereby, express their support for the amendment I am offering.

I am offering this amendment on behalf of colleagues which I will submit for the RECORD as well.

I yield the floor.

The PRESIDING OFFICER. The Senator from Connecticut is recognized.

Mr. DODD. Mr. President, I wish to speak a couple of minutes. This is the first opportunity we have had, with all the other amendments we talked about, to even talk about this very critically important part of the legislation, and that is the section dealing with derivatives, which is a source of major interest.

I wish to spend a couple of minutes describing to my colleagues what is in this bill that is before us dealing with derivatives, and then I will express some concerns about the amendment of my good friend and colleague from North Dakota. Then at the conclusion of that, unless others would like to be quickly heard on this matter, I will move to table the Dorgan amendment.

That is normally not what we have done. There have been no tabling mo-

tions made over these 2½ weeks. Let me express my regret that Senator DORGAN was unable to get a straight up-or-down vote on his amendment. Even though I have concerns about it, I tried over the last 2 weeks to have everyone have their amendments raised so we could have a good, vibrant, full-throated debate on matters and let Members decide. In some cases, we had a 60-vote margin; in most cases a 50-vote margin. No one has said to anyone yet: Your amendment can't come up.

I say to the Senator from North Dakota, I tried to see to it that everybody has the opportunity to be heard. As he knows and others know, we have had a stalemate this afternoon on whether matters can be heard.

As I said, derivatives, as most of my colleagues and many in the country understand, are essentially hedges or bets whose worth rises and falls with the price of something in the marketplace. They can be very commonsense financial tools to help businesses manage their costs. The word is taken on a pejorative, but actually derivatives are critically important in our economy.

For instance, let's say you make candy for a living; you are a candy manufacturer. The price of sugar is an incredibly important factor in determining your bottom line, and the cost of sugar can fluctuate dramatically. All sorts of factors can raise or lower the price of sugar, which is a critical component in your production of candy, but it is a factor you cannot control. You do not necessarily control what happens to the price of sugar as a candy manufacturer. Derivatives can help you manage volatility, and that is why they are so valuable in our economy.

If it sounds like insurance, that is because if used properly, that is exactly what it is.

Let's say you are an investor and you will not be able to afford the loss if your company or government whose bonds you bought defaults. Again, you do not have control over that company's or government's ability to pay you back. So a form of insurance has sprung up in the form of derivatives that would protect you against that kind of default. It is called a credit default swap, or CDS.

Just like a derivatives contract on the price of sugar, it is not necessarily a bad thing. In fact, it could be very helpful in terms of managing volatility and protecting against losses totally unconnected with your activity.

Credit default swaps played a huge role, as we now know, in the lead-up to the financial crisis that has cost our country so much.

For instance, take what happened to AIG, the former insurance giant. Before the crisis, institutions around the world bought credit protection against mortgage-backed securities from AIG, just like you or I might have bought some other, more pedestrian insurance policy. When those mortgage-backed securities failed, AIG owed money to

all of those protection buyers around the world. But AIG, as a seller of CDSs, had no regulatory requirement that it actually have the capital on hand that it would need to pay those parties if, in fact, it was called.

Guess who ended up having to make those counterparties whole. We, the taxpayers, the taxpayers across the country because AIG lacked the capital behind those derivatives. Even worse, because there was no reporting requirement, regulators did not even know where the risks were in the financial system. Because there was no requirement that these transactions run through a clearinghouse, even people in the financial sector could not figure out for sure who was exposed to AIG's potential failure.

The result, of course, was a total freeze in our markets and our financial system because financial sector actors no longer trusted that their counterparties would be creditworthy. And who could blame them? It is like if you did not trust your bank to be around the next day, you would get your money out in a hurry, as many did back 80 years ago when there were no protections. When the word went out, people took to the streets. That is why the bill drawn up in our Banking Committee and Agriculture Committee contains some very tough new rules for CDSs and the rest of the derivatives market.

Under the terms of our bill, CDSs must centrally be cleared and traded on regulated exchanges in order to reduce counterparty risks and to promote transparency and stability in our financial system.

The central clearinghouse will set margin requirements and position limits. Those ideas have been around for decades, by the way, within the commodities markets, going back to the 1870s or 1880s. Margin requirements and collateral requirements have been required; hence, there are very few problems in the commodities markets because of margin requirements and collateral requirements.

The bill before us includes tough new rules for protection sellers, such as AIG and dealers such as Goldman Sachs, that will be registered and regulated by the SEC and CFTC. They will have to face tough new rules to curb excessive risk taking, and all CDSs will be reported through a central clearinghouse, data repository, or directly to regulators.

For the very first time, financial advisers working with municipalities—the people helping to ensure that our communities invest wisely—will have to register and be subject to rules and regulations.

Our colleague from North Dakota, Senator DORGAN, has offered an important amendment to tackle yet another problem, as he sees it, with CDSs. If you owned a house and bought a policy that would pay you money if the house burned down, we would call that insurance. But if you bought that policy on

someone else's house, a house you did not even own, you probably would not get invited to spend the weekend there because you were betting the house would catch on fire.

At best, we call that a cynical bet. Unfortunately, it happens a lot in our financial system. It is called a naked CDS. It is a CDS in which the entity buying protection does not even own the underlying credit.

During the crisis, traders bought protection hoping that borrowers would fail to pay back their loans—borrowers such as the government of Greece or the State of California, for that matter.

Betting on failure, of course, is dangerous, as we know. That is why Senator DORGAN has offered an important amendment, in his mind, to define the problem. In addition to requiring all CDSs to be cleared, it outright bans naked CDSs and synthetic asset-backed securities.

I have described the serious steps we have taken in our underlying bill to reduce the dangers in the CDS market. Senator DORGAN's amendment goes a step further and, in my view, too far at this particular juncture. Let me explain why.

I don't know, nor can anyone say with absolute clarity, what are the implications and the unintended consequences if we have a total ban on the naked synthetic credit default swaps.

Here is my concern. You can have, for instance, people hedging against where they have uninsured interests. In fact Greece—a country that may fall, an entity in which there is no particular financial interest but there is a concern that economy may not be there—they lack insurable interests, necessarily, but it is not illegitimate to want to protect yourself against an event such as the collapse of another country that could cause financial disruptions.

My concern about the Dorgan amendment, and had we been dealing with it in another means—that is, we had offered the Dorgan amendment—I intended to offer a side-by-side amendment that would have allowed this to go forward but asking the security risk management operation we set up in this bill to make valuation to determine how this could work.

I happen to believe in certain instances what Senator DORGAN offers makes sense. My concern is I cannot tell you with certainty what the unintended consequences are. I cannot say with absolute certainty what Senator DORGAN is proposing actually will be doing what it claims or if there are broader implications to it.

This is a very important matter. I do not minimize it at all. But as chairman of this committee responsible for advising colleagues and drafting legislation, I need to talk with some certainty about what I think the implications will be of certain proposals. I cannot tell you what the outcome of this will be. There may be serious con-

sequences negatively to our economy if we adopt this amendment as is.

For those reasons this evening, I feel compelled to disagree with this amendment. The only alternative I have to disagreeing to it is to vote to table because of the procedural position in which we find ourselves. I would have preferred a side-by-side which would have given some room for the Dorgan amendment to move forward with further consideration as to how it is applied.

Lacking that ability, do we accept or reject the amendment? Because of the concerns I have about accepting the amendment without knowing what the consequences may be, I have to recommend the amendment be defeated. Without necessary protections for commercial end users, financial stability, and governments and corporations that depend on credit in which to operate and any alternative, we risk shutting down a $25 trillion credit default swap market—a $25 trillion credit default swap market. We need thorough examination and study before taking this kind of dramatic action. That much is at risk if this amendment were to be adopted.

I urge my colleagues, given the circumstances, to support the tabling motion.

I see my colleague from North Dakota. I withhold making the tabling motion and give him a chance to respond.

Mr. DORGAN. Mr. President, I appreciate the courtesy of my colleague from Connecticut. My colleague talks about unintended consequences. We already know the real consequences of what are called naked credit default swaps. That is all we are talking about with this amendment.

My colleague started out by talking about normal hedging by a candy manufacturer with respect to the price of sugar. That is not what this is about at all, and I am not prepared to lose a debate in which I am not involved. That is not what this is about. This is about naked credit default swaps.

My colleague says there is $25 trillion of notional value of credit default swaps. I have cited two sources—the best two of which I am aware—that says 80 percent of them—think of this—as much as 80 percent of them have no insurable interest. They are just flatout naked, just gambling, betting, not investing.

This is not a case of unintended consequences. We know the real consequences. We have already lived it and experienced it and we ought to understand that we cannot accept it any longer.

This bill allows us to decide what kind of financial system we want going forward. Do we want to leave here saying we want a financial system in which the big shots on Wall Street decide they want to trade $25 trillion worth of credit default swaps, 90 percent of them in the five biggest banks?

If that is what they want to do and it is betting rather than investing, God

bless them; let them do it. Who are we to tell them? Who are we to tell them? We lost about $15 trillion, that is who we are.

My question is: Are we going to see if we can sober up this system to say this is not the kind of financial system with which we grew up? Only in the last decade and a half did we decide to securitize everything and create these new exotic instruments—CDOs, naked credit default swaps and the like. That has happened recently. It was not because my colleagues from Connecticut and Alabama came to the floor of the Senate and said: Let's decide to create a whole series of new financial instruments in this country that are hard to pronounce and understand. They can all make a lot of money in fees, pay big bonuses, and it will work out just fine. That is not how it happened. It happened because we had a bunch of brain-dead regulators, among other things, who said: Go play. And they all went to play and made a lot of money, and this economy nearly pancaked.

So this amendment, I would say to the Senator from Connecticut, is very simple. It would ban the use of naked credit default swaps in which no one has any insurable interest.

By the way, with respect to unintended consequences, under this modified amendment I have offered, the appropriate Federal regulators, including the chair of the Financial Stability Oversight Board, may phase in the effective date for up to 18 months if they determine the phase-in of the prohibitions and limitations in the amendment is necessary to avoid undue market disruptions.

Having said that, I respect the view of my colleague. I profoundly disagree with it. I hope very much that my colleagues will decide not to table this amendment and to stand on the side of people who say: Let's really make a change here. We understand what happened. It was awful for this country. Let's make sure it doesn't happen again. The only way we will do that is to effect the kind of change that exists in this amendment.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. DODD. Mr. President, again very briefly, obviously much of what we have included under our bill, of course, is designed specifically to avoid the kinds of losses that occurred. There are provisions in the bill dealing with those kinds of safeguards—the clearinghouses, the regulators, the mandatory exchanges, and the like. That is in the bill.

Again, I have to say to my colleagues here that there are potentially serious consequences to this. There are no protections for commercial end users if this amendment is adopted. We run the risk of financial instability in governments and corporations that depend upon credit to operate—$25 trillion.

Again, I would have offered a side-by-side which would have taken some of the good aspects of the Dorgan amendment, but my concern is about exactly

**S3894**   CONGRESSIONAL RECORD — SENATE   *May 18, 2010*

the provisions I have mentioned, and there is too much at risk, in my view.

If this is the only choice we are given, I have to provide my recommendation. My recommendation is, given the choice we are given, the choice I have to make in this particular case is that we table this amendment.

For those reasons, Mr. President, I move to table the Dorgan amendment, and I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second? There appears to be a sufficient second.

Mr. DODD. Mr. President, I ask unanimous consent that if the Dorgan amendment No. 4114 is disposed of, then the Senate proceed to vote in relation to the Grassley amendment No. 4072, with no intervening amendment in order.

The PRESIDING OFFICER. Without objection, the unanimous consent request is agreed to.

The question is on agreeing to the motion.

The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from West Virginia (Mr. BYRD), the Senator from Arkansas (Mrs. LINCOLN), the Senator from New York (Mr. SCHUMER), and the Senator from Pennsylvania (Mr. SPECTER) are necessarily absent.

Mr. KYL. The following Senator is necessarily absent: the Senator from Ohio (Mr. VOINOVICH).

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 57, nays 38, as follows:

[Rollcall Vote No. 156 Leg.]

YEAS—57

| | | |
|---|---|---|
| Akaka | DeMint | LeMieux |
| Alexander | Dodd | Lieberman |
| Barrasso | Enzi | Lugar |
| Baucus | Gillibrand | McCain |
| Bayh | Graham | McConnell |
| Bennett | Grassley | Mikulski |
| Bingaman | Gregg | Murkowski |
| Bond | Hagan | Nelson (NE) |
| Brown (MA) | Hatch | Reed |
| Brownback | Hutchison | Risch |
| Burr | Inhofe | Roberts |
| Carper | Inouye | Sessions |
| Chambliss | Isakson | Shelby |
| Coburn | Johanns | Snowe |
| Cochran | Johnson | Stabenow |
| Collins | Kerry | Thune |
| Corker | Kohl | Vitter |
| Cornyn | Kyl | Warner |
| Crapo | Landrieu | Wicker |

NAYS—38

| | | |
|---|---|---|
| Begich | Feingold | Nelson (FL) |
| Bennet | Feinstein | Pryor |
| Boxer | Franken | Reid |
| Brown (OH) | Harkin | Rockefeller |
| Bunning | Kaufman | Sanders |
| Burris | Klobuchar | Shaheen |
| Cantwell | Lautenberg | Tester |
| Cardin | Leahy | Udall (CO) |
| Casey | Levin | Udall (NM) |
| Conrad | McCaskill | Webb |
| Dorgan | Menendez | Whitehouse |
| Durbin | Merkley | Wyden |
| Ensign | Murray | |

NOT VOTING—5

| | | |
|---|---|---|
| Byrd | Schumer | Voinovich |
| Lincoln | Specter | |

The motion was agreed to.

Mr. DODD. I move to reconsider the vote, and I move to lay that motion on the table.

The motion to lay on the table was agreed to.

AMENDMENT NO. 4072

Mr. DODD. I inquire of the Chair, the pending business is now the Grassley amendment; is that correct?

The PRESIDING OFFICER. The pending amendment is the Grassley amendment.

Mr. DODD. I understand there will be a request for a rollcall vote on the Grassley amendment. After that, we are still anxious—we have additional amendments. I say to my colleagues, many of you have submitted amendments you would like to have considered this evening before we get to a cloture vote tomorrow. I am willing to stay and try to accommodate as many as possible. I know Members would like to have clarity on whether we will have any more votes. There are a number of other amendments we would take up in relatively short order.

I have submitted some 49 amendments to my good friend, RICHARD SHELBY, the ranking member of the committee, that we could accept, both Democratic and Republican amendments. Some are bipartisan amendments. I am not expecting to accept every one of them, but there are many that could be part of a managers' amendment that could take care of a lot of concerns others have raised. We will have to wait to determine whether they have been cleared.

Tomorrow, there will be a cloture motion. In the meantime, there is still time this evening to consider amendments that otherwise would probably fail in a postcloture environment. I am willing to stay and deal with as many of these amendments as we can before we get to that cloture motion tomorrow, but the pending matter is the Grassley amendment.

There has been a request for the yeas and nays on those votes. That is the immediate business. After that, I cannot tell you with absolute certainty there will be additional rollcall votes. If others ask for them, we may ask you to come back and cast a ballot.

The PRESIDING OFFICER. The majority leader is recognized.

Mr. REID. Mr. President, we are trying to have more votes, but we will have to see if we do. We will have this vote. I think it is fair to say it may be difficult to have more votes tonight.

We are going to work—we are scheduled to have the vote an hour after we come in. I will work with the Republican leader to find out exactly what time we need that to be. I know there are some problems with attendance. We will have it at either 10 o'clock or 11 o'clock, whatever is convenient for everyone. We may be able to dispose of some amendments, even in the morning.

Mr. DODD. While all Members are here, this has been a remarkable 3 weeks. I realize not every amendment

has been adopted, but for many of us, we were able to get back to the business where we actually have amendments offered, debates occurring, a good-throated discussion of a very important set of issues.

My hope would be that tomorrow—it is coming to the point where we can go on indefinitely on the subject matter. We need to get to closure at some point. My plea to colleagues, as you are thinking about this evening, amendments tonight, a few amendments tomorrow, some amendments in postcloture, we need to come to closure on this legislation. It is a good bill. The country is expecting us to answer the issue of whether we are going to protect our people from future bailouts, give them some protection against the kinds of problems that occurred in the past.

I urge you, as the chairman of this committee, to be supportive of our motion tomorrow and begin to reach closure on this bill so we can move on to other matters.

Mr. President, I ask for the yeas and nays on the Grassley amendment.

The PRESIDING OFFICER. Is there a sufficient second? There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. DURBIN. I announce that the Senator from West Virginia (Mr. BYRD), the Senator from Arkansas (Mrs. LINCOLN), and the Senator from Pennsylvania (Mr. SPECTER) are necessarily absent.

Mr. KYL. The following Senator is necessarily absent: the Senator from Ohio (Mr. VOINOVICH).

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 75, nays 21, as follows:

[Rollcall Vote No. 157 Leg.]

YEAS—75

| | | |
|---|---|---|
| Alexander | DeMint | Lugar |
| Barrasso | Dorgan | McCain |
| Baucus | Durbin | McCaskill |
| Bayh | Ensign | McConnell |
| Begich | Enzi | Mikulski |
| Bennet | Feingold | Murkowski |
| Bennett | Graham | Murray |
| Bingaman | Grassley | Nelson (NE) |
| Bond | Gregg | Nelson (FL) |
| Brown (MA) | Hagan | Risch |
| Brown (OH) | Harkin | Roberts |
| Brownback | Hatch | Sessions |
| Bunning | Hutchison | Shaheen |
| Burr | Inhofe | Shelby |
| Cantwell | Isakson | Snowe |
| Carper | Johanns | Stabenow |
| Casey | Johnson | Tester |
| Chambliss | Kaufman | Thune |
| Coburn | Kerry | Udall (CO) |
| Cochran | Klobuchar | Udall (NM) |
| Collins | Kohl | Vitter |
| Conrad | Kyl | Webb |
| Corker | Landrieu | Whitehouse |
| Cornyn | Leahy | Wicker |
| Crapo | LeMieux | Wyden |

NAYS—21

| | | |
|---|---|---|
| Akaka | Gillibrand | Pryor |
| Boxer | Inouye | Reed |
| Burris | Lautenberg | Reid |
| Cardin | Levin | Rockefeller |
| Dodd | Lieberman | Sanders |
| Feinstein | Menendez | Schumer |
| Franken | Merkley | Warner |

NOT VOTING—4

Byrd          Specter
Lincoln       Voinovich

The amendment (No. 4072) was agreed to.

Mr. DODD. I move to reconsider the vote and to lay that on the table.

The motion to lay on the table was agreed to.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. HARKIN. I call up amendment No. 4085 and ask for its immediate consideration.

The PRESIDING OFFICER. Is there objection to setting aside the pending amendment?

Mr. ENZI. I object.

The PRESIDING OFFICER. Objection is heard.

Mr. HARKIN. Parliamentary inquiry.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. HARKIN. What is the pending amendment?

The PRESIDING OFFICER. The pending amendment is amendment No. 4050, offered by the Senator from Maryland, Mr. CARDIN.

Mr. HARKIN. Mr. President, I wish to be heard on this amendment. We were told to stay here tonight so we could offer amendments. I have had an amendment pending since this bill was brought to the floor. I have not been able to bring it up. We were told we could stay here tonight and offer amendments. In good faith, I stayed here to offer an amendment. Now I am told we can't offer amendments because of the pending amendment, and we can't set it aside. What kind of games are being played around here? I had this amendment pending ever since the beginning, and I have not been allowed to bring it up. With cloture tomorrow, it would fall. What does it mean that we should stay around here to offer amendments tonight, when there is a pending amendment we can't set aside?

If that is the game we are going to play, I am going to put in a quorum call and we will not call it off.

Mr. REID. Will my friend yield without losing his right to the floor?

Mr. HARKIN. Without losing my right to the floor, I yield to the majority leader.

Mr. REID. In the conversations we just continued over here, I tried to work something out. It was my understanding that the minority, the Republicans, agreed to allow the Senator's amendment dealing with annuities to come up.

Mr. HARKIN. I can't hear.

Mr. REID. In a conversation we had over here a few minutes ago, the Republicans and Senator DODD and his staff thought it would be appropriate to bring up your amendment dealing with annuities. That was part of the general agreement we had worked out over here.

Mr. HARKIN. Well, I have my ATM amendment, and then there is an annuities amendment.

Mr. REID. The annuities amendment is what the conversation was about.

Mr. HARKIN. This is the ATM amendment that I have had filed since the beginning. I have had it filed since this bill was brought to the floor.

Mr. REID. So what about the annuity amendment?

Mr. HARKIN. I have that amendment too. I didn't know there was a limit. I have two amendments. I have an annuities amendment and an ATM amendment.

Mr. REID. I guess my question through the Chair to my friend from Iowa is, rather than going into a quorum call tonight, you could always do that some other time. I think it would be more productive if your amendment, which is dealing with annuities, was lumped into a number of other amendments that have been agreed to on both sides. See if we can dispose of those. Then if you still feel aggrieved at a later time, you could still do whatever you want.

Mr. HARKIN. I will not be able to because there will be a cloture vote tomorrow, and I will have been precluded for 3 weeks from offering my amendment. That is not quite fair ball around here. I said I would do my amendment in 5 minutes. I don't need to take much time.

Mr. REID. I say again through the Chair to my friend, it seems that it would be better that you would have the opportunity at least to get the annuity amendment, which a number of us believe is a very important amendment. I think it would be better if we were able to at least get rid of that amendment in a positive way. I think that is a very important amendment. If I had to choose between the ATM amendment or the amendment dealing with annuities, it would be hard for me to make a choice which one is the most important amendment. It is not a question of not having two amendments. It is a question of couldn't we at least dispose of one of them which is an important amendment; otherwise, the way this train is going, we may never get to the annuity amendment.

Mr. HARKIN. I say to my friend, the leader, that we seem to have an impasse. I have an annuities amendment. I don't know what is going to happen to that. I don't know if they are going to bring it up, vote on it or not vote on it. No one has said to me what they are going to do with it. I have an ATM amendment I have been trying to bring up. I heard my friend from Connecticut—and he is my friend; I respect him highly—say: Stay around here tonight and offer amendments. I just offered an amendment, and now I can't offer the amendment because they will not set aside the pending amendment.

Mr. REID. I am not going to belabor the point, other than to say to my friend, there has been a tentative agreement between the two managers of the bill, including offering your amendment dealing with annuities. That is an important amendment. I

support it a lot. I think the other amendment is good too. But we don't have agreement on both of them. We do on one of them.

Mr. HARKIN. Mr. President, until we find some way to work something out, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. WYDEN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Is there objection?

Mr. NELSON of Florida. I object.

The PRESIDING OFFICER. Objection is heard.

The bill clerk continued with the call of the roll.

The PRESIDING OFFICER. The Senator from Oregon.

Mr. WYDEN. Mr. President, I ask unanimous consent to vacate the quorum call.

The PRESIDING OFFICER. Is there objection?

Without objection, the quorum call is lifted.

Mr. WYDEN. Mr. President, I ask unanimous consent to set aside the pending amendment and call up amendment No. 4019, the bipartisan amendment Senator GRASSLEY and I have worked on for years to end secret holds here in the Senate, and permit 10 minutes of debate.

The PRESIDING OFFICER. Is there objection?

Mr. SHELBY. I object.

The PRESIDING OFFICER. Objection is heard.

Mr. SHELBY. I object on behalf of Senator DEMINT.

The PRESIDING OFFICER. Objection is heard.

The Senator from Oregon.

Mr. WYDEN. Parliamentary inquiry: Could the Senator who objected to my request identify on whose behalf the objection was made?

Mr. SHELBY. I objected on behalf of Senator DEMINT.

Mr. WYDEN. Mr. President, if I could be heard on this very briefly, my friend Senator GRASSLEY is here, and perhaps we could take 3 minutes or so each to discuss this.

We have worked on this now for more than a decade. The American people are furious at the way business is done in Washington, DC, and if ever there were a concrete reason why, we have seen it in the handling of this bipartisan effort to once and for all take business in the Senate out of the shadows and do public business in public. This has widespread, bipartisan support. It is designed to ensure that when a Senator uses one of the most powerful tools at their disposal to actually block the public from seeing public business, that Senator would be publicly accountable. That hasn't been the case, and again and again we have seen colleagues over the last decade abuse this process.

It used to be years ago something that was a courtesy. Now it has come to rule life here in the Senate. Scores and scores of instances of holds have been used by both political parties. There is one Senator in this body—just one—who has objected to this coming up, and that Senator has been unwilling on multiple occasions to come to the floor of the Senate and actually state why he insists on defending secret holds. So the effort to derail secret holds is, in effect, something that is also being done in secret.

We wish to open the Senate to the kind of transparency and accountability the American people deserve, but we can't even get to a debate because the person who wants to derail this effort for new openness and new transparency won't even come to the floor and say it to our face. That is what this is all about. One can have their own views with respect to holds. Colleagues will differ on this, but what we ought to insist on is what Senator GRASSLEY has said over this decade and that is if you are going to object, you ought to have the guts to come forward and do it publicly.

I will tell my colleagues, I believe the secret hold here in the Senate is an absolutely indefensible violation of the public's right to know. Having an office here in the Senate, honored by the people of your State, in my view is a sacred trust. I believe if you told the people of your home State that you are going to go to Washington and keep the public from even getting a peek at a critical nomination or a bill, they wouldn't stand for it for a moment. They certainly wouldn't send you back to the Senate.

I intend to come back to this floor again and again and again. I see my friend Senator GRASSLEY here, who has in my view been a leader in the fight for open and transparent government. I will tell my colleagues, I think the idea that one Senator—because we got this to a vote and we asked for 10 minutes tonight for a debate, this would pass overwhelmingly—but one Senator objects to our even getting a vote for more sunshine in government. Again, that Senator has been unwilling on multiple occasions to come to the floor and say why he favors secrecy.

In fact, yesterday—I say this to my friend, the Senator from Alabama, my good friend—the objector said, Well, he was interested in the Senator from South Carolina having the opportunity to come and talk to Senator GRASSLEY and me about our amendment. He has done nothing of the sort. So he objected the first time without notice when we were minutes away from a victory that would have transformed Senate procedure for new openness. He has objected through colleagues. He has been unwilling to come and talk to us about why he insists on secrecy—and, by the way, what he apparently wants to do is something I have actually voted for.

This strikes me as an absolutely indefensible way to do business. It is a concrete case, in my view, of why the American people are so furious about the way business is done in Washington, DC.

I wish to have my friend from Iowa have a few minutes, and then, with the indulgence of the Chair, we will wrap up. This is our third such effort, and I don't care how many times we have to come back to the floor to win this fight for open, transparent, and accountable government. I think it goes right to the core of our duties in the Senate.

I yield the floor, and I particularly express my appreciation to the Senator from Iowa for his patience. We now have well over 10 years into this cause and we are going to prosecute this issue of openness and accountability until the public interest prevails.

I yield the floor.

The PRESIDING OFFICER. The Senator from Iowa is recognized.

Mr. GRASSLEY. Mr. President, my friend from Oregon has adequately spoken about the rationale behind what we are trying to do as well as the substance of it, so there is no point in my repeating that. But I think people ought to wake up to what is inevitable around here. When 3 or 4 years ago we had exactly the same substance up, it passed the Senate 84 to 13, I think, and through subterfuge, it was taken out in conference. The House doesn't conference a Senate procedure, so that is why I use the word "subterfuge." So we ended up with something that has not worked in the last 3 or 4 years.

Then we hear, particularly from the other side, about the holds, blaming this side for it. Every side has some guilt of misuse of holds. The fact is there is nothing in our amendment that changes the power of an individual Senator to hold up something. It is not as though we are trying to compromise this very significant power that an individual Senator has, but we are taking the adjective "secret" away from secret hold so that you know who the person is; so you can have dialogue with that person; so you can find out what their objections are; so you can reach compromises. That is the purpose of it. When things are secret, it is not only obnoxious to our principle of representative government; it violates the opportunity for an institution such as this to actually work. We should want to enhance the respect of this institution and one way to do that is to take the adjective out of secret hold, not to change anything else. It will enhance so much public understanding of what we are doing, because the public's business ought to be public. In our democracy, 99 percent of what we do—and maybe the only exception would be privacy of an individual or national security—of the public's business ought to be public, and that is what the people expect. But this word "secret" keeps from the public knowledge a lot of information that ought to be there to make this body work and to make sure we reduce the cynicism of the public toward government operation.

As I said, first, it is inevitable that this is going to happen. Senator WYDEN and I are going to pursue this, because this is the time to do it. The abuse of this power has gone on way too long.

I yield the floor.

Mr. SHELBY. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. MERKLEY. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. MERKLEY. Mr. President, I ask unanimous consent that the pending amendment be set aside and that my amendment No. 4101 be brought up, considered as read, and that a vote be held at 9 p.m. this evening.

The PRESIDING OFFICER. Is there objection?

Mr. SHELBY. Objection.

The PRESIDING OFFICER. Objection is heard.

Mr. MERKLEY. Mr. President, earlier this evening, my colleague noted that philosophically he shared some interest in this amendment. Others were objecting to it. I wonder whether he would share, in the interest of the debate—and Senator WYDEN was just speaking to it, and Senator GRASSLEY was also—who is objecting to this amendment being debated tonight.

Mr. SHELBY. I was objecting on behalf of myself and a lot of other Members.

Mr. MERKLEY. I thank the Senator. I think it would be useful if the citizens of our Nation were to know who was objecting and that the names be read into the RECORD. I think the citizens have a right to know where their Senators stand on this issue. It is an ideal time to let the citizens know who is putting the secret holds on this amendment.

Mr. SHELBY. Mr. President, if I can respond, there is no secret hold here. I am objecting on behalf of myself to his unanimous consent request.

Mr. MERKLEY. Mr. President, I know I put my colleague in a terrible spot by asking that question. But I do think the citizens of our Nation deserve an explanation as to why we are here tonight and not currently debating any of a whole list of amendments that Members of this body wanted to bring forward about how we improve our financial system.

The amendment, No. 4101, is an amendment that is cosponsored by CARL LEVIN and myself and about 20 other Senators in this body. There are not that many amendments that have 20-plus cosponsors. I will tell you that it is not the number of cosponsors, although that indicates a genuine interest among colleagues in debating this; it is the substance that goes to the heart of the conversation between Wall Street and Main Street.

This amendment is about how we aggregate capital in our country and how

we allocate it. How do we get money where it does the most good to build our economy and build the success of our families? We have a couple of different ways of doing that in our Nation. One is that we make a deposit in a bank, and the bank also has access to the Federal Reserve window, where they get very low cost loans. The intent of us providing both access to the Fed window and the low-cost loan and providing a government insurance on deposits is that this money is going to go into loans to our families and our small businesses. That access to capital is absolutely essential for building our small businesses.

Right now, our businesses are having a difficult time accessing capital. I bet every Member of this body has gone around their States and heard the stories I hear in Oregon. I hear about credit lines being cut in half or eliminated. I hear about projects where they are ready to seize a business opportunity but that opportunity is blocked because they cannot get a loan they would have gotten in a heartbeat last year or 2 years ago or 3 years ago. Those opportunities are not just about the success of the business; they are about the success of our families because when those small businesses expand, they put people to work.

Right now, access to capital is frozen through much of our economy, inaccessible to our families and small businesses to be able to seize those opportunities to expand. Why is that? It is because we put in the same house both our lending system and our high-risk investing system. Both of these work very well.

Let me explain the high-risk investing side. If you are so fortunate as to have a big chunk of capital, you may say: I am going to put this into this private equity fund or venture capital fund or this hedge fund, and they are going to have some very capable managers who are going to look for investments—often high-risk opportunities. They will scour the United States, and they are going to find opportunities to invest. A lot of the time those investments pay off handsomely. Those who are fortunate enough to have the funds to be able to put them into such investment vehicles often do very well.

Occasionally, the bets that are made go awry. Why is that? Well, a fund says: You know what, there is a huge new opportunity in Russia, for example, because the price of oil is going up and they have a lot of oil they want to develop. They are changing their rules and there are new opportunities for business to thrive and take advantage of those new rules. So they invest in Russia, but something goes wrong and the price of oil drops and their investments blow up—suddenly, the investment fund blows up.

If that investment fund is by itself, it doesn't really hurt the rest of the economy. As long as it is by itself and not systemically so large that it poses a huge risk to the rest of the economy,

and it goes bust, the investors simply lose their money. No harm done. But if it is inside of a bank, now you have a problem because when that goes bust, the bank is responsible for the responsibilities of that fund, and the result is that the bank goes down.

We saw that Citibank went down. We saw so many other big banks—when I say "went down," I mean they had huge losses. Citibank is still alive. I know the folks in South Dakota will be happy to know that. They had huge losses, and the former chair of Citibank believes we need to separate the high-risk investing and the function of depositing, accessing money through the Fed, and making those loans to our families and small businesses so they can thrive. It is a separation between two functions.

I would be happy to yield to my colleague if he wants to explain why he is objecting to having a debate on the floor of the Senate that is a debate that is so important to the success of our small businesses, so important to the success of our families, that is so important because we should have learned over what happened in the last 2 years that if these two functions are combined, they hurt each other. Why would we not want to debate the diversion of money out of the hands of our small businesses and into Wall Street? I would yield if my colleague across the aisle would like to say why he is objecting to having this debate tonight. If he would like to jump up later and explain it, I will take that comment at that time.

We cannot do our job here in the Senate if a Senator blocks the debate of issues that are important to the success of our Republic. We cannot do our job here in the Senate if a Senator blocks the debate of issues that are important to our families. We cannot do our job if folks, on behalf of Wall Street giants, come to the floor and object to the debate of fixing our financial system so our small businesses can thrive.

I can tell you this: Back home, people know that this body helped out the biggest corporations in America last year in a very difficult time for them, when many of them would have gone bust. They want to know why this body, tonight, is unwilling to debate changes in the law that will help the small businesses of America, changes that will help the families of America, debate that will enable us to discuss improving our system so that we can have decades of solid growth in the years ahead. Why should Wall Street veto a debate in this body tonight for Main Street? I can't explain that to the folks back home.

I can't explain to the folks back home that we have an amendment that has been carefully worked on for months; that there are colleagues on both sides of the aisle who wanted to have this debate; that we have an amendment that was worked on very carefully with experts from Wall Street

to make sure we got it right; that we have an amendment about which the Treasury Department called in experts, brought them in through meetings and said: Here is the challenge, here is what you need do and how you can fix it. How do I explain to them that, with all that work, we could have a rational debate. But it isn't going to happen because Wall Street is asking colleagues to block the debate for the American people. Why is Wall Street winning and Main Street losing tonight? I would like an explanation. The American people would like an explanation.

Another piece of this bill says that nonbank financial organizations—by this, you can simply say hedge funds and equity funds, funds that pool money and make risky investments—that if they are so large, they pose a risk to the economy as a whole, then the regulators can add additional capital requirements, so they have to set aside more dollars for every dollar they invest.

Two years ago, the SEC lifted the capital requirements on the largest five investment banks in America. Bear Stearns went from 20-to-1 leverage to 40-to-1 leverage in 1 year. What do I mean by that? For every dollar they set aside in case investments went bad, they invested $20. So you only had to have a 5-percent drop in value to wipe out what they set aside. At the end of the year, they got 40-to-1 leverage, and that meant for every $100 invested, they only had $2.50 set aside, and you only needed 2.5 percent reduction in investments to go bust. What kind of regulation system would allow 40-to-1 leverage?

Should we not have a debate on the second main piece of this amendment, which says that regulators, when you have a systemically significant firm, can increase the leverage requirement, increase the capital set aside, so that firm is not operating in a way that it can bring down our economy or punch a huge hole in our economy?

So the first part of the amendment says that high-risk investing is wonderful for allocating capital but do it away from our lending system so that our small businesses and our families can have access to a steady flow of capital, so that capital will not be frozen when investments go bad.

The second part of the amendment says: Give the regulators the power to increase the capital requirement when they are large and can tear a big hole, so if they do crazy, risky things and they lose, they do not hurt the rest of the economy. I think it is common sense. Why is that debate so scary to my colleagues who are objecting to it tonight?

This is not about whether the amendment wins. We offered tonight to have this vote with our arms tied behind our back and one leg. What do I mean by that? We offered to have this vote tonight with a 60-vote requirement, even though a number of Democratic Senators are missing—a supermajority requirement so that we can have a debate

on Main Street about Main Street, about Main Street working better. But Wall Street asked colleagues to block this debate. That is wrong.

The third part of this amendment says we need integrity in writing securities. This is the superb work of my colleague, Senator LEVIN. I know he will expand on it in due course. But here is the thing. A system with integrity is good for allocating capital efficiently because people want to invest in a system that has integrity. When we established the Securities and Exchange Commission to oversee the stock world, people gained more faith that the system was not rigged. They were more willing to buy stocks and, by that fashion, invest their moneys in the companies of America, build those companies. The success of those companies was good for our families—our working families—and the jobs that went with them.

But now in securities, we have a very opaque, a very dark market where only a few companies have control of the information and people do not know what the price point is, and they do not know what the details are. We have swaps being written where if you participate in it, you do not even know who is on the other side of the deal. There were folks doing deals with middlemen on Wall Street, and they did not know who the insurer was. They did not know it was AIG on the other side of the deal. When you buy insurance, you want to know who the insurer is. They could not get access to that information.

In securities, here is the thing. Right now, we have companies that while they are designing and selling securities also are betting against the success of those securities. I must say, that does not instill much confidence in the integrity of the system.

I ask my colleagues, and I ask the citizens of this country: Would you like to buy a car from someone who would not tell you whether they installed brakes and who was taking out an insurance policy on your life; they are betting you are going to get in a wreck? You would say: No, I would not want to buy a car from someone who is not telling me if they put in the brakes and is taking out a life insurance policy on my life. I would be scared to death to buy that car.

The story goes on. Would you buy a loaf of bread from someone who would not tell you what the ingredients were and you do not know if it is a good loaf of bread, and they are taking an insurance policy out on your life? You would be worried about the ingredients in that bread.

That is the problem we have in the securities world. It is a very simple approach that Senator LEVIN has laid out in which it calls for integrity in securities. If you are designing and selling them, you do not bet against them.

There are all kinds of details that have been put into these three parts of the amendment to make them work.

Actually, there is nothing in this amendment that is very far outside a core set of issues being considered. Modern bank holding companies do a lot of things. They do wealth management. They do broker dealers in securities and other financial products. They do market making where they help bring together this group that wants to buy and this group that wants to sell. They make loans to power up our families and our small businesses. All those functions continue in our bill.

But amidst that set, there is one thing that is being carved out, and that one thing is high-risk investing. When Merrill Lynch blows up, you do not want it to take down Bank of America. Two years ago, Merrill Lynch blew up. It would not have taken down Bank of America because it was not in Bank of America. But it is today. It is a riskier system we have today than 2 years ago.

We should have a debate about this on the floor of the Senate. Bear Stearns, 2 years ago, was by itself. But now it is part of JPMorgan Chase. If Bear Stearns, 10 years from now, makes investments that go awry and it goes down, it blows up a major lender. These types of bankruptcies need to not be a situation where they send shock waves and paralyze our economy. So common sense: more collateral, if you are a huge investor, set by regulators at a rational level with appropriate hearings. That high-risk investing, do it under a different roof so if it blows up, it does not affect lending, and those securities—a little bit of integrity in the marketing of securities.

These are simple ideas. These are commonsense ideas that will make our financial system work better for everyone, making it more feasible for our small businesses to gain access to credit, making it more feasible for our families to gain access to credit, making it less likely that a major disruption in investing is going to freeze up those loans and the result is that credit lines are being cut so they cannot expand business and cannot hire.

That is where we are now. We are frozen. In mortgages, we do not have a functioning securities market right now. It is important because banks make loans and then they sell them on to the market. But they can only sell them if the market has somebody to sell to. Right now investors are leery, and they should be leery when there are these conflicts of interest that the good work my friend from Michigan has done addresses.

This debate should happen. It is wrong for a Senator to object to the people of the United States having their day to talk about a financial system that works for small businesses and works for families.

I know my colleague from Michigan is prepared to expand on the work he has been doing. At the close of my remarks, I wish to thank many of my colleagues who have been immersed in this effort to design a better financial

system. Senator DODD and his team on Banking have been working night and day looking at every angle to get this amendment right. My friends at Treasury—I cannot tell you how many nights they have been up working, consulting with folks who are deep in the industry, to understand what works and does not to get this right. Senator LEVIN's team and my team have been working so hard in consulting and facilitating and writing and rewriting so we could have this debate in a responsible way tonight. We did not want to have a debate where we had an amendment that was illogical or had rough edges that had not been sanded off. We wanted to have a responsible debate.

We may not have had the votes necessary to adopt the amendment. We do not know. That is a mystery. But what we know for sure is that the people of America have been shortchanged tonight by some colleagues at the request of Wall Street blocking consideration of this amendment, and that is not right.

I yield the floor.

The PRESIDING OFFICER. The Senator from Rhode Island is recognized.

Mr. REED. Mr. President, I ask unanimous consent that the cloture vote on the Dodd-Lincoln substitute amendment No. 3739 occur at 2 p.m., Wednesday, May 19; and that Members have until 1 p.m. to file germane second-degree amendments.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. REED. Under a previous order, a Shelby amendment No. 4010 and a Vitter amendment No. 4003 were ordered to be called up. I would like to state for the record that those amendments are still in order to be called up and hope that the RECORD will so reflect.

The PRESIDING OFFICER. The RECORD will so reflect.

Mr. REID. Mr. President, months ago, one of the most respected names in finance, Paul Volcker, the former Chairman of the Federal Reserve Board, made a commonsense proposal to protect taxpayers from the risk-taking on Wall Street.

The essence of the proposal was this: Banks that have an explicit or implicit backing from taxpayers, through deposit insurance or otherwise, should not be allowed to make investments for their own profits. Banks can do one or the other, but not both.

The goal of the proposal is clear: We will not let Wall Street bankers take advantage of taxpayers to make themselves rich.

Wall Street should be free to serve their clients, help investors save and allow entrepreneurs to raise the money they need to grow their businesses. But big banks should not be taking exaggerated risks that benefit only themselves and their own pocketbooks.

Our Wall Street reform bill has a provision that reflects this principle. Senators LEVIN and MERKLEY have been working for weeks on a proposal that

makes the tough underlying bill even tougher by giving taxpayers additional safeguards.

Their amendment would stop big banks from high-risk speculation and stop them from investing in hedge funds or private-equity funds. It would impose tough capital requirements on the biggest firms that pose the biggest risks to the financial system.

And it prohibits the conflicts of interest that allow Wall Street firms to bet against the very products they sell to their clients.

Mr. President, financial instruments and securities trading are complex. But this amendment is nothing more than simple common sense.

It stops Wall Street from gambling away other people's money with little risk and large reward. It rejects the rules in place today—which are the same rules that were in place when our economy nearly collapsed—rules that let big banks take home their winnings but ask for all us to cover the loses. And it says to those who game the system: the game is over.

If Republicans are serious about learning from the mistakes of the past, they'll join us. If they agree that protecting middle-class consumers, safeguarding families' savings and protecting seniors' pensions is more important than carrying water for Wall Street millionaires, they'll join us. If they don't, it will be clear to the American people who's on their side, and who isn't.

And even if—in spite of all the evidence to the contrary—they still disagree that taxpayers shouldn't be on the hook for big banks' bad bets, I ask them to at least let us have a vote on this amendment, and let the majority rule.

The Levin-Merkley amendment and this larger bill will help prevent future financial crises. They will guarantee taxpayers that they won't ever again be asked to bail out a out bank that doesn't want to take responsibility for its own mistakes. And they will make sure the disastrous recession our families and businesses have endured for the last several years does not get worse, and never happens again.

Mr. INOUYE. Mr. President, the financial reform bill before the Senate includes a section, subtitle J, section 991, that would permit the Securities and Exchange Commission, SEC, to be "self-funded," meaning that the SEC would set its own budget and collect the subsequent fees from the companies the agency regulates. The effect of this action would be to remove a critical oversight role for the Appropriations Committee.

Currently, Congress sets the amount to be collected and the SEC adjusts their fees during the year accordingly. The provision included in S. 3217 allows the SEC to both set the fee level and adjust the fees accordingly, basically creating a carte blanche approach to SEC budgeting.

I, along with eight of my colleagues, including the vice chairman of the Appropriations Committee, Senator COCHRAN, the chairman and ranking member of the subcommittee with oversight responsibilities for the SEC, Senators DURBIN and COLLINS, along with Senators BYRD, HARKIN, VOINOVICH, MURKOWSKI, and BROWNBACK, have introduced a bipartisan amendment to strike the provision from the underlying bill.

No one disputes the fine job Chairperson Mary Schapiro has done since taking the helm of the SEC. But the foundation of our government is based on checks and balances, not personalities. Agencies should not be given sole authority to negotiate the fees that support their operations with the very institutions over which they regulate. Such a situation allows for absolutely no meaningful oversight by Congress.

However, if Congress is going to concede to the SEC absolute control of its billion-dollar budget, then the agency must have effective internal controls in place. Unfortunately, that is not the case. The Government Accountability Office has faulted the SEC several times in the past for weaknesses in this very area.

So the underlying provision will exempt an agency from the appropriations process and its annual congressional oversight without ensuring that any internal controls are in place for revenue and budget management. While it may not be the intent of the underlying provision, what is clear is that spending for the SEC would go unmonitored.

The amendment I and my colleagues introduced would strike section 991 from the bill, and thus restore the existing fee-based system for the SEC. The existing fee-based system is a successful model that has the annual appropriations bill both trigger the collection of the fees and determine the amount that can be spent. This model is used for other fee-based agencies such as the Federal Communications Commission, the Federal Trade Commission, the Patents and Trademark Office, and parts of the Federal Drug Administration.

It is clear that the House of Representatives does not support the approach included in the underlying Senate bill as they did not include a provision for the SEC to be self-funded in their legislation. I have spoken with my fellow cosponsors of this amendment, and we have agreed not to offer this amendment during the current debate. We take this action in support of the managers' and leaderships' interest in wrapping up floor consideration of the measure and because it is clear that this issue will be resolved appropriately during the conference negotiations on this bill.

## MORNING BUSINESS

Mr. REED. Mr. President, I ask unanimous consent that the Senate proceed to a period for the transaction of morning business, with Senators permitted to speak for up to 10 minutes each.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. REED. Mr. President, I request to be recognized in morning business.

The PRESIDING OFFICER. Without objection, it is so ordered.

## PRIVATE POOLS OF CAPITAL

Mr. REED. Mr. President, like many of my colleagues, I have several amendments that have been filed. At this moment, it is not possible to call up all the amendments, but I wish to speak to one of them and hope that prior to the conclusion of our debate, I will have the opportunity, and I hope my colleagues do have an opportunity, to call up amendments that are still important to the legislation and deserve consideration by the body.

My amendment would require registration with the Securities and Exchange Commission for private equity funds, hedge funds, and venture capital funds that are larger than $100 million. It recognizes that large pools of capital without any connection to regulatory authority could pose a systemic risk. It is a function, as we found out, in some cases, that if they make erroneous judgments, that could cause a systemic problem.

This proposal has been embraced by a wide cross-section of interested and knowledgeable parties. It has the support of the Obama Administration. It has the support of the North American Securities Administrators Association, who represent State securities regulators. It has the support of the Private Equity Council, the Managed Funds Association, Americans for Financial Reform, the AFL–CIO, and AFSCME. It has broad-based support, and I think it is part of the major effort of this legislation to increase transparency and, as a result, to preclude and prevent fraud, particularly when we are dealing with these large pools of private capital.

Private equity firms' activities can often make or break companies, resulting in a significant loss of jobs. We have seen of the 163 nonfinancial companies that went bankrupt last year, nearly half were backed by leveraged buyout firms.

There are startling examples of companies, going concerns that employ thousands of Americans, that are acquired by private equity companies. Their business model, in many cases, is to leverage that company by borrowing extensively and by using these proceeds to purchase the company and then hopefully to repay themselves handsomely. If they are at a point in which the company is burdened with too much debt, they will either attempt to sell it off or they are forced into bankruptcy. The result, unfortunately, in many cases, is thousands of working men and women in this country lose their jobs. The company goes bust. There is nothing left.

This behavior has to, at least, be on the radar screen, if you will, of the regulators. They have to know that these