**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| The People of the State of New York, by Attorney General Letitia James; the Commonwealth of Pennsylvania, by Attorney General David W. Sunday, Jr.; State of Colorado, *ex rel.* Philip J. Weiser, Attorney General, and Martha Fulford, Administrator; Maryland Office of the Attorney General; State of Nevada; State of New Hampshire; State of New Jersey, by Attorney General Jennifer Davenport; State of North Dakota, *ex rel.* Drew H. Wrigley, Attorney General; State of Oklahoma; State of South Dakota; Commonwealth of Virginia, *ex rel.* Jay Jones, Attorney General; State of Washington; and State of Wisconsin,<br><br>          Plaintiffs,<br><br>          v.<br><br>OneMain Holdings, Inc.; OneMain Finance Corporation; OneMain Consumer Loan, Inc.; OneMain Financial Holdings, LLC; OneMain Financial Group, LLC; OneMain Financial, Inc.,<br><br>          Defendants. | Case No: 1:26-cv-2117 (PAE)<br><br>Hon. Paul A. Engelmayer |

**<u>PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ...................................................................................................... 3

    A.   Statutory Background ................................................................................................ 3

    B.   OneMain's Add-On Packing Scheme ....................................................................... 4

ARGUMENT ................................................................................................................................ 5

    I.   The Court Is Not Jurisdictionally Precluded from Considering the States' Claims ........... 5

        A.   Jurisdiction Lies Where a Suit Does Not Seek to Contravene a Consent Order ............ 5

        B.   The States Do Not Seek to Contravene the Consent Order ........................................... 7

    II.   *Res Judicata* Does Not Preclude the States' Claims........................................................... 9

        A.   The CFPB's and States' Interests Were Not Aligned ..................................................... 10

        B.   The CFPB Did Not Understand Itself to Be Representing the States ........................... 12

    III.   The States Are Authorized to Enforce TILA ................................................................. 13

    IV.   Venue Is Proper in This Court ...................................................................................... 15

        A.   Section 5552(a)(1)'s Venue Provision Is Permissive, Not Restrictive ......................... 16

            1.   Plain Language and History Show that Section 5552(a)(1) Is Permissive ............... 16

            2.   OneMain Misreads the Legislative History ................................................................. 18

            3.   A Restrictive Interpretation Generates Anomalous Results ..................................... 19

        B.   Venue Is Proper Under Section 5564(f) ........................................................................ 21

    V.   The States Have Authority to Assert CFPA Claims ....................................................... 22

        A.   The States Have Authority by Virtue of the CFPA Itself ............................................. 22

        B.   The New York Attorney General Has Authority Under New York Law ...................... 23

        C.   The Nevada Attorney General Has Authority Under Nevada Law .............................. 25

        D.   The Oklahoma Attorney General Has Authority Under Oklahoma Law ..................... 25

        E.   The Wisconsin and Pennsylvania AGs Have Obtained the Requisite Authority ......... 26

    VI.   Maryland, Nevada, and New Jersey's State-Law Claims Are Properly Pleaded ......... 26

        A.   Rule 9(b) Does Not Apply ............................................................................................ 27

        B.   In Any Event, the Claims Meet Rule 9(b)'s Pleading Requirements ........................... 29

    VII.   Colorado's State-Law Claims Are Properly Pleaded................................................... 30

    VIII.   The Court Should Not Dismiss the States' Request for Penalties ............................... 31

        A.   Civil Penalties Are Available Under the CFPA............................................................ 31

B.    Penalties Are Available Under State Law ................................................................... 32

CONCLUSION................................................................................................................................ 33

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*American Fair Credit Association v. United Credit National Bank*,
   132 F. Supp. 2d 1304 (D. Colo. 2001)............................................................... 6

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
   404 F.3d 566 (2d Cir. 2005) ............................................................................ 30

*Alabama v. PHH Mortg. Corp.*,
   No 18-cv-0009 (D.D.C.)................................................................................... 18

*Bakenie v. JPMorgan Chase Bank, N.A.*,
    No. 12-cv-60, 2012 WL 4125890 (C.D. Cal. Aug. 6, 2012) ........................... 7

*Benton v. Bank of America Corp.*,
   159 F. Supp. 3d 89 (D.D.C. 2016).................................................................... 22

*Bilotta v. Novartis Pharms. Corp.*,
   50 F. Supp. 3d 497 (S.D.N.Y. 2014) ................................................................ 29

*Brotherhood of R.R. Trainmen v. Baltimore & O. R. Co.*,
   331 U.S. 519 (1947) ......................................................................................... 21

*Bryant v. Koppers, Inc.*,
   627 F. Supp. 3d 466 (D. Md. 2022)................................................................... 27

*Camillus Clean Air Coalition v. Honeywell Int'l, Inc*
   947 F. Supp. 2d 208 (N.D.N.Y. 2013).............................................................. 6

*Cartwright v. Georgia-Pac. Corp.*,
   663 P.2d 718 (Okla. 1982)................................................................................ 25

*CFPB v. Credit Acceptance Corp.*,
    23-cv-0038 (S.D.N.Y. Jan. 4, 2023) ............................................................... 24

*City of New York v. Beretta U.S.A. Corp.*,
   315 F. Supp. 2d 256 (E.D.N.Y. 2004).............................................................. 10

*Com. of Pa. v. Mid-Atlantic Toyota Distributors, Inc.*,
   704 F.2d 125 (4th Cir. 1983)............................................................................ 23

*Consumer Prot. Div. v. Morgan*,
   874 A.2d 919 (Md. 2005).................................................................................. 28

*Cortez Byrd Chips v. Bill Harbert Construction Co.*,
   529 U.S. 193 (2000) ......................................................................................................Passim

*David v. U.S.*,
   No. 18-cv-3896 (ER), 2020 WL 8872107 (S.D.N.Y. Apr. 15, 2020) ....................................... 21

*Doe v. Pataki*,
   120 F.3d 1263 (2d Cir. 1997) ................................................................................................. 18

*Dubin v. U.S.*,
   599 U.S. 110 (2023) ............................................................................................................... 15

*Duplex Printing Press Co. v. Deering*,
   254 U.S. 443 (1921) ............................................................................................................... 19

*Ellis v. J.P. Morgan Chase & Co.*,
   950 F. Supp. 2d 1062 (N.D. Cal. 2013)..................................................................................... 6

*Esquire Trade & Finance, Inc. v. CBQ, Inc.*,
   562 F.3d 516 (2d Cir. 2009) ................................................................................................... 12

*F.D. Rich Co., Inc. v. U.S. for Use of Indus. Lumber Co., Inc.*,
   417 U.S. 116 (1974) ............................................................................................................... 21

*Ferrer v. Yellen*,
   659 F. App'x 982 (11th Cir. 2016)............................................................................................ 6

*FTC v. Affiliate Strategies, Inc.*,
   No. 09-4104, 2010 WL 11470099 (D. Kan. Jun. 4, 2010) ...................................................... 27

*FTC v. Consolidated Foods Corp.*,
   396 F. Supp. 1344 (S.D.N.Y. 1974) ....................................................................................... 26

*FTC v. DirecTV*,
   No. 15-cv-1229, 2015 WL 9268119 (N.D. Cal. Dec. 21, 2015) ............................................. 13

*FTC v. Freecom Commc'ns, Inc.*,
   401 F.3d 1192 (10th Cir. 2005)............................................................................................... 27

*FTC v. Uber Techs., Inc.*,
   No. 25-cv-03477, 2026 WL 976077 (N.D. Cal. Apr. 10, 2026) ............................................. 26

*Garrity v. Maryland State Bd. of Plumbing*,
   135 A.3d 452 (Md. 2016) ....................................................................................................... 33

*Gen. Dynamics Land Sys., Inc. v. Cline*,
  540 U.S. 581 (2004) ....................................................................................................... 18

*Gennari v. Weichert Co. Realtors*,
  691 A.2d 350 (N.J. 1997) ................................................................................................ 28

*Harmon Industries v. Browner*,
  191 F.3d 894 (8th Cir. 1999) ........................................................................................... 11

*Hubbard v. U.S.*,
  514 U.S. 695 (1995) ......................................................................................................... 18

*Elec. Books Antitrust Litig.*,
  11-MD-2293, 2014 WL 2535112 (S.D.N.Y. June 5, 2014) ........................................... 33

*JPMorgan Chase Mortg. Modification Litig.*,
  880 F. Supp. 2d 220 (D. Mass. 2012)............................................................................ 6, 9

*In re Standard & Poor's Rating Agency Litig.*,
  23 F. Supp. 3d 378 (S.D.N.Y. 2014) ............................................................................... 11

*Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*,
  929 A.2d 1076 (N.J. 2007) .............................................................................................. 28

*Katz v. Live Nation, Inc.*,
  No. 09-cv-3740, 2010 WL 2539686 (D.N.J. June 17, 2010) .......................................... 28

*Kinder Morgan CO2 Co., L.P. v. Montezuma Cty. Bd. of Comm'rs*,
  396 P.3d 657 (Colo. 2017)............................................................................................... 31

*Kingdomware Techs., Inc. v. U.S.*,
  579 U.S. 162 (2016) ......................................................................................................... 17

*Kokesh v. SEC*,
  581 U.S. 455 (2017) ......................................................................................................... 33

*Korenblum v. Citigroup, Inc.*,
   No. 15-cv-3383 (JMF), 2015 WL 6001275 (S.D.N.Y. Oct. 14, 2015) .................................... 12

*Lawsky v. Condor Cap. Corp.*,
   No. 14-cv-02863, Dkt. No. 167 (S.D.N.Y. Dec. 22, 2014)................................................. 23, 32

*Leroy v. Great W. United Corp.*,
  443 U.S. 173 (1979) ......................................................................................................... 20

*Lieberson v. Johnson & Johnson Consumer Cos., Inc*

865 F. Supp. 2d 529 (D.N.J. 2011) ................................................................................... 28, 29

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ................................................................................................... 15

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012) ....................................................................................... 28

*McCormick v. Medtronic, Inc.*,
   101 A.3d 467 (Md. Ct. Spec. App. 2014).................................................................... 27

*Monahan v. New York City Dep't of Corrections*,
   214 F.3d 275 (2d Cir. 2000) ......................................................................................... 9

*Mountain Coal Co., LLC v. Water Quality Control Div.*,
   576 P.3d 212 (Colo. 2025)........................................................................................... 31

*Navajo Nation v. Wells Fargo & Co*
   344 F. Supp. 3d 1292 (D.N.M. 2018) .................................................................... 11, 13

*NCC Sunday Inserts, Inc. v. World Color Press, Inc.*,
   692 F. Supp. 327 (S.D.N.Y. 1988) ............................................................................. 27

*Negrete v. Citibank, N.A.*,
   237 F. Supp. 3d 112 (S.D.N.Y. 2017) ........................................................................ 30

*Nelson v. George*,
   399 U.S. 224 (1970) ................................................................................................... 32

*New Mexico ex. rel. Balderas v. Real Estate Law Ctr., P.C.*,
   405 F. Supp. 3d 1233 (D.N.M. 2019)......................................................................... 31

*New York v. Hendrickson Bros., Inc.*,
   840 F.2d 1065 (2d Cir. 1988) ..................................................................................... 33

*NLRB v. SW General, Inc.*,
   580 U.S. 288 (2017) ................................................................................................... 18

*Off. of the Att'y Gen. v. Berger L. Grp., P.A.*,
   No. 14-cv-1825, 2015 WL 5922933 (M.D. Fla. Oct. 9, 2015)..........................Passim

*Pelman v. McDonald's Corp.*,
   396 F.3d 508 (2d Cir. 2005) .................................................................................. 26, 27

*Pennsylvania by Shapiro v. Mariner Fin., LLC*,
   711 F. Supp. 3d 463 (E.D. Pa. 2024)................................................................Passim

*Pennsylvania v. Mid-Atlantic Toyota Distributors, Inc.*,
　704 F.2d 125, 129-30 (4th Cir. 1983) ....................................................................... 23

*Pennsylvania v. Navient Corp.*,
　967 F.3d 273 (3d Cir. 2020) ..................................................................................... 1

*People ex rel. M.L.M.*,
　104 P.3d 324 (Colo. App. 2004)............................................................................... 31

*People ex rel. Spitzer v. Telehublink Corp.*,
　301 A.D.2d 1006 (3d Dep't 2003)....................................................................... 10, 24

*People v. Coventry First LLC*,
　13 N.Y.3d 108 (2009)............................................................................................... 24

*People v. Debt Resolve, Inc.*,
　387 F. Supp. 3d 358 (S.D.N.Y. 2019) ...................................................................... 27

*People v. Grasso*,
　42 A.D.3d 126 (1st Dep't 2007)................................................................................ 23
　11 N.Y.3d......................................................................................................... 23

*People v. Greenberg*,
　27 N.Y.3d 490 (2016)............................................................................................... 24

*People v. Iverson*,
　37 N.Y.3d 98 (2021)................................................................................................. 24

*People v. Miner*,
　2 Lans. 396 (N.Y. Gen. Term 1868)......................................................................... 23

*People v. N. Leasing Sys., Inc.*,
　193 A.D.3d 67 (1st Dep't 2021)................................................................................ 24

*People v. Trujillo*,
　251 P.3d 477 (Colo. App. 2010)............................................................................... 31

*Photopaint Tech., LLC v. Smartlens Corp.*,
　335 F.3d 152 (2d Cir. 2003) .................................................................................... 20

*Poole v. Nevada Auto Dealership Investments, LLC*,
　135 Nev. 280 (2019)................................................................................................. 28

*Rex v. Chase Home Finance LLC*,
　905 F. Supp. 2d 1111 (C.D. Cal. 2012) ...................................................................... 7

vii

*Reynolds v. Lifewatch, Inc.*,
   136 F. Supp. 3d 503 (S.D.N.Y. 2015) ................................................................................... 30

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ............................................................................................ 27, 29

*Russello v. U.S.*,
   464 U.S. 16 (1983) ................................................................................................................. 22

*S.E.C. v. First Jersey Securities, Inc.*,
   101 F.3d 1450 (2d Cir. 1996) .......................................................................................... 10, 12

*Sacerdote v. Cammack Larhette Advisors, LLC*,
   939 F.3d 498 (2d Cir. 2019) .............................................................................................. 9, 10

*Safe Haven Home Care, Inc. v. U.S. Dep't of Health and Human Servs.*,
   130 F.4th 305 (2d Cir. 2025) ................................................................................................ 21

*Sanders v. Zwicker & Assocs., P.C.*,
   No. 13-cv-3998, 2014 WL 11456070 (N.D. Tex. Sept. 9, 2014) ............................................ 6

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
   591 U.S. 197 (2020) ................................................................................................................. 1

*Simmons v. Himmelreich*,
   578 U.S. 621 (2016) ............................................................................................................... 14

*Smiga v. Dean Witter Reynolds, Inc.*,
   766 F.2d 698 (2d Cir. 1985) .................................................................................................. 17

*Sompo Japan Ins. Co. of America v. Yang Ming Marine Transport, Co.*,
   578 F. Supp. 2d 584 (S.D.N.Y. 2008) ............................................................................... 16, 17

*State v. Nieto*,
   993 P.2d 493 (Colo. 2000) ..................................................................................................... 31

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ..................................................................................................... 10, 11, 12

*Taylor v. Gabelli*,
   345 F. Supp. 2d 313 (S.D.N.Y. 2004) ................................................................................... 29

*Tennessee ex rel. Skrmetti v. Ideal Horizon Benefits, LLC*,
   No. 3:23-cv-0046, 2024 WL 4351650 (E.D. Tenn. Sept. 30, 2024) ................................. Passim

*U.S. v. 111 East 88th Partners*,
  No. 16-cv-9446 (PGG), 2020 WL 1989396 (S.D.N.Y. Apr. 27, 2020) .................................... 10

*U.S. v. Federative Rep. of Brazil*,
  748 F.3d 86 (2d Cir. 2014) ........................................................................................ 32, 33

*U.S. v. ITT Rayonier*,
  627 F.2d 996 (9th Cir. 1980) .......................................................................................... 11

*U.S. Capital Funding VI, Ltd v. Patterson Bankshares*
  137 F. Supp. 3d 1340 (S.D. Ga. 2015) ........................................................................... 6, 7

*U.S. v. Power Eng'g Co.*,
  125 F. Supp. 2d 1050 (D. Colo. 2000) ............................................................................. 11

*U.S. v. St. Regis Paper Co.*,
  355 F.2d 688 (2d Cir. 1966) ............................................................................................ 33

*U.S. v. Wells Fargo Bank, N.A.*,
  972 F. Supp. 2d 593 (S.D.N.Y. 2013) .............................................................................. 29

*Verizon Commc'ns v. FCC*,
  156 F.4th 86 (2d Cir. 2025) ............................................................................................ 22

*Virginia House of Delegates v. Bethune-Hill*,
  587 U.S. 658 (2019) ....................................................................................................... 22

*Williams v. Washington*,
  581 S.W.2d 494 (Tex. Civ. App. 1979) ............................................................................ 33

*Wilson v. Better Mortgage Corp.*,
  811 F. Supp. 3d 631 (S.D.N.Y. 2025) .............................................................................. 31

**Statutes**

12 U.S.C. 1818 ............................................................................................................... 5
12 U.S.C. § 5536 ............................................................................................................ 14
12 U.S.C. § 5552 ...................................................................................................... Passim
12 U.S.C. § 5563 .......................................................................................................... 5, 6
12 U.S.C. § 5564 ...................................................................................................... Passim
12 U.S.C. § 5565 ...................................................................................................... 15, 24
12 U.S.C.§ 5481 ............................................................................................................ 14
28 U.S.C. § 1391 ...................................................................................................... Passim
42 U.S.C. § 9613 ............................................................................................................. 6
71 P.S. § 733-506 .......................................................................................................... 26
C.R.S. § 5-9.3-108 ......................................................................................................... 30

Md. Code Ann., Com. Law § 13-301 ..................................................................................27
N.Y. Const., art. V, § 1 ....................................................................................................23
N.Y. Executive Law § 63...................................................................................................23
Nev. Const. Art. 5, § 22 ...................................................................................................24
Nev. Rev. Stat § 598.0915 ...............................................................................................28
NRS 228.304......................................................................................................................25
NRS 228.320......................................................................................................................25
NRS 228.380......................................................................................................................25
NRS 228.390......................................................................................................................25
NRS 598.0923 .............................................................................................................25, 28
Pub. L. No. 111-203, 124 Stat. 1391, § 101 ...................................................................13
RCW 19.86.080 .................................................................................................................33
RCW 19.86.140 .................................................................................................................33
Wis. Stat. § 165.25(1m) ....................................................................................................26

**Rules**

F.R.C.P. 8...................................................................................................................27, 28
F.R.C.P. 9.................................................................................................................... Passim
F.R.C.P. 12.........................................................................................................................15

**Regulations**

*Authority of States To Enforce the Consumer Financial Protection Act of 2010; Rescission*,
    90 Fed. Reg. 20,565 (May 15, 2025)............................................................................15

**Other Authorities**

156 Cong. Rec. S2947 ......................................................................................................19
156 Cong. Rec. S3867 ......................................................................................................19
S. REP. NO. 111-176, at 39 (2010) ...............................................................................1,15

**Miscellaneous Authorities**

18 C. WRIGHT, A. MILLER, & E. COOPER, FED. PRAC. & PROC. JURIS.
(3d ed.) ................................................................................................................ 10, 12, 29
NAT'L ASS'N OF ATT'YS GEN., STATE ATT'YS GEN. POWERS AND RESPONSIBILITIES
 (4th ed. 2018). ..................................................................................................................22
Rohit Chopra & Seth Frotman, *State Enforcement as a Federal Legislative Tool*,
 62.1 HARV. J. ON LEG. 1 (2024) ....................................................................................23
Colin Provost, *The Politics of Consumer Protection: Explaining State Attorney General
    Participation in Multi-State Lawsuits*, 59 POL. RSCH. Q. 609 (2006) .......................18

## PRELIMINARY STATEMENT

Congress passed the Consumer Financial Protection Act ("CFPA") to protect Americans from the predatory lending that had "precipitat[ed] a financial crisis that wiped out over $10 trillion in American household wealth and cost millions of Americans their jobs, their retirements, and their homes." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 205 (2020). "Though the problems in the mortgage market ha[d] received most of the public's attention," explained Congress, "[a]busive lending, high and hidden fees, unfair and deceptive practices, confusing disclosures, and other anti-consumer practices" had also caused the collapse. S. REP. NO. 111-176, at 17 (2010). And Federal regulators had not only failed to prevent these practices; they had also preempted the States from doing so. Congress therefore specifically authorized the States to enforce the CFPA "to pick up slack when the federal Government fails to enforce and regulate." *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 286 (3d Cir. 2020).

OneMain deploys the very "[a]busive lending, high and hidden fees, unfair and deceptive practices, [and] confusing disclosures" Congress designed the CFPA to empower States to prevent. OneMain's customers *need* the money it offers – to buy groceries, pay medical bills, or just get through to the next billing cycle. That need is strong enough that they will borrow at interest rates hovering at the legal limit. OneMain has constructed a scheme that takes advantage of that need by luring customers in with promises of quick and simple cash before "packing" their loans with credit insurance and other products that regularly cost thousands of dollars. Sometimes OneMain does not orally mention these "add-on" products at all. Other times it tells consumers they are free or mandatory. Almost never does it explain their full cost. No matter the variation, the result is singular: Consumers so desperate for cash that they will borrow at exorbitant rates also wind up paying hundreds or thousands of dollars for products they do not want or do not understand.

1

OneMain does not dispute that the Plaintiff States (the "States") have pleaded facts sufficient to satisfy the CFPA threshold for deception (Count 1), unfairness (Count 2), and abusiveness (Counts 3 and 4). Instead, OneMain seeks to deprive the States of the right to enforce those provisions via various implausible procedural arguments.

None has merit. *First*, OneMain maintains that the CFPB's 2023 consent order with OneMain precludes this suit, but both its text and the governing law foreclose that argument. *Second*, OneMain argues that *res judicata* bars the States from maintaining their claims. But *res judicata* would only apply if the States were in privity with the parties to the Consent Order, which they were not, and in any event has no application to conduct that occurred after the Order. *Third*, OneMain acknowledges that the States can enforce the entirety of the CFPA, but somehow still maintains that they cannot enforce the provision of the CFPA declaring it unlawful to violate other Federal Consumer Financial Laws, including the Truth in Lending Act (TILA). *Fourth*, OneMain claims that the States cannot sue together in this District, yet the text of the relevant provision of the CFPA, Section 5564(f), clearly says otherwise; and the venue provision in Section 5552(a)(1) supplements, rather than supplants, the venue options otherwise available. *Fifth*, OneMain asserts that Congress cannot directly create a cause of action that States can enforce. This is not only incorrect but would invert the standard that courts use to determine whether states have authority to enforce federally created rights. *Sixth*, OneMain argues that some of the plaintiff States must meet a heightened pleading standard to bring state law consumer protection claims. This is wrong, and in any event, the States meet that standard. OneMain also attacks Colorado's state law claims, based on a misreading of Colorado law. *Finally*, OneMain propounds arguments regarding the availability of penalties, which are both premature and erroneous.

The Court should reject OneMain's farfetched arguments and permit the States to pursue this important case, consistent with Congress's intent in passing the CFPA.

**FACTUAL BACKGROUND**

**A.       Statutory Background**

"[I]n what has become known as the Great Recession," explained the Senate Report on the CFPA, "millions of Americans ha[d] lost jobs; millions of American families ha[d] lost trillions of dollars in net worth; millions of Americans ha[d] lost their homes; and millions of Americans ha[d] lost their retirement, college, and other savings." S. REP. NO. 111-176, at 39 (2010). It began in the housing market, but the "slump brought into focus the prevalence of unsound lending practices, including predatory lending tactics, most often in the subprime market." *Id.* at 43.

Congress specifically blamed the financial carnage on federal regulators, which, instead of preventing predatory lenders from deceiving consumers, preempted the states from doing so themselves. "Many major market participants," said the Senate, "were not subject to meaningful oversight by federal regulators." *Id.* And so, "[w]here federal regulators refused to act, the states stepped into the breach. . . . Unfortunately, rather than supporting . . . [state] anti-predatory lending laws, federal regulators preempted them." *Id.* at 16. This "actively created an environment where abusive. . . lending could flourish without State controls." *Id.* at 17. And it "bec[a]me clear that a major cause of the most calamitous worldwide recession since the Great Depression was the simple failure of federal regulators to stop abusive lending." *Id.* at 15.

Congress therefore designed the CFPA to empower the States to protect consumers from predatory lending schemes, ensuring that it "grant[ed] authority to State attorneys general to enforce this Act." *Id* at 175. But OneMain now seeks to deprive the States of the authority to do exactly that: prevent predatory lending, especially in the subprime market.

3

### B.     OneMain's Add-On Packing Scheme

OneMain packs its customers' loans with hundreds or thousands of dollars' worth of largely worthless insurance and other products ("add-on products") without orally mentioning them, or by misrepresenting them, or by charging for them despite consumers declining them. Hard-working Americans become customers of OneMain because they need what the company advertises: "[f]ixed payments and clear, upfront terms" for installment loans. (Compl. (Dkt. No. 1) ¶ 89.) They expect to receive those loans in the manner the company promises: "clear, upfront terms" and  a "[c]lear and easy" loan closing process "from start to finish." *Id.* Neither is true.

OneMain misleads consumers at both in-person loan and remote closings. For in-person closings, OneMain's employees slip add-ons into the loan packages of unsuspecting consumers, before obfuscating the add-on disclosures in a flood of fine print that inundates each borrower. *Id.* ¶ 11, 107. In remote closings, the already-fine print fades into illegibility to fit inside a phone screen. *Id.* ¶ 116. At both, the company's written policy is to pressure customers to agree to add-ons unless and until the consumer explicitly says "no" three separate times. *Id.* ¶ 133. And OneMain's policy explicitly sets no limit on how many times a loan closer can attempt to "overcome objections" of consumers who express reservations that fall short of "no." *Id.* ¶ 135.

All the while, OneMain increases and obscures the add-ons' cost. It maximizes the cost by offering these products only with single premiums, which it combines with the loan principal and finances, increasing the interest borrowers owe and OneMain collects. *Id.* ¶ 4, 94, 156. At the same time, if OneMain mentions the products at all, it typically focuses consumers on the substantially lower monthly cost without articulating the total obligation. It almost always fails to mention that add-ons inflate the interest amount. And it universally omits the hundreds or even thousands of dollars of interest attributable to the add-ons. *Id.* ¶ 4, 5, 156-59.

4

This is by design. OneMain pays its employees substantial commissions for add-on sales, pits employees against each other based on add-on production, and bestows prizes on those who sell the most. *Id.* ¶ 203-09. Meanwhile, it has disciplined those who fail to sell enough add-ons. *Id.* ¶ 206. The upshot is obvious: sell insufficiently and suffer; sell illegally and receive reward.

OneMain's refinancing practices compound the harm. It refinances loans whether they are delinquent or nearing maturity, indiscriminately blitzing consumers with the promise to "get the extra money you need," with "[n]o nonsense" and "[n]o surprises." *Id.* ¶ 263-65. But most consumers are in fact surprised to learn that refinancing extended the term of their loan, increased their monthly payment, and/or augmented their interest rate. *Id.* ¶ 268-70. Each refinancing also presents another opportunity for OneMain to redouble its add-on packing, which is usually more costly, as the price of a credit product rises with the increased loan balance. *Id.* ¶ 276.

OneMain's motion to dismiss should be denied because it does not dispute these facts and instead attempts to evade accountability with the array of erroneous arguments discussed below.

## ARGUMENT

### I.    The Court Is Not Jurisdictionally Precluded from Considering the States' Claims

In its brief ("Br.," Dkt. No. 103), OneMain argues that the States are precluded from presenting their claims because of alleged inconsistencies with the CFPB's 2023 Consent Order ("Consent Order," Dkt. No. 104-1). Because nothing in the States' Complaint would contravene the Consent Order, the court has jurisdiction over this action.

#### A.    Jurisdiction Lies Where a Suit Does Not Seek to Contravene a Consent Order

OneMain relies on 12 U.S.C. § 5563(d)(2) (part of the CFPA) and 12 U.S.C. 1818(i)(1) (similar language in the Financial Institutions Supervisory Act). (Br. at 5.) Under Section 5563(d)(2), as under Section 1818(i)(1), claims brought by non-parties to a consent order are not

barred unless they seek relief that would contravene or violate the order. *In re JPMorgan Chase Mortg. Modification Litig.*, 880 F. Supp. 2d 220, 232-33 (D. Mass. 2012) (ruling that Section 1818(i)(1) did "not preclude the court from [remedying the plaintiffs' claims] as the result would not be inconsistent with the Consent Order"); *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1080 (N.D. Cal. 2013) (rejecting jurisdiction defense where "the Complaint on its face does not seek to 'review, modify, suspend, terminate, or set aside' the Consent Order").[1]

OneMain seems to assert that Section 5563(d)(2)'s jurisdictional bar extends even further, barring any challenge to practices that a consent order merely "addressed." (Br. at 5.) That position would undermine the CFPA's purpose, and has no basis even in the out-of-circuit cases OneMain cites, which hold that consent orders bar only subsequent claims seeking remedies in direct contravention of the consent order. In *American Fair Credit Association v. United Credit National Bank*, the court determined that it retained jurisdiction over most of plaintiff's claims because the consent order in question did not "prohibit" the relief plaintiff sought. 132 F. Supp. 2d 1304, 1311-12 (D. Colo. 2001). And *Camillus Clean Air Coalition v. Honeywell Int'l, Inc.* held the court lacked jurisdiction under 42 U.S.C. § 9613(h) only because plaintiff's requested relief "would require changes to the terms of the Consent Decree." 947 F. Supp. 2d 208, 212-13 (N.D.N.Y. 2013).

OneMain cherry picks a line from *U.S. Capital Funding VI, Ltd v. Patterson Bankshares* the court *rejected* to hold the opposite two sentences later. (Br. at 5 (quoting 137 F. Supp. 3d 1340, 1360 (S.D. Ga. 2015).) The court made clear: "these and other courts have determined that Section 1818(i) does not disrupt jurisdiction over claims seeking relief that is neither addressed in nor

---

[1] *See also Sanders v. Zwicker & Assocs., P.C.*, No. 13-cv-3998, 2014 WL 11456070, at *4 (N.D. Tex. Sept. 9, 2014) (retaining jurisdiction because complaint did not "seek remedies that would be inconsistent with the Consent Order"); *Ferrer v. Yellen*, 659 F. App'x 982, 988 (11th Cir. 2016) (Section 1818(i) "does not appear to prevent courts from adjudicating claims based on substantive laws solely because a [federal agency] has taken similar or parallel actions").

inconsistent with the consent order." 137 F. Supp. 3d at 1361. The court held the plaintiff's claims *could proceed* because they "d[id] not challenge the soundness" of the remedies in the consent order and instead sought relief for separate, "fraudulent and tortious activity." *Id.* at 1361-62.

The other case OneMain cites, *Bakenie v. JPMorgan Chase Bank, N.A.*, No. 12-cv-60, 2012 WL 4125890 (C.D. Cal. Aug. 6, 2012), is distinguishable: there, unlike here, the consent order required ongoing monitoring of defendant's conduct by an "independent consultant," with which the subsequent lawsuit might have interfered. *Id.* at \*3. Moreover, *Bakenie* is an unpublished case that has been rejected due to its "absence of reasoning" and failure to discuss relevant precedent. *Rex v. Chase Home Finance LLC*, 905 F. Supp. 2d 1111, 1132-33 (C.D. Cal. 2012).[2]

### B.    The States Do Not Seek to Contravene the Consent Order

Nothing in the Complaint asks the Court to change any of the requirements of the Consent Order, to direct OneMain to violate it, or to limit the CFPB's ability to enforce it. Indeed, OneMain does not attempt to argue that the main thrust of the States' claims undermines the terms of the Consent Order. That is, OneMain *never* contends the Consent Order would be violated were the Court to grant relief for OneMain's alleged practices of "surreptitiously charg[ing] consumers hundreds or thousands of dollars" for add-on products "pack[ed] into loans without the consumers' knowledge" or of "blaz[ing] through the closing process," "brush[ing] past the fine print," and "pressur[ing] the consumer into taking every product." (Compl. ¶¶ 2-3, 10-11.)

Instead, OneMain attempts to manufacture inconsistencies regarding three subsets of allegations: (1) OneMain's failure to provide adequate advance notice to consumers regarding add-

---

[2] *Rex* also noted that accepting an argument like OneMain's would subvert the purpose of statutes like the CFPA by "creat[ing] a jurisdictional mechanism by which [firms] can escape millions of dollars of liability" by entering in a consent order setting forth a forward-looking "plan" and then violating the law in the execution of that plan. 905 F. Supp. 2d at 1131-32.

ons; (2) OneMain's failure to disclose the true cost of add-ons pre-closing; and (3) OneMain's failure to inform consumers of their cancellation rights. (Br. at 6-9.) None of these allegations, and no relief the States seek, would contravene the Consent Order or require OneMain to engage in prohibited conduct. Therefore, the Court has jurisdiction.

*First*, OneMain argues that the States' claims regarding its misleading marketing practices, which fail to disclose information about add-on products (Compl. ¶¶ 7, 74-88, 137-43 (referenced at Br. at 6-7, 9)), are somehow foreclosed by the Consent Order's requirement that OneMain refrain from "selling" add-on products without first providing a loan offer that does not include add-on products (Consent Order ¶¶ 73(c)). But nothing in the Consent Order prohibits OneMain from disclosing basic information about its add-on products while marketing its loans – or indeed from marketing its add-ons at all. One Main could of course provide consumers with information regarding add-on products and their terms without "selling" them.

*Second*, OneMain conflates a requirement in the Consent Order to provide certain disclosures after a loan is approved with a nonexistent requirement that it can provide *only* that disclosure. The States allege that OneMain fails to inform consumers *pre-closing* of the true cost of add-ons, namely, the products' initial premium plus interest and the significant effect of obtaining them on the total cost of the loan over its full term. (Compl. ¶¶ 92, 156-62 (referenced at Br. at 7-9).) OneMain argues its failure to inform consumers about the true cost of add-ons is somehow "mandated" by the Consent Order's requirement that it break down add-on costs in *post-closing* written communications and phone calls. (Br. at 7 (citing Consent Order ¶ 76).) These

8

disclosures alone are inadequate (Compl. ¶¶ 194-99), but the States do not ask the Court to order OneMain to stop providing them.[3]

*Third*, OneMain repeats its error with regard to the States' cancellation allegations. (Compl. ¶¶ 98-103 (referenced at Br. at 8-9).) OneMain again points to disclosures and procedures required by the Consent Order and argues that the States' claims would subvert them. (*Id.* (citing Consent Order ¶¶ 76(e)-(f), 87-92).) But the States' effort to ensure OneMain adequately informs customers of their add-on cancellation rights – rather than "refus[ing] to cancel add-on products" or "act[ing] aggressively" toward consumers who attempt to cancel (Compl. ¶101) – does not contradict those requirements. Again, the States do not ask the Court to contravene the Consent Order.

The States do not seek "a do-over" of the CFPB's resolution. (Br. at 8.) They have brought a wealth of new allegations against OneMain, detailing unlawful practices it engaged in prior to and for years after the Consent Order, up through the present. The Consent Order explicitly envisioned such claims, making it clear that it cannot be construed as allowing OneMain "to violate any law, rule, or regulation." (Consent Order ¶ 139.) *See In re JPMorgan Chase Mortg. Modification Litig.*, 880 F. Supp. 2d at 232-33 (consent order's requirement that defendant "comply with all applicable federal and state laws" made it "abundantly clear" it did not "establish an exclusive remedy" for the harms plaintiffs alleged).

## II.    *Res Judicata* **Does Not Preclude the States' Claims**

OneMain's attempt to evade State enforcement through an unduly expansive theory of *res judicata* fails, because OneMain cannot establish privity between the CFPB and the States. *See Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 285 (2d Cir. 2000). To establish

---

[3] OneMain ignores the following language in the very paragraph of the Consent Order that requires post-closing disclosures: such disclosures are to be provided "*[i]n addition* to any disclosures required by Federal, state, or local law." (Consent Order ¶ 76 (emphasis added).)

privity, OneMain has the burden of showing the CFPB "adequately represented" the States. *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 508 n.52 & 510 (2d Cir. 2019). At a minimum, "adequate representation" requires that: (1) the interests of the CFPB and the States were "aligned"; and (2) the CFPB "understood [it]self to be acting in a representative capacity" of the States. *Id.* (quoting *Taylor v. Sturgell*, 553 U.S. 880, 900 (2008)).[4]

Importantly, "in light of the severe consequences of preclusion, where privity is in question, doubts should be resolved against imposing preclusion to ensure that the party to be bound can be considered to have had a full and fair opportunity to litigate." *U.S. v. 111 East 88th Partners*, No. 16-cv-9446 (PGG), 2020 WL 1989396, at *12 (S.D.N.Y. Apr. 27, 2020).

### A.    The CFPB's and States' Interests Were Not Aligned

OneMain cannot show the CFPB "adequately" represented the States because the two do not have "aligned interests." *Sacerdote*, 939 F.3d at 510. Courts repeatedly reject the notion that government entities with concurrent enforcement authority "represent" one another's interests for purposes of nonparty preclusion. *See, e.g.*, *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 266-67 (E.D.N.Y. 2004). The CFPB and the States are not just different government entities; they are independent sovereigns under core principles of federalism, such that "litigation by one does not bind another." *111 East 88th Partners*, 2020 WL 1989396, at *13 (quoting 18 C. WRIGHT, A. MILLER, & E. COOPER, FED. PRAC. & PROC. JURIS. § 4458 (3d ed.)). The two represent not only the private interests of their residents, but also different *sovereign interests* that may take the form of different enforcement priorities.[5] This is particularly salient in the context of consumer

---

[4] *Res judicata* generally would only apply to conduct or transactions pre-dating the prior adjudication in question, *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1464 (2d Cir. 1996), and OneMain does not argue otherwise.

[5] The contrast between the CFPB's focus in the Consent Order on add-on cancellations and the States' focus on misleading add-on packing highlights these different priorities.

protection. *See In re Standard & Poor's Rating Agency Litig.*, 23 F. Supp. 3d 378, 405 (S.D.N.Y. 2014) (recognizing sovereign interests like securing an honest marketplace and protecting state's economic welfare); *People ex rel. Spitzer v. Telehublink Corp.*, 301 A.D.2d 1006, 1009-10 (3d Dep't 2003) (same). Congress recognized these distinct interests by assigning concurrent state and federal enforcement authority in the CFPA.

OneMain relies on three inapposite, out-of-circuit decisions. (Br. at 13.) The first, *Navajo Nation v. Wells Fargo & Co.*, was incorrectly decided, as it fails to give any weight to the different interests of different sovereigns. 344 F. Supp. 3d 1292, 1305-08 (D.N.M. 2018).[6] The other two cases, *Harmon Industries v. Browner*, 191 F.3d 894 (8th Cir. 1999) and *U.S. v. ITT Rayonier*, 627 F.2d 996 (9th Cir. 1980), involve intertwined federal-state enforcement under environmental regulatory schemes far afield from the statutory scheme established under the CFPA.[7] Both rely on a broad theory of "virtual representation" of non-parties that the Supreme Court rejected in *Taylor v. Sturgell*, which instead established the much narrower "adequate representation" factors cited above. 553 U.S. at 895-905. *See Harmon*, 191 F.3d at 903; *Rayonier*, 627 F.2d at 1003. Even before the Court decided *Taylor* in 2008, the *Harmon/Rayonier* line of cases was rejected as an "unsupported expansion of the doctrine of *res judicata*." *U.S. v. Power Eng'g Co.*, 125 F. Supp. 2d 1050, 1065-66 (D. Colo. 2000), *aff'd* 303 F.3d 1232 (10th Cir. 2002).

---

[6] *Navajo Nation* is also distinguishable, for the reasons discussed in footnote 8, *infra*.

[7] *Harmon* and *Rayonier* involved environmental regulatory schemes where the Environmental Protection Agency (EPA) deputized state environmental regulators to act on its behalf. For example, in *Rayonier*, the applicable law required the EPA to approve of state programs to issue discharge permits; the EPA could veto permits and revoke state issuing authority, and both State and federal agencies, in what the court called a "partnership," could enforce permit compliance. 627 F.2d at 998, 1001-02. When the defendant allegedly violated such a state-issued permit, the EPA pressured the state agency to take enforcement action. *Id.* at 999. *Harmon* similar involved a state agency acting "in lieu of" the EPA. 191 F.3d at 897-99, 903. Nothing remotely similar exists under the CFPA, which grants *concurrent* and *independent* enforcement authority. The CFPB need not approve State enforcement actions, participate, or even agree with them.

11

**B.    The CFPB Did Not Understand Itself to Be Representing the States**

Nothing in the record before the Court demonstrates that the CFPB "understood itself to be acting in a representative capacity" vis-à-vis the States when it entered into the Consent Order. *Taylor*, 553 U.S. at 900; s*ee also Korenblum v. Citigroup, Inc.*, No. 15-cv-3383 (JMF), 2015 WL 6001275, at \*2 (S.D.N.Y. Oct. 14, 2015) (rejecting *res judicata* defense where there was "nothing in the materials the Court may consider on a Rule 12(b)(6) motion that reveal[ed] [the settling parties'] intent" to preclude the lawsuit). Adequate representation for preclusion purposes requires OneMain show, "at a minimum," one of two circumstances: "(1) special procedures to protect the nonparties' interests or (2) an understanding by the concerned parties that the first suit was brought in a representative capacity." *Esquire Trade & Finance, Inc. v. CBQ, Inc.*, 562 F.3d 516, 521-22 (2d Cir. 2009). Neither of those circumstances was present here.

Relatedly, the Consent Order's preclusive effect depends on the parties' intent. *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1465 (2d Cir. 1996) ("Though litigation settlements can resolve issues not raised in the pleadings, any such resolution depends on the intent of the parties to the settlement[.]"). Therefore, "[t]here is no preclusion at all if the parties do not intend to preclude later litigation." 18 WRIGHT & MILLER, § 4443.

The language of the Consent Order and stipulation clearly demonstrate the CFPB did not intend, and OneMain did not understand the Consent Order, to preclude similar actions brought by non-party government regulators such as the States. The CFPB took pains to ensure that OneMain understood that, notwithstanding the settlement, other government agencies could bring "any action" against OneMain. (Consent Order ¶ 131.) Similarly, the Consent Order prohibits OneMain from using the monetary remedy therein to offset monetary remedies in "Related Consumer Actions" brought by private litigants or other government agencies based on "substantially the

12

same facts." (*Id.* at ¶¶ 3(j) & 110.) OneMain acknowledged in the accompanying Stipulation that the CFPB made no representations regarding "any liability outside of this action" arising from the underlying facts. (Dkt. No. 104-2 ¶ 5.)[8] Because the CFPB did not intend to represent the States, OneMain cannot show privity and therefore cannot carry its burden to show that *res judicata* applies. *See FTC v. DirecTV*, No. 15-cv-1229, 2015 WL 9268119, at *4 (N.D. Cal. Dec. 21, 2015) (rejecting preclusion where "the facts alleged . . . give no indication that [the state] attorneys general [in prior case] understood themselves to be acting in a representative capacity for the federal government").

### III.    The States Are Authorized to Enforce TILA

OneMain's contention that the States have no authority to enforce TILA is without merit. The text clearly provides otherwise: "[T]he attorney general . . . of any State may bring a civil action . . . to enforce provisions of this title." 12 U.S.C. § 5552(a)(1). "[T]his title" refers to the entire CFPA, i.e., Title X of the Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010. PUB. L. NO. 111-203 124, Stat. 1391, § 101, Short Title ("*This title* may be cited as the 'Consumer Financial Protection Act of 2010'." (emphasis added)). Section 5536(a)(1)(A) of Title X declares it illegal for any "covered person" or "service provider" to "offer

---

[8] *Navajo Nation* failed to give any force to analogous provisions in its consent order (*Navajo* order), 344 F. Supp. 3d at 1303-04, and this Court should reject its erroneous approach. In that case, the New Mexico district court, in holding that the Navajo Nation's CFPA claims were precluded, failed to apply constitutional dual sovereignty and the enforcement structure designed by Congress. *See id.* at 1305-08. Moreover, the *Navajo* order (June 22, 2026 declaration of Benjamin C. Fishman, Ex. A) included a materially different key provision. Whereas the *Navajo* order's release provision applied to both the CFPB *and* "any other governmental agency" (*Navajo* order, ¶¶ 84-85), that is <u>not</u> the case for the OneMain Consent Order, whose release applies <u>only</u> to future enforcement action by the CFPB (Consent Order ¶¶ 131-32). Reinforcing this important distinction, the OneMain Consent Order states: "**Further, for the avoidance of doubt,** the provisions of this Consent Order do not bar, estop, or otherwise prevent **any other person or governmental agency** from taking **any action** against Respondent." (*Id.* ¶ 131.)

13

or provide to a consumer any financial product or service not in conformity with Federal consumer financial law." Title X, in turn, defines "Federal consumer financial law" to include the "enumerated consumer law[s]." 12 U.S.C. § 5481(14). And those "enumerated consumer laws" include TILA. *Id.* at (12)(O). There is no more to it than that: The States can bring a civil action against any covered person or service provider that violates TILA.

Consistent with that plain language, courts have found that states can enforce TILA through the CFPA. *See, e.g.*, *Pennsylvania by Shapiro v. Mariner Fin., LLC*, 711 F. Supp. 3d 463, 484 (E.D. Pa. 2024); *see also Tennessee ex rel. Skrmetti v. Ideal Horizon Benefits, LLC*, No. 3:23-cv-0046, 2024 WL 4351650, at *13 (E.D. Tenn. Sept. 30, 2024) (same). None has said otherwise.

OneMain's argument to the contrary would draw an artificial line between the provisions of Section 5536(a). The company does not contest that the CFPA authorizes the States to enforce Title X's prohibition on unfair, deceptive, or abusive acts and practices ("UDAAP"), found in Section 5536(a)(1)(B). (*See* Br. at 15-16.) But it claims the States cannot enforce the immediately preceding paragraph, Section 5536(a)(1)(A), which declares it unlawful for covered entities to "commit any act or omission in violation of a Federal consumer financial law." OneMain provides *no* justification for bifurcating paragraph (B) from (A). There is none. Congress authorized the States to enforce "this title." "Congress says what it means and means what it says." *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016). As the *Mariner* court made clear, "[i]n addition to prohibiting UDAAP, 12 U.S.C. § 5536(a)(1) of the CFPA expressly incorporates and makes it a violation of the statute to offer or provide to consumers financial products or services not in conformity with, or that violate, the 18 pre-existing laws, including TILA." 711 F. Supp. 3d at 482.

The Rule of Construction supports this position, and OneMain's contrary argument "undercut[s]" the CFPA's purpose: "to expand protections for consumers, in part, by authorizing

14

state enforcement actions." *Mariner*, 711 F. Supp. 3d at 483. OneMain's reliance on the word "modification" in 12 U.S.C. § 5552(a)(3) (cannot "be construed as modifying, limiting, or superseding") is unpersuasive. "Under the familiar interpretive canon *noscitur a sociis*, 'a word is known by the company it keeps.'" *Dubin v. U.S.*, 599 U.S. 110, 124 (2023). The words after, "limiting" and "superseding," demonstrate Congress meant what it said in the Senate Report: The Rule of Construction ensures the CFPA "does not limit any provision of any enumerated consumer law that relates to State authority to enforce Federal law." S. REP. NO. 111-176, at 175 (2010).[9]

Section 5565 of the CFPA confirms what the text already makes clear. That provision permits both the CFPB and states to recover costs associated with the prosecution of any action to "enforce any Federal consumer financial law." 12 U.S.C. § 5565(b). This shows that the CFPA contemplates state enforcement of federal consumer financial law, including TILA.

## IV. Venue Is Proper in This Court

OneMain's argument that States other than New York cannot establish venue in this Court also fails. Venue is proper under both the general venue statute and the CFPA, under which "*[a]ny civil action brought under this title*" may be brought "in a district in which the defendant is located or resides or is doing business." (Compl. ¶ 45 (citing 28 U.S.C. § 1391 (general venue) and 12 U.S.C. § 5564(f) (CFPA venue)) (emphasis added).) OneMain does not dispute venue under the general statute, waiving such argument. *See* F.R.C.P. 12(h). Instead, it argues that the supposedly limiting language in 12 U.S.C. § 5552(a)(1) supplants general venue. OneMain also argues that Section 5564(f) of the CFPA applies only to cases the CFPB brings. Both arguments are wrong.

---

[9] OneMain also adverts to the CFPB's recent recission of its own interpretive rule, *Authority of States to Enforce the Consumer Financial Protection Act of 2010; Rescission*, 90 FED. REG. 20,565 (May 15, 2025). But "agencies have no special competence in resolving statutory ambiguities. Courts do." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024). And the CFPB's argument is as atextual as OneMain's.

A.      **Section 5552(a)(1)'s Venue Provision Is Permissive, Not Restrictive**

In general, "special venue provisions are permissive, and may be supplemented by the more expansive provisions of the general venue statutes." *Sompo Japan Ins. Co. of America v. Yang Ming Marine Transport Co.*, 578 F. Supp. 2d 584, 594-96 (S.D.N.Y. 2008). OneMain nevertheless asks the Court to adopt a restrictive reading of Section 5552(a)(1) of the CFPA. (Br. at 17-21.) No court has accepted OneMain's interpretation, and several have rejected it. *See Mariner*, 711 F. Supp. 3d at 476-82; *Ideal Horizon*, 2024 WL 4351650, at *8; *see also Off. of the Att'y Gen. v. Berger L. Grp., P.A.*, No. 14-cv-1825, 2015 WL 5922933, at *2 (M.D. Fla. Oct. 9, 2015) (finding venue "proper in this district under 28 U.S.C. § 1391(b)" for CFPA action brought in Florida district court by Florida and Connecticut). In determining whether, contrary to the general rule, a specific venue provision is restrictive rather than permissive, courts consider three factors: (1) the language of the venue provision, (2) the statute's history and purpose, and (3) the practical consequences of a restrictive interpretation, and in particular, the avoidance of "anomalous results." *Cortez Byrd Chips v. Bill Harbert Construction Co.*, 529 U.S. 193, 198-204 (2000). This analysis shows Section 5552(a)'s venue provision supplements the general venue statute and Section 5564(f) of the CFPA (discussed *infra*), rather than limiting venue in any way.

1.      **Plain Language and History Show that Section 5552(a)(1) Is Permissive**

Section 5552(a)(1) provides that each State's attorney general ("AG") "*may* bring a civil action in the name of such State in any district court of the United States in that State . . . to enforce provisions of this title." 12 U.S.C. § 5552(a)(1) (emphasis added). The analysis in *Mariner* is instructive and directly on point. There, several states sued Mariner Finance under the CFPA in a Pennsylvania district court. Mariner made the arguments that OneMain now copies, and the court

16

squarely rejected them. As to statutory language, the *Mariner* court ruled as follows:

> As a general matter, special venue provisions are often interpreted by courts to supplement, rather than preempt, the general venue statute, such that venue may be proper under either, unless there is an explicit, contrary statutory indication. The language of 12 U.S.C. § 5552(a)(1) supports a similar determination here. Congress did not use the language "must," "may only" or "shall" in this instance. Use of those terms would, by definition, create a directive or mandate. When used, such terms demonstrate an intent to supplant a general venue provision with a narrow one specific to a statutory cause of action. Instead, Congress used the word "may" which is generally construed as permissive and not mandatory.

711 F. Supp. 3d at 477-78 (cleaned up). As the *Mariner* court correctly ruled, the word "may" is

generally permissive. *Kingdomware Techs., Inc. v. U.S.*, 579 U.S. 162, 171 (2016). If Congress

intended for the venue provision to be restrictive, it "would have used stronger language" than the

word "may." *Smiga v. Dean Witter Reynolds, Inc.*, 766 F.2d 698, 706 (2d Cir. 1985).[10]

> As to the relevant statutory history, the *Mariner* court explained:

> The circumstances under which the CFPA was enacted confirm that the intended effect of the CFPA was to treat 12 U.S.C. § 5552(a)(1) as permitting, not limiting, venue choice. Congress, in enacting the CFPA, envisioned that the States would act in tandem with the Bureau, serving as whistleblowers on the front-line, to prevent the kind of predatory practices the Great Recession taught can be hard for the Federal Government to spot, deter, and investigate, absent robust State and centralized federal, parallel involvement. Congress, in enacting the CFPA, was cognizant of the spectacular failure of federal prudential regulators which had led to financial crisis that nearly crippled the U.S. economy in 2008 and so the CFPA was meant to provide a robust direct and comprehensive response. The CFPA also recognized that states are much closer to abuses and are able to move more quickly when necessary to address them and so it both reinforced and expanded the role of states in protecting consumers, as reflected also in the statutory text.

711 F. Supp. 3d at 480-81 (cleaned up). OneMain's restrictive reading would undermine

Congress's intent by forcing each AG to sue in their own state's courts, eliminating multistate

cases. But multistate actions like this one, which were commonplace before passage of the

---

[10] *Compare Sompo Japan*, 578 F. Supp. 2d at 594-96 (finding special venue provision restrictive only because it used language "may *only* be brought").

CFPA,[11] remain a key tool allowing states to pool their limited resources to pursue consumer protection law violations committed, as here, across multiple states.[12] Congress would have used explicit language had it wanted, incongruously, to bar multistate actions in the midst of a statute intended to significantly strengthen both state and federal enforcement of consumer protection law.[13]

### 2. OneMain Misreads the Legislative History

Ignoring this context, OneMain (Br. at 18-20), points to a change between the House and Senate versions of the CFPA and a "lone statement by a U.S. Senator." *Mariner*, 711 F. Supp. 3d at 478 (rejecting such reliance). Such sources are not reliable guides, and courts are reluctant to rely on them – especially where, as here, the statutory text is clear. *See Hubbard v. U.S.*, 514 U.S. 695, 703 (1995); *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 599 (2004) ("Even from a sponsor, a single outlying statement cannot stand against a tide of context and history.").[14]

In any event, OneMain fails to substantiate its spin on the history. *First*, its quotes from Senators Corker and Carper (Br. at 19-20) do not relate to the venue provision at issue. The Senate

---

[11] *See, e.g.*, Colin Provost, *The Politics of Consumer Protection: Explaining State Attorney General Participation in Multi-State Lawsuits*, 59 POL. RSCH. Q. 609, 609 (2006) ("[Multistate consumer protection] litigation has arguably become the most important multi-state activity of [state AGs] as it is now the primary method by which states deal with deceptive advertising, antitrust violations, and consumer fraud.").

[12] Examples of multistate actions brought under the CFPA without CFPB involvement include *Mariner*, 711 F. Supp. 3d 463; *Ideal Horizon*, 2024 WL 4351650; *Berger L. Grp.*, 2015 WL 5922933; and *Alabama v. PHH Mortg. Corp.*, No 18-cv-0009 (D.D.C.).

[13] *See Mariner*, 711 F. Supp. 3d at 480-81 (restrictive reading of Section 5222(a)(1) would "frustrate the purpose" of the CFPA); *Ideal Horizon*, 2024 WL 4351650, at *8 ("In enacting the CFPA, Congress intended to preserve the enforcement power of the states. A restrictive reading of § 5552(a)(1) is inconsistent with that purpose.").

[14] *See also NLRB v. SW General, Inc.*, 580 U.S. 288, 307 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history . . . ."); *Doe v. Pataki*, 120 F.3d 1263, 1277 (2d Cir. 1997) (declining to rely on isolated statements to glean intent).

version that existed weeks prior to the May 18, 2010 "Carper Amendment" *already included* the language in question. *See* 156 CONG. REC. S2947 (Apr. 29, 2010).[15] The Carper Amendment related to preemption of state actions against national banks, now included in Section 5552(a)(2) (*not* Section 5552(a)(1)). *See* 156 CONG. REC. S3867 (Dkt. No. 104-05) (Senator Corker stating that the Carper Amendment "has to do with Federal preemption"). In other words, Senator Carper did not *introduce* the language at issue (which was already in the bill), and his comments about the CFPA's supposed prohibition on AGs crossing state lines represent only his one-sided, non-determinative, and therefore irrelevant gloss. *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 476 (1921) ("[D]ebates in Congress expressive of the views and motives of individual members are not a safe guide, and hence may not be resorted to, in ascertaining the meaning.").

*Second*, OneMain does not provide *any* evidence supporting its explanation of the change between the House version of the bill and what became Section 5552(a)(1). (Br. at 19.) It is possible Congress considered the broader language in the House bill unnecessary because of the comparatively broad language in what would become Section 5564(f), discussed *infra*.

### 3.    A Restrictive Interpretation Generates Anomalous Results

OneMain's restrictive interpretation of Section 5552(a)(1) would create "anomalous results." *Cortez*, 529 U.S. at 198-204. Specifically, it could leave a state without *any* viable venue to enforce the CFPA. This would contradict the CFPA's establishment of concurrent enforcement by the CFPB and States, as well as the Supreme Court's admonition in *Cortez*: "Congress does not in general intend to create venue gaps, which take away with one hand what Congress has given

---

[15] *Available at* https://www.govinfo.gov/content/pkg/CREC-2010-04-29/pdf/CREC-2010-04-29-senate.pdf (at 177, showing then-current version of Section 1042(a)(1) (which states, like the final version of Section 5552(a)(1), that state AGs "may bring a civil action in the name of such State . . . in any district court of the United States in that State . . . to enforce provisions of this title")).

by way of jurisdictional grant with the other. Thus, in construing venue statutes it is reasonable to prefer the construction that avoids leaving such a gap." *Id.* at 203.

*Mariner* explained this potential venue gap. 711 F. Supp. 3d at 479-80. Especially in states whose long-arm statutes do not run to the limits of the Due Process Clause, the courts in an AG's state might lack personal jurisdiction over a firm that had violated the CFPA and harmed the state's residents, for example, because the company had no in-state branches. In that scenario, were venue under Section 5552(a)(1) limited to the AG's home state, the AG would be left with *no* jurisdiction in which to sue. The Court should not interpret Section 5552(a)(1) to generate such an anomalous result. *Id.* (adopting this analysis); *see also Ideal Horizon*, 2024 WL 4351650, at *8 (same).

Moreover, contrary to OneMain's argument (Br. at 18), the permissive interpretation of Section 5552(a)(1) would not render its language "superfluous," because it could provide for otherwise-lacking venue: for instance where, despite personal jurisdiction existing in the AG's state, venue under the general venue statute did not exist in the AG's entire state or particular judicial district.[16] *Mariner*, 711 F. Supp. 3d at 480 (adopting this analysis). In sum, rather than limiting the venue available, as OneMain argues, Section 5552(a)(1) expands it.

In addition to contradicting the CFPA's overarching purpose, OneMain's reading would undermine venue law's key aims: convenience for defendants and efficient use of judicial resources. *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 183-84 (1979); *Photopaint Tech., LLC v. Smartlens Corp.*, 335 F.3d 152, 157 n.4 (2d Cir. 2003) (finding statute's specific venue provision to be permissive due to considerations of judicial economy). OneMain's read of Section

---

[16] For example, the New York AG might prefer to sue in the Southern District of New York, even though a "substantial part of the events" under 28 U.S.C. § 1391(b)(2), occurred only in a different district in the state. Or, despite a basis for specific personal jurisdiction in New York State, a defendant might argue a "substantial part of the events" for general venue purposes did not occur in the State. In both circumstances, the permissive interpretation would allow the AG's suit.

5552(a)(1) would *require* state AGs to bring suits in their home states, regardless of whether the defendant resides there. But as the Supreme Court warned, "it would take a very powerful reason ever to suggest that Congress would have meant to eliminate" the defendant's residence as a potential venue. *Cortez*, 529 U.S. at 200. No reason, much less a "powerful" one, exists here. And requiring each state AG to bring suits in their respective states would undermine judicial economy and efficiency – here, resulting in thirteen separate actions in thirteen different states.[17]

### B. Venue Is Proper Under Section 5564(f)

Section 5564(f) of the CFPA authorizes "[a]ny civil action brought under this title" to be "brought in a United States district court . . . in a district in which the defendant resides or is doing business." Since OneMain resides in this district (Compl. ¶¶ 43-45), Section 5564(f) applies.

Ignoring the statute's plain language, OneMain argues that Section 5564(f) applies only to lawsuits brought by the CFPB. OneMain bases its argument *entirely* on the title of the "subchapter" (which includes over 100 provisions, including Section 5552) and "part" in which Section 5564(f) appears. (Br. at 21 n.6.) But "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *David v. U.S.*, No. 18-cv-3896 (ER), 2020 WL 8872107, at *1 (S.D.N.Y. Apr. 15, 2020) (quoting *Brotherhood of R.R. Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 528-29 (1947)); *see also Safe Haven Home Care, Inc. v. U.S. Dep't of Health and Human Servs.*, 130 F.4th 305, 321 (2d Cir. 2025) (statutory title cannot "override" the plain meaning of the text).

Section 5564 overall also makes clear that subsection (f) is *not* limited to the CFPB. Each subsection within Section 5564 is expressly limited to "the Bureau" (i.e., the CFPB) *except* for subsections (f) and (g). Those subsections refer to actions brought or arising "under this title." If

---

[17] *See F.D. Rich Co., Inc. v. U.S. for Use of Indus. Lumber Co., Inc.*, 417 U.S. 116, 125 (1974) (holding that judicial economy supports venue for resolving several claims in single proceeding).

21

Congress intended those subsections to be limited to actions brought only by the CFPB, Congress would have expressly included "the Bureau," as it did for the other provisions within Section 5564. Consequently, this Court should "refrain from concluding here that the differing language in the two subsections has the same meaning in each." *Russello v. U.S.*, 464 U.S. 16, 23 (1983). *Verizon Commc'ns v. FCC*, 156 F.4th 86, 96-97 (2d Cir. 2025) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally.").[18]

## V.    The States Have Authority to Assert CFPA Claims

OneMain asks this Court to determine that certain state AGs lack authority to bring CFPA claims on their respective State's behalf. (Br. at 21-26.) That argument is without merit. The ability of state AGs to enforce the CFPA is well-settled. And New York, Nevada, and Oklahoma each give their AGs broad authority to bring lawsuits on the State's behalf, including under the CFPA.

### A.    The States Have Authority by Virtue of the CFPA Itself

Congress expressly provided a right of action for state AGs in the CFPA. 12 U.S.C. § 5552(a)(1) ("[T]he attorney general (or the equivalent thereof) of any State may bring a civil action in the name of such State."). Its decision to empower the States to enforce the CFPA is wholly congruent with the laws of all 50 states and the District of Columbia, which vest their AGs with "constitutional, statutory, and common law authority." NAT'L ASS'N OF ATT'YS GEN., STATE ATT'YS GEN. POWERS AND RESPONSIBILITIES (4th ed. 2018). Even the cases OneMain cites affirm the state AGs' role representing their State in court. *See, e.g.*, *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662 (2019) (determining the Virginia House "does not have the

---

[18] OneMain (Br. at 21 n.6) relies on *Benton v. Bank of America Corp.*, 159 F. Supp. 3d 89 (D.D.C. 2016), but that case concerned venue for private plaintiffs, which is not at issue here. *Id.* at 92.

authority to displace the AG as a representative of the state"). Consistent with this longstanding tradition, state AGs may sue on federally created rights of action *unless* state law clearly limits their power. *See Pennsylvania v. Mid-Atlantic Toyota Distributors, Inc.*, 704 F.2d 125, 129-30 (4th Cir. 1983). And for over a decade, states through their AGs have enforced the CFPA. *See* Rohit Chopra & Seth Frotman, *State Enforcement as a Federal Legislative Tool*, 62.1 HARV. J. ON LEG. 1, 21 (2024) (finding all States have invoked the CFPA).

States do not need a separate statutory grant of authority to sue when federal law authorizes them to do so. In any event, New York, Nevada, and Oklahoma have each given their AG broad authority to bring lawsuits on the State's behalf, and OneMain's arguments to the contrary ignore that each State's AG is empowered to vindicate State interests in court.

**B.      The New York Attorney General Has Authority Under New York Law**

In addition to the authority granted by the CFPA itself, N.Y. Executive Law § 63(1) empowers the AG to "prosecute and defend all actions and proceedings in which the state is interested . . . in order to protect the interest of the state." This provision authorizes the AG to bring a CFPA action on the State's behalf. *See also* N.Y. Const., art. V, § 1 ("The head of the department of audit and control shall be the comptroller and of the department of law, the attorney-general"); N.Y. Exec. L. § 63(12) (empowering the AG to seek injunctive relief, restitution, and damages for any "illegal" act). That ends the inquiry.

Ignoring this statutory text, OneMain relies on *People v. Miner*, 2 Lans. 396 (N.Y. Gen. Term 1868) and *People v. Grasso*, 42 A.D.3d 126 (1st Dep't 2007), *aff'd*, 11 N.Y.3d 64 (2008), neither of which is on point. *Grasso* confronted an attempt by the AG to bring "four causes of action with a lower burden of proof than that specified by the statute, overriding the fault-based scheme codified by the Legislature . . . *thus* reaching beyond the bounds of the Attorney General's

23

authority." 11 N.Y.3d at 70 (emphasis added). *Miner* concerns the *displacement* of the AG's common law powers by a statute. 2 Lans. at 399. This case, in contrast, concerns a *statutory* cause of action the statute itself (the CFPA) authorizes the NYAG to exercise.

OneMain's assertion that New York's adoption of the FAIR Act limits the AG's ability to sue OneMain has no basis in law or reason. The sponsor describing the act as "comprehensive" does not evince an intent to *bar the AG from enforcing any other law*. OneMain's reading contradicts the "statutory text, which is the clearest indicator" of intent. *People v. Iverson*, 37 N.Y.3d 98, 103 (2021). The FAIR Act was adopted to expand the State's ability to combat consumer frauds, not restrict it. Indeed, the statute, by its terms, "shall not supersede, amend or repeal any other law of this state under which the attorney general . . . is authorized to take any action." GBL § 349(g). And nothing in the legislative record mentions restricting the authority to bring CFPA claims, which the NYAG had been exercising for years. *See, e.g.*, *Mariner,* 711 F. Supp. 3d 463; *CFPB v. Credit Acceptance Corp.*, 23-cv-0038 (S.D.N.Y. Jan. 4, 2023).

OneMain's argument that remedies available to the NYAG under the FAIR Act are narrower than under the CFPA is neither relevant nor true. The FAIR Act and Executive Law § 63(12) provide the AG the ability to obtain broad equitable relief, including restitution, rescission, and disgorgement. *See People v. Coventry First LLC*, 13 N.Y.3d 108, 113 (2009); *People v. Greenberg*, 27 N.Y.3d 490, 497-98 (2016); *People v. N. Leasing Sys., Inc.*, 193 A.D.3d 67, 72-83 (1st Dep't 2021). Nor does it matter that the penalties applicable to a FAIR Act violation are lower than those under the CFPA. *Compare* GBL § 350-d, *with* 12 U.S.C. § 5565(a)(2). Courts regularly award separate penalties for different statutory violations. *See Telehublink*, 301 A.D.2d at 1009.

24

## C.    The Nevada Attorney General Has Authority Under Nevada Law

The Nevada Constitution empowers the Nevada AG to perform such "duties as may be prescribed by law." Nev. Const. Art. 5, § 22. Nothing under Nevada law precludes the AG from enforcing federal consumer protection statutes that expressly grant it that authority. To the contrary, Nevada law explicitly provides that "the Consumer's Advocate" – the appointed head of the Bureau of Consumer Protection, which brings the instant claims and is within the AG's office, NRS 228.320-390 – "may exercise the power of the Attorney General in areas of consumer protection." NRS 228.380. This consumer protection authority covers numerous statutes, including but not limited to NRS 598.0923(1)(c) & 598.0963(3), which authorize the Consumer's Advocate to bring enforcement actions concerning violations of state or *federal* law relating to the sale of goods or services and deceptive trade practices. *See also* NRS 228.390(1)(a) ("The Consumer's Advocate has sole discretion to represent or refrain from representing the public interest and any class of customers in any proceeding."). Thus, where federal consumer protection statutes expressly grant enforcement authority to the AG, that power may be exercised, as here, by the Consumer's Advocate of the Bureau of Consumer Protection. NRS 228.304.

## D.    The Oklahoma Attorney General Has Authority Under Oklahoma Law

Oklahoma Statutes Title 74, § 18b(a)(3) grants its AG broad authority "[t]o initiate or appear in any action in which the interests of the state or the people of the state are at issue, *or* to appear at the request of the Governor, the Legislature, or either branch thereof" (emphasis added). This statute unambiguously creates two separate grants of authority, connected by the disjunctive "or," making clear these are alternative bases for action. The Legislature did not intend to make a request from the governor or Legislature a condition precedent to litigation. It could have included condition language, such as "upon request," as it did elsewhere in the statute, *see, e.g., id.* §

25

18b(a)(10), but it did not. In a weak attempt to contest the AG's standing, OneMain omits the statute's first and broader grant of authority and relies on a case interpreting the statute *before* the operative language was added in 1995. (Br. at 26 (citing *Cartwright v. Georgia-Pac. Corp.*, 663 P.2d 718, 721 (Okla. 1982).) Neither undermines the Oklahoma AG's clear authority to bring this action under the unambiguous language of Title 74, § 18b(A)(3).

**E.        The Wisconsin and Pennsylvania AGs Have Obtained the Requisite Authority**

OneMain is incorrect that Pennsylvania and Wisconsin were required to allege they had obtained approval and authority to sue. *See FTC v. Uber Techs., Inc.*, No. 25-cv-03477, 2026 WL 976077, at *11 (N.D. Cal. Apr. 10, 2026) (holding that a federal agency need not affirmatively allege compliance with all statutory procedures and prerequisites to sue because "presumption of regularity applies" and government alleged "in its opposition, which was signed by counsel, that '[it had] complied'" (citing *FTC v. Consolidated Foods Corp.*, 396 F. Supp. 1344, 1348-49 (S.D.N.Y. 1974))). Pursuant to Wis. Stat. § 165.25(1m), "[i]f requested by the governor or either house of the legislature," the Wisconsin Department of Justice "shall" "prosecute or defend in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." The Governor of Wisconsin authorized the Department of Justice to file this lawsuit. Similarly, prior to filing, the Pennsylvania AG obtained the approval required by 71 P.S. § 733-506(B). Both Wisconsin and Pennsylvania therefore have standing.[19]

**VI.    <u>Maryland, Nevada, and New Jersey's State-Law Claims Are Properly Pleaded</u>**

The Court should reject OneMain's argument (Br. at 27-29) that state-law claims made by Maryland, Nevada, and New Jersey should be dismissed under F.R.C.P. 9(b). Rule 9(b) does not

---

[19] If the Court agrees with OneMain that authorization allegations are necessary, the States request leave to amend to add such allegations.

apply because these claims do not "require proof of the same essential elements (such as reliance) as common-law fraud." *Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005). Even if Rule 9(b) applies, these claims meet its requirements.

### A.      Rule 9(b) Does Not Apply

Maryland, Nevada, and New Jersey's state law claims against OneMain are not subject to Rule 9(b) because they do not allege common law fraud. *Pelman*, 396 F.3d at 511 (holding notice pleading applies to cause of action not requiring allegations of reliance).[20] Rule 9(b) applies only to fraud claims, so "its application to claims brought under consumer protection statutes is inappropriate, even if those claims have a deceptive dimension," unless the elements of the claim replicate common law fraud. *People v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 365 (S.D.N.Y. 2019) (claim did not replicate common law fraud because scienter not an element of pleading); *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (applying Rule 9(b) to a securities fraud claim requiring proof of scienter) (cited at Br. at 28). The claims in question do not replicate common law fraud because they do not require proof of scienter, reliance, or injury. They are thus subject to the Rule 8(a) standard, which they easily satisfy. *See FTC v. Freecom Commc'ns, Inc.,* 401 F.3d 1192, 1203 n.7 (10th Cir. 2005) (finding a government enforcement action was not a "common law fraud action"); *FTC v. Affiliate Strategies, Inc.,* No. 09-4104, 2010 WL 11470099, at *7-14 (D. Kan. Jun. 4, 2010) (applying notice pleading to state AG consumer protection actions).

*Maryland*: Maryland's claims (Count 16), brought under Md. Code Ann., Com. Law § 13-301, *et. seq,,* do not "replicat[e] a claim for common-law fraud," *McCormick v. Medtronic, Inc.*,

---

[20] In federal court, "State law governs substantive issues of state law" and federal law "governs procedural issues of state law." *NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 692 F. Supp. 327, 330 (S.D.N.Y. 1988). As Rule 9(b) is a federal procedural rule, the question of whether it applies to state consumer protection claims is governed by federal law. *Id.*

101 A.3d 467 (Md. Ct. Spec. App. 2014), as they do not require proof of scienter, *Consumer Prot. Div. v. Morgan*, 874 A.2d 919, 970 (Md. 2005), reliance, Md. Com. § 13-302, or injury, *id.*[21]

*Nevada*: Nevada's claims (Count 17) are brought under two NDTPA provisions: (1) violations of federal law, under Nev. Rev. Stat § 598.0923(1)(c); and (2) knowing misrepresentations in transactions, under Nev. Rev. Stat § 598.0915. The former tracks the States' federal claims and does not require heightened pleading. And claimants under the latter statute need not prove the elements of common law fraud. *See Poole v. Nevada Auto Dealership Investments, LLC*, 135 Nev. 280, 286-87 (2019).

*New Jersey*: New Jersey (Count 18) brings claims of (1) unconscionable commercial conduct and (2) deception and misrepresentation. Because unconscionable conduct does not require any elements of common law fraud, Rule 9(b) does not apply. *See Katz v. Live Nation, Inc.*, No. 09-cv-3740, 2010 WL 2539686, at *5 (D.N.J. June 17, 2010) (holding that "heightened pleading standard of Rule 9(b) does not apply" to unconscionable commercial practice claims under the NJCFA). Rule 9(b) also does not apply to New Jersey's misrepresentation claim, because its elements, when asserted by the AG, do not include scienter, reliance, or injury. *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 366 (N.J. 1997); *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 606 (3d Cir. 2012).[22]

---

[21] *Bryant v. Koppers, Inc.* (cited at Br. at 28), in fact supports the States' position: "[W]here a party alleges a violation under § 13-303, [it] can allege an 'unfair and deceptive trade practice' without replicating a claim for common-law fraud thereby obviating the need for heightened pleading at the dismissal stage." 627 F. Supp. 3d 466, 479-80 (D. Md. 2022) (cleaned up). *Bryant* was accordingly dismissed on Rule 8 grounds.

[22] *Lieberson v. Johnson & Johnson Consumer Cos., Inc.* (cited at Br. at 27), involves only private parties and an omission, which requires an "[i]ntent to defraud," unlike the affirmative acts New Jersey alleges here. 865 F. Supp. 2d 529, 538 (D.N.J. 2011). Thus, the plaintiff had to show all

## B.    In Any Event, the Claims Meet Rule 9(b)'s Pleading Requirements

Even if the Court applies Rule 9(b), Counts 16-18 meet its requirements. Rule 9(b) generally requires a complaint to "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." *U.S. v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 615-16 (S.D.N.Y. 2013) (quoting *Rombach*, 355 F.3d at 170). However, the analysis "depends on the nature of the case" and the specificity required "to give notice to the adverse party and enable him to prepare a responsive pleading." *Id.* Where fraudulent schemes are "complex or extensive," or take place "over a number of years," Rule 9(b) is "relaxed." *Taylor v. Gabelli*, 345 F. Supp. 2d 313, 326 (S.D.N.Y. 2004). It would be "impractical to require [plaintiffs] to plead the specifics with respect to each and every instance of fraudulent conduct" for repeated, complex, and ongoing fraud. *Wells Fargo*, 972 F. Supp. 2d at 616; *see also Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 517 (S.D.N.Y. 2014) ("Pleading the specifics of thousands of claims would be cumbersome, unwieldy, and would accomplish no purpose." (cleaned up)).

OneMain asks this Court to take that impractical approach, contending the States must identify specific consumers and OneMain employees by name, provide exact dates, and specify each instance of misrepresentation (Br. at 28). Neither the text nor purpose of Rule 9(b) requires that. 18 WRIGHT & MILLER, § 1298 ("[T]he most basic consideration for a federal court in making a judgment as to the sufficiency of a pleading for purposes of Rule 9(b) [is] how much detail is necessary to give adequate notice to an adverse party and enable that party to prepare a responsive pleading[.]"). The States allege that OneMain engaged in misrepresentations over years, in

---

elements of common-law fraud: (1) unlawful conduct with an "intent to defraud"; (2) an "ascertainable loss"; and (3) a "causal connection," so Rule 9(b) applied. *Id.*

transactions with thousands or millions of consumers across multiple states. It is not necessary to include transaction-level detail beyond what the Complaint includes to put OneMain on notice of the claims against it and to provide adequate information for OneMain to respond.

Under the proper notice-focused application of Rule 9(b), the States more than meet their burden. The Complaint details repeated misleading conduct as to add-on products and refinances occurring throughout OneMain's 1,300 branches across 44 states, on its website, and at its central call center. (Compl. ¶¶ 15, 74-84, 104-12, 119.) This detail sufficiently allows OneMain to respond to the allegations, including on a state-by-state basis. And the States have of course "identified the speaker" of the misleading statements: OneMain. The company incentivized, required, and rewarded deceptive statements regarding add-ons. (Compl. ¶¶ 85, 93, 203-10.) "[F]raudulent statements of an agent, when made within the scope of its agency, are attributable to the principal." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 580 (2d Cir. 2005).[23]

## VII.    Colorado's State-Law Claims Are Properly Pleaded

OneMain (Br. at 29) argues that it cannot violate C.R.S. § 5-9.3-108(1)(e) because its GAP agreements "do not contain a maximum loan-to-value ratio [LTV] at all" and thus cannot "exceed" 150%. But subsection (e) establishes a clear statutory ceiling: a GAP agreement "shall not be sold" if the maximum LTV exceeds 150%. C.R.S. § 5-9.3-108(1)(e). A GAP agreement with no maximum necessarily has an unlimited maximum that exceeds that limit. Maximum LTV coverage limits are standard terms in GAP agreements. The legislature decided to tie the cap to these

---

[23] The "unknown employees" problem in *Negrete v. Citibank, N.A.*, 237 F. Supp. 3d 112 (S.D.N.Y. 2017) (cited at Br. at 29) does not exist here. The States do not allege that unidentified persons occasionally make unauthorized misrepresentations. *See Negrete*, 237 F. Supp. 3d at 122. They allege OneMain encourages its many employees across its 1,000+ branches to engage in a course of misleading conduct. It is thus not necessary to name specific employes; the States need only clearly identify who these employees represent and describe the agency relationship, *see Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 523 (S.D.N.Y. 2015). The States have met this burden.

provisions. OneMain cannot avoid the cap by omitting the provisions or having "unlimited" coverage. This reading applies the statutory text as written and gives effect to every word. *See Mountain Coal Co., LLC v. Water Quality Control Div.*, 576 P.3d 212, 219 (Colo. App. 2025).[24] Reading subsections (d) and (e) together confirms this reading. *See People v. Trujillo*, 251 P.3d 477, 479 (Colo. App. 2010) (stating statutes must be read "as a whole"). Subsection (d) ensures that GAP coverage matches the LTV, and (e) supplies the LTV limit. Without this outer limit, the statute permits the type of inflated, predatory transactions OneMain offers. OneMain's interpretation collapses the provisions and leaves subsection (e) without meaningful effect. *See People ex rel. M.L.M.*, 104 P.3d 324, 325 (Colo. App. 2004).

## VIII.    The Court Should Not Dismiss the States' Request for Penalties

OneMain's motion to dismiss the States' request for penalties is procedurally premature and should be denied. *See, e.g.*, *Wilson v. Better Mortgage Corp.*, 811 F. Supp. 3d 631, 645 (S.D.N.Y. 2025) (Engelmayer, J.). Here, civil penalties are not an independent cause of action, and despite OneMain's contention (Br. at 29), they are not clearly "unavailable as a matter of law." It would therefore be premature to resolve the availability of penalties at this stage of litigation. To the extent the Court reaches this issue, OneMain's contention should be rejected.

### A.    Civil Penalties Are Available Under the CFPA

Multiple courts have recognized the authority of state AGs to recover civil penalties under the CFPA. *See, e.g.*, *New Mexico ex. rel. Balderas v. Real Estate Law Ctr., P.C.*, 405 F. Supp. 3d 1233, 1259 (D.N.M. 2019) (state AG entitled to discovery relevant to determining appropriate

---

[24] Reading the statute to prohibit GAP agreements with a stated maximum of 151% or 200% or 2000% yet allow GAP agreements like OneMain's with a maximum of infinity makes no sense and would nullify the statutory cap. *Kinder Morgan CO2 Co., L.P. v. Montezuma Cty. Bd. of Comm'rs*, 396 P.3d 657, 664 (Colo. 2017); *State v. Nieto*, 993 P.2d 493, 501 (Colo. 2000).

penalties under Dodd-Frank); *Berger L. Grp., P.A.*, 2015 WL 5922933, at *9 (awarding civil penalties to state AGs under CFPA). And this Court has approved a consent judgment under which a state regulator, which had brought claims under the CFPA, obtained a civil penalty for those violations. *Lawsky v. Condor Cap. Corp.*, No. 14-cv-02863, Dkt. No. 167 (S.D.N.Y. Dec. 22, 2014) (Fishman Decl., Ex. B). OneMain cites no case in which a court has held that state AGs lack authority to recover civil penalties under the CFPA, and the States have identified none.

OneMain asks this Court to read the CFPA to say civil money penalties may be sought and obtained only by the CFPB. But the CFPA provides state AGs with authority to enforce the CFPA and "to secure remedies under provisions of this title." 12 U.S.C. § 5552(a)(1). Section 5552(a)(1) allows the States to obtain civil penalties because they are a remedy available under another "provision of this title," namely Section 5565(c)(3), which states that "any person that violates" any provision of the Act shall pay a civil penalty.

### B.    Penalties Are Available Under State Law

OneMain argues several States cannot seek civil penalties under state law based on the narrow and discretionary common law exception to the Full Faith and Credit Clause called the "penal law rule," under which states are not obligated to enforce penal judgments from other states. *See Nelson v. George*, 399 U.S. 224, 229 (1970). That argument is wrong for two reasons.

*First*, Congress specifically authorized states to seek both (1) remedies under the CFPA and (2) any "remedies otherwise provided under other law." 12 U.S.C. § 5552(a)(1). The penalties the States seek are indisputably "provided under" state law. Thus, Congress specifically sanctioned states to seek state law penalties for CPFA claims, and the penal law rule has no application. The Second Circuit has made clear that the common law rule "may be abrogated by statute, provided

32

the statute speaks directly to the point addressed by the common law." *U.S. v. Federative Rep. of Brazil*, 748 F.3d 86, 95 (2d Cir. 2014). The penal law rule therefore does not apply here.

*Second*, the rule does not apply to state consumer protection laws (which are, of course, civil) or to related penalties: federal courts "do have jurisdiction to enforce state penalties that are civil in nature." *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1086 (2d Cir. 1988); *see also In re Elec. Books Antitrust Litig.*, No. 11-MD-2293, 2014 WL 2535112, at *4 (S.D.N.Y. June 5, 2014) (same).[25] The penal law rule applies only to "criminal or quasi criminal statutes." *Williams v. Washington*, 581 S.W.2d 494, 495 (Tex. Civ. App. 1979). Consumer protection laws are "remedial, as opposed to penal, in nature." *Id.* at 496 (citing *U.S. v. St. Regis Paper Co.*, 355 F.2d 688, 694 (2d Cir. 1966) (holding FTC civil penalties not a "revenue-raising or penal measure"));[26] *see also Garrity v. Maryland State Bd. of Plumbing*, 135 A.3d 452, 470 (Md. 2016) (ruling state consumer protection law's monetary penalties "are civil, rather than criminal"). OneMain's argument otherwise (Br. at 30-31) relies on a quote without context from *Williams*, a handful of roughly century-old cases of at-best questionable relevance, and a recent decision about the meaning of "penalties" in a statute irrelevant here. None is compelling in light of the Second Circuit's holdings in *Hendrickson Brothers* and *St. Regis Paper*, *supra*.

**CONCLUSION**

For the foregoing reasons, the Court should deny OneMain's motion to dismiss.

---

[25] *U.S. v. Federative Rep. of Brazil*, 748 F.3d 86, 92 (2d Cir. 2014) (Br. at 30) did not rule on civil penalties. *Kokesh v. SEC*, 581 U.S. 455 (2017) (Br. at 31-32) is not about the penal law rule.

[26] Although OneMain exempts Washington from its penalties argument, its basis for doing so appears to be based on a misunderstanding of Washington law. Washington's Consumer Protection Act (WA CPA) authorizes the AG to recover both restitution and civil penalties. *See* RCW 19.86.080 (authorizing the recovery of restitution); RCW 19.86.140 (authorizing civil penalties). To the extent OneMain reads the Texas court's opinion in *Williams v. Washington* as standing for the proposition that civil penalties are limited to consumer restitution under the WA CPA, it is mistaken.

Dated:  June 22, 2026                              Respectfully submitted,

**FOR THE STATE OF NEW YORK:**

LETITIA JAMES
Attorney General

*/s/  Ben Fishman*
BENJAMIN C. FISHMAN
PATRICK GIBSON
NORA VAN HORN
Assistant Attorneys General
Attorneys for the State of New York
Bureau of Consumer Frauds & Protection
28 Liberty Street, 20th Floor
New York, NY 10005
(212) 416-6067
(212) 416-8330
benjamin.fishman@ag.ny.gov
patrick.gibson@ag.ny.gov

Of counsel:
JANE M. AZIA
Bureau Chief
LAURA J. LEVINE
Deputy Bureau Chief

**FOR THE COMMONWEALTH OF PENNSYLVANIA:**

DAVID W. SUNDAY, JR.
Attorney General

*/s/  Nicholas F. B. Smyth*
NICHOLAS F.B. SMYTH
Assistant Chief Deputy Attorney General
KEVIN BENDESKY
Deputy Attorney General
Attorneys for Commonwealth of Pennsylvania
Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(412) 880-0475
(717) 836-5682
nsmyth@attorneygeneral.gov
kbendesky@attorneygeneral.gov
*Appearing Pro Hac Vice*

34

**FOR THE STATE OF COLORADO:**

*/s/ Kevin J. Burns*
KEVIN J. BURNS, CO Reg. No. 44527
Senior Assistant Attorney General
MARK T. BARNES, CO Reg. No. 23091
First Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 9th Floor
Denver, CO 80203
(720) 508-6110
(720) 508-6894
kevin.burns@coag.gov
mark.barnes@coag.gov
*Attorneys for Plaintiff State of Colorado,* ex rel.
*Philip J. Weiser, Attorney General and Martha
Fulford, Administrator*
*Appearing Pro Hac Vice*

**FOR THE MARYLAND OFFICE OF THE
ATTORNEY GENERAL, CONSUMER
PROTECTION DIVISION:**

ANTHONY G. BROWN
Attorney General

*/s/ Matthew G. Miller*
MATTHEW G. MILLER
MD 2111230005 (*Appearing Pro Hac Vice*)
DAVID A. BENNER
MD 2309180001 (SDNY DB 7261)
WILSON M. MEEKS
MD 2001060021 (SDNY WM 1066)
Attorneys for the Office of the Attorney General for
the State of Maryland, Consumer Protection
Division
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6925
(410) 576-6958
mmiller@oag.maryland.gov
dbenner@oag.maryland.gov
wmeeks@oag.maryland.gov

**FOR THE STATE OF NEVADA:**

AARON D. FORD
Attorney General

*/s/ Anthony J. Walsh*
ANTHONY J. WALSH, NV 14128
SAMANTHA B. FEELEY, NV 14034
Senior Deputy Attorneys General
Attorneys for the State of Nevada
Nevada Office of Attorney General
100 N. Carson St.
Carson City, NV 89701
(775) 762-5836
(702) 486-3789
ajwalsh@ag.nv.gov
sfeeley@ag.nv.gov
*Appearing Pro Hac Vice*

**FOR THE STATE OF NEW HAMPSHIRE:**

JOHN M. FORMELLA
Attorney General

*/s/ Brandon H. Garod*
BRANDON H. GAROD, Bar #21164
Senior Assistant Attorney General
Attorney for the State of New Hampshire
New Hampshire Department of Justice
1 Granite Place South
Concord, NH 03301
(603) 271-1217
brandon.h.garod@doj.nh.gov
*Appearing Pro Hac Vice*

35

**FOR THE STATE OF NEW JERSEY:**

JENNIFER DAVENPORT
Attorney General

*/s/  Zeyad A. Assaf*
ZEYAD A. ASSAF, NJ Bar #290002021
Deputy Attorney General
Attorney for the State of New Jersey
New Jersey Office of the Attorney General
Division of Law
124 Halsey St., 5th Fl.
Newark, New Jersey 07102
(609) 696-5363
Zeyad.Assaf@law.njoag.gov
*Appearing Pro Hac Vice*

**FOR THE STATE OF OKLAHOMA:**

GENTNER DRUMMOND
Attorney General

*/s/  Cameron Capps*
Cameron Capps OBA# 32742
Deputy Attorney General
Consumer Protection
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-0858
Fax: (405) 522-0085
*Attorney for Plaintiff State of Oklahoma*
*Appearing Pro Hac Vice*

**FOR THE STATE OF NORTH DAKOTA:**

DREW H. WRIGLEY
Attorney General

*/s/  Tiffany J. Grossman*
Tiffany J. Grossman
State Bar ID 08109
Assistant Attorney General
Office of Attorney General
Consumer Protection & Antitrust Division
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone (701) 328-5570
tgrossman@nd.gov
*Appearing Pro Hac Vice*

**FOR THE STATE OF SOUTH DAKOTA:**

MARTY J. JACKLEY
Attorney General

*/s/  Jacob R. Dempsey*
JACOB R. DEMPSEY, Mr., Bar # 5025
Assistant Attorney General
Attorney for the State of South Dakota
South Dakota Office of Attorney General
1302 S.D. E. Hwy 1889, Suite 1
Pierre, SD 57501
(605) 773-4425
(605) 773-6358
*Appearing Pro Hac Vice*

36

**FOR THE COMMONWEALTH OF VIRGINIA:**

JAY JONES
Attorney General

*/s/  James E. Scott*
James E. Scott, VA Bar No.: 88882
Unit Manager and Senior Assistant
Attorney  General
Office of the Attorney General
Consumer Protection Section
202 North Ninth Street
Richmond, VA 23219
(804) 225-4778
jscott@oag.state.va.us
*Appearing Pro Hac Vice*

**FOR THE STATE OF WASHINGTON:**

NICHOLAS W. BROWN
Attorney General

*/s/  Ashley N. Gomez*
ASHLEY N. GOMEZ, WSBA #52093
LOGAN STARR, WSBA #55944
MARC WORTHY, WSBA #29750
MADELINE DAVIS RIGSBY, WSBA #51261
Assistant Attorneys General
Attorneys for the State of Washington
Washington State Office of Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 389-3857
(206) 389-2733
(206) 464-6388
(206) 572-0465
ashley.gomez@atg.wa.gov
logan.starr@atg.wa.gov
marc.worthy@atg.wa.gov
maddie.davisrigsby@atg.wa.gov
*Appearing Pro Hac Vice*

**FOR THE STATE OF WISCONSIN:**

JOSHUA L. KAUL
Attorney General

*/s/  Frances L. Kern*
FRANCES L. KERN, WI Bar #1141100
Assistant Attorney General
Attorney for the State of Wisconsin
Wisconsin Department of Justice
17 W. Main Street
Post Office Box 7857
Madison, Wisconsin 53707
(608) 266-0764
frances.kern@wisdoj.gov
*Appearing Pro Hac Vice*

37

## CERTIFICATE OF SERVICE

I, Benjamin C. Fishman, hereby certify that a true and correct copy of the foregoing

Memorandum of Law in Opposition to Defendants' Motion to Dismiss was served upon all

counsel of record who are deemed to have consented to electronic filing through the Court's

CM/ECF system on this 22nd day of June, 2026.


/s/ Benjamin C. Fishman
Benjamin C. Fishman, NY Bar. No. 4489373
Assistant Attorney General
Attorney for the People of the State of New York
Bureau of Consumer Frauds & Protection
Office of the New York State Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
(212) 416-8330
benjamin.fishman@ag.ny.gov