# Exhibit A

**UNITED STATES OF AMERICA
CONSUMER FINANCIAL PROTECTION BUREAU**

**ADMINISTRATIVE PROCEEDING**

**2016-CFPB-0015**

| | |
|---|---|
| **In the Matter of:**<br><br><br>**WELLS FARGO BANK, N.A.** | **CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) has reviewed the sales practices of Wells Fargo Bank, N.A. (Respondent, as defined below) and determined that it has engaged in the following acts and practices: (1) opened unauthorized deposit accounts for existing customers and transferred funds to those accounts from their owners' other accounts, all without their customers' knowledge or consent; (2) submitted applications for credit cards in consumers' names using consumers' information without their knowledge or consent; (3) enrolled consumers in online-banking services that they did not request; and (4) ordered and activated debit cards using consumers' information without their knowledge or consent. The Bureau has concluded that such acts violate §§ 1031 and 1036(a)(1)(B) of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531 and 5536(a)(1)(B). Under §§ 1053 and 1055 of CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

## I
## Jurisdiction

1.    The Bureau has jurisdiction over this matter under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565.

## II
## Stipulation

2.    Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order" (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying the findings of facts and conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## III
## Definitions

3.    The following definitions apply to this Consent Order:

a.    "**Affected Consumers**" means any consumer subjected to any of the Improper Sales Practices.

b.    "**Board**" means Respondent's duly-elected and acting Board of Directors.

c.    "**California Enforcement Action**" means the lawsuit styled *People v. Wells Fargo & Co., et al.*, Los Angeles Superior Court, Case No. BC580778, filed by the Office of the Los Angeles City Attorney.

d.    "**Community Bank Regional Bank Branch Network**" means the Respondent's retail-branch operations within Respondent's Regional Bank group.

e.      "**Effective Date**" means the date on which this Order is issued.

f.      "**Improper Sales Practices**" means any of the following in the Community Bank Regional Bank Branch Network:

(1)     opening any account without the consumer's consent;

(2)     transferring funds between a consumer's accounts without the consumer's consent;

(3)     applying for any credit card without the consumer's consent;

(4)     issuing any debit card without the consumer's consent; and

(5)     enrolling any consumer in online-banking services without the consumer's consent.

g.      "**Los Angeles City Attorney**" means the Office of the Los Angeles City Attorney.

h.      "**Regional Director**" means the Regional Director for the West Region for the Office of Supervision for the Consumer Financial Protection Bureau, or his/her delegate.

i.      "**Related Consumer Action**" means a private action by or on behalf of one or more consumers or an enforcement action by a governmental agency other than the California Enforcement Action, brought against Respondent based on substantially the same facts as described in Section IV of this Consent Order.

j.      "**Relevant Period**" includes the period from January 1, 2011, to the Effective Date.

k.      "**Respondent**" means Wells Fargo Bank, N.A. and its successors and assigns.

## IV
## Bureau Findings and Conclusions

The Bureau finds the following:

4.    Respondent is a national bank headquartered in Sioux Falls, South Dakota. Respondent is an insured depository institution with assets greater than $10 billion within the meaning of 12 U.S.C. § 5515(a).

5.    Respondent is a "covered person" under 12 U.S.C. § 5481(6).

6.    During the Relevant Period, Respondent offered a broad array of consumer financial products and services, including mortgages, savings and checking accounts, credit cards, debit and ATM cards, and online-banking services.

7.    Respondent sought to distinguish itself in the marketplace as a leader in "cross-selling" banking products and services to its existing customers.

8.    Respondent set sales goals and implemented sales incentives, including an incentive-compensation program, in part to increase the number of banking products and services that its employees sold to its customers.

9.    Thousands of Respondent's employees engaged in Improper Sales Practices to satisfy sales goals and earn financial rewards under Respondent's incentive-compensation program. During the Relevant Period, Respondent terminated roughly 5,300 employees for engaging in Improper Sales Practices.

10.    Respondent's employees engaged in "simulated funding." To qualify for incentives that rewarded bankers for opening new accounts that were funded shortly after opening, Respondent's employees opened deposit accounts without consumers' knowledge or consent and then transferred funds from consumers' authorized accounts

to temporarily fund the unauthorized accounts in a manner sufficient for the employee to obtain credit under the incentive-compensation program.

11.    Respondent's employees submitted applications for and obtained credit cards for consumers without the consumers' knowledge or consent.

12.    Respondent's employees used email addresses not belonging to consumers to enroll consumers in online-banking services without their knowledge or consent.

13.    Respondent's employees requested debit cards and created personal identification numbers (PINs) to activate them without the consumer's knowledge or consent.

14.    During the Relevant Period, Respondent's employees opened hundreds of thousands of unauthorized deposit accounts and applied for tens of thousands of credit cards for consumers without consumers' knowledge or consent.

15.    Respondent has performed an analysis to assess the scope of Improper Sales Practices that occurred between May 2011 and July 2015, including the number of potential instances of such practices.

**Findings and Conclusions as to
Unauthorized Deposit Accounts & Simulated Funding**

16.    Respondent's analysis concluded that its employees opened 1,534,280 deposit accounts that may not have been authorized and that may have been funded through simulated funding, or transferring funds from consumers' existing accounts without their knowledge or consent. That analysis determined that roughly 85,000 of those accounts incurred about $2 million in fees, which Respondent is in the process of refunding. The fees included overdraft fees on linked accounts the consumers already

had, monthly service fees imposed for failure to keep a minimum balance in the unauthorized account, and other fees.

17.    Section 1036(a)(1)(B) of the CFPA prohibits "unfair" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(1).

18.    By opening unauthorized deposit accounts and engaging in acts of simulated funding, Respondent caused and was likely to cause substantial injury to consumers that was not reasonably avoidable, because it occurred without consumers' knowledge, and was not outweighed by countervailing benefits to consumers or to competition.

19.    Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service. 12 U.S.C. § 5531(d)(1). Additionally, an act or practice is abusive if it takes unreasonable advantage of the inability of the consumer to protect his or her interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

20.    Respondent's acts of opening unauthorized deposit accounts and engaging in simulated funding materially interfered with the ability of consumers to understand a term or condition of a consumer financial product or service, as they had no or limited knowledge of those terms and conditions, including associated fees.

21.    Additionally, Respondent's acts of opening unauthorized deposit accounts and engaging in simulated funding took unreasonable advantage of consumers' inability

to protect their interests in selecting or using consumer financial products or services, including interests in having an account opened only after affirmative agreement, protecting themselves from security and other risks, and avoiding associated fees.

22.    Therefore, Respondent engaged in "unfair" and "abusive" acts or practices that violate §§ 1031(c)(1), (d)(1), (d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), (d)(1), (d)(2)(B), 5536(a)(1)(B).

### Findings and Conclusions as to Unauthorized Credit Cards

23.    Respondent's analysis concluded that its employees submitted applications for 565,443 credit-card accounts that may not have been authorized by using consumers' information without their knowledge or consent. That analysis determined that roughly 14,000 of those accounts incurred $403,145 in fees, which Respondent is in the process of refunding. Fees incurred by consumers on such accounts included annual fees and overdraft-protection fees, as well as associated finance or interest charges and other late fees.

24.    Section 1036(a)(1)(B) of the CFPA prohibits "unfair" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(1).

25.    By applying for and opening credit-card accounts using consumers' information without their knowledge or consent, Respondent caused and was likely to cause substantial injury that was not reasonably avoidable, because it occurred without consumers' knowledge, and was not outweighed by countervailing benefits to consumers or competition.

26. Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service. 12 U.S.C. § 5531(d)(1). Additionally, an act or practice is abusive if it takes unreasonable advantage of the consumer's inability to protect his or her interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

27. Respondent's acts of opening credit-card accounts using consumers' information without their knowledge or consent materially interfered with the ability of consumers to understand a term or condition of a consumer financial product or service, as they had no or limited knowledge of those terms and conditions, including associated fees.

28. Additionally, Respondent's acts of opening credit-card accounts using consumers' information without their knowledge or consent took unreasonable advantage of the consumers' inability to protect their interests in selecting or using a consumer financial product or service.

29. Therefore, Respondent engaged in "unfair" and "abusive" acts or practices that violate §§ 1031(c)(1), (d)(1), (d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), (d)(1), (d)(2)(B), 5536(a)(1)(B).

### Findings and Conclusions as to
### Unauthorized Enrollment into Online-Banking Services

30. During the Relevant Period, Respondent's employees used email addresses not belonging to consumers to enroll consumers in online-banking services without their knowledge or consent.

31.    Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it takes unreasonable advantage of the consumer's inability to protect his or her interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

32.    Respondent's acts of enrolling consumers in online-banking services without their knowledge or consent took unreasonable advantage of consumers' inability to protect their interests in selecting or using a consumer financial product or service, including interests in having these products or services activated only after affirmative agreement and protecting themselves from security and other risks.

33.    Therefore, Respondent engaged in "abusive" acts or practices that violate §§ 1031(d)(2)(B) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(B), 5536(a)(1)(B).

**Findings and Conclusions
as to Unauthorized Debit Cards**

34.    During the relevant period, Respondent's employees requested debit cards and created PINs to activate them without consumers' knowledge or consent.

35.    Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it takes unreasonable advantage of the consumer's inability to protect his or her interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

36.    Respondent's acts of issuing debit cards to consumers without their knowledge or consent took unreasonable advantage of consumers' inability to protect their interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

37.     Therefore, Respondent engaged in "abusive" acts that violate §§ 1031(d)(2)(B) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(B), 5536(a)(1)(B).

## ORDER

### V
### Conduct Provisions

**IT IS ORDERED**, under §§ 1053 and 1055 of the CFPA, that:

38.     Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536, by engaging in Improper Sales Practices.

### VI
### Independent Consultant's Report and Compliance Plan

**IT IS FURTHER ORDERED** that:

39.     Within 45 days of the Effective Date, Respondent must select an independent consultant with specialized experience in consumer-finance-compliance issues to conduct an independent review of Respondent's sales practices within the Community Bank Regional Bank Branch Network related to deposit accounts, credit-card accounts, unsecured lines of credit, and related products and services (Independent Consultant's Review). Respondent must submit the name of the independent consultant to the Regional Director for non-objection. Upon receipt of non-objection from the Regional Director, the Bank must retain the independent consultant. The Independent Consultant's Review must assess whether Respondent's current policies and procedures are reasonably designed to ensure that Respondent's sales practices comply with all applicable Federal consumer financial laws as defined in 12 U.S.C. § 5481(14), and that Respondent's employees do not engage in Improper Sales Practices.

40.    The Independent Consultant's Review must include but will not be limited to:

a.    whether Respondent's employees are required to undergo training reasonably designed to prevent Improper Sales Practices and other sales-integrity violations; whether such training is adequate, complete, and timely updated, provided when employees join Respondent, and repeated at sufficient recurring intervals during their employment to reinforce such training; whether training records are complete, accurate and adequate; and whether employees are informed of an obligation to report all sales-integrity issues internally through an "ethics hotline" or similar mechanism;

b.    whether Respondent's monitoring policies and procedures ensure that Respondent monitors employees' sales practices proactively, and that Respondent devotes sufficient personnel and resources to monitor those practices appropriately;

c.    whether Respondent has adequate policies and procedures for (i) receiving, retaining, and addressing consumer inquiries or complaints; (ii) receiving, retaining, and addressing employee allegations of Improper Sales Practices or any other allegations of sales-integrity violations; (iii) tracking and addressing indicators of potential Improper Sales Practices or any other sales-integrity violations; and (iv) identifying and remediating consumers for Improper Sales Practices or other sales-integrity violations identified after the Effective Date, as well as for correcting any related systemic issues identified after the Effective Date;

d.    whether Respondent's policies and procedures related to sales of deposit accounts, credit cards, unsecured lines of credit, and related products and services are reasonably designed to ensure consumer consent is obtained before any such product is sold or issued to a consumer. The Independent Consultant's Review

must include, but not be limited to, whether Respondent has adequate policies and procedures for capturing and retaining consumer signatures and other evidence of consent for such products and services, for providing a grace period before assessing fees on any deposit account, and for closing accounts in which there is no customer-initiated activity during the grace period without assessing fees; and

e.    whether Respondent's performance-management and sales goals for its employees are consistent with the objective of preventing Improper Sales Practices and other sales-integrity violations.

41.    Within 180 days of the retention of the independent consultant, the independent consultant must prepare a written report (Independent Consultant's Report) detailing the findings of the review and provide the Independent Consultant's Report to the Board or a committee thereof.

42.    Within 90 days of receiving the Independent Consultant's Report, the Board or a committee thereof must:

a.    In consultation with the independent consultant, develop a plan (Compliance Plan) to: (i) correct any deficiencies identified, and (ii) implement any recommendations or explain in writing why a particular recommendation is not being implemented; and

b.    submit the Independent Consultant's Report and the Compliance Plan to the Regional Director.

43.    The Regional Director may, in his or her discretion, make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Compliance Plan, the Board or a committee thereof must make the requested revisions to the Compliance Plan, have the

independent consultant review the revised Compliance Plan for adequacy, accuracy, effectiveness, and completeness, and resubmit the revised Compliance Plan and the independent consultant's review of the revised Compliance Plan to the Regional Director within 60 days of the date that the Regional Director directs the Company to revise the Compliance Plan. The Regional Director may, in his or her discretion, consult with the Los Angeles City Attorney in arriving at a determination of non-objection to the Compliance Plan or direction to Respondent to revise the Compliance Plan.

44.    After receiving notification that the Regional Director has made a determination of non-objection to the Compliance Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan and have the independent consultant review and assess compliance with the Compliance Plan and validate that the Compliance Plan has been properly executed; the results of such review should be submitted to the Regional Director within 30 days after completion.

## VII
## Role of the Board

**IT IS FURTHER ORDERED** that:

45.    The Board or a committee thereof must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order before submission to the Bureau.

46.    Although this Consent Order requires Respondent to submit certain documents for the review or non-objection by the Regional Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for

ensuring that Respondent complies with Federal consumer financial law and this Consent Order.

47.    In each instance that this Consent Order requires the Board or a committee thereof to ensure adherence to, or perform certain obligations of Respondent, the Board or a committee thereof must:

    a.    authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

    b.    require timely reporting by management to the Board or a committee thereof on the status of compliance obligations; and

    c.    require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with directives from the Board or a committee thereof related to this Section.

## VIII
## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

48.    Respondent has retained the services of an independent third-party consulting firm (which is not the independent consultant referred to in Section VI) to identify consumers who have incurred fees or other charges as a result of Improper Sales Practices.

49.    Within 10 days of the Effective Date, Respondent must reserve or deposit into a segregated deposit account an amount not less than $5 million, for the purpose of providing redress to Affected Consumers as required by this Section.

50.    Within 90 days of the Effective Date, Respondent must submit to the Regional Director for review and non-objection the comprehensive written plan for

providing redress consistent with this Consent Order (Redress Plan). The Regional

Director may, in his or her discretion, make a determination of non-objection to the

Redress Plan or direct Respondent to revise it. If the Regional Director directs

Respondent to revise the Redress Plan, Respondent must make the revisions and

resubmit the Redress Plan to the Regional Director within 45 days. After receiving

notification that the Regional Director has made a determination of non-objection to the

Redress Plan, Respondent must implement and adhere to the steps, recommendations,

deadlines, and timeframes outlined in the Redress Plan.

51.    The Redress Plan must:

a.    identify all Affected Consumers, except insofar as it is impracticable

to do so, as well as the types and amounts of any fees or charges incurred by Affected

Consumers as a result of the Improper Sales Practices, and state the means by which

Affected Consumers have been identified and by which the fees or charges they incurred

have been calculated;

b.    describe procedures by which Respondent will notify Affected

Consumers who were subject to any of the Improper Sales Practices described in

paragraph 3.f of this Order, including the form of the notification such consumers will

receive;

c.    describe the process for providing redress to Affected Consumers

and identify the dollar amount of redress for each category of Affected Consumers;

d.    detail how Respondent will locate Affected Consumers for payment

of redress, and the steps Respondent will take with respect to consumers whose redress

payments are returned as undeliverable or not cashed within a prescribed time period;

e.      state the manner in which redress will be provided to each such Affected Consumer, and the form of redress; and

f.      provide the form of the letter or notice that will be sent to such Affected Consumers notifying them of the redress.

52.    Within 120 days after completing the Redress Plan, Respondent's Internal Audit department must review and assess compliance with the terms of the Redress Plan (Redress Plan Review) and validate that the Redress Plan has been properly executed.

53.    Within 30 days after completion of the Redress Plan Review, Respondent must prepare and submit to the Regional Director a report summarizing the results of the Redress Plan Review.

54.    After completing the Redress Plan, if the amount of redress provided to Affected Consumers is less than $5 million, Respondent may recoup any remaining funds up to the amount Respondent paid to Affected Consumers before the submission of the Redress Plan as redress for fees or charges those Affected Consumers incurred as a result of the Improper Sales Practices. Respondent must, within 30 days of the completion of the Redress Plan, pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent and according to the Bureau's wiring instructions, any remaining funds not recouped by Respondent under this paragraph.

55.    The Bureau may use these remaining funds to pay additional redress to Affected Consumers. Upon receiving a written request from Respondent, the Bureau may provide Respondent with information concerning additional redress. If the Bureau determines, in its sole discretion, that additional redress is wholly or partially impracticable or otherwise inappropriate, or if funds remain after the additional redress

is completed, the Bureau will deposit any remaining funds in the U.S. Treasury as

disgorgement. Respondent will have no right to challenge any actions that the Bureau or

its representatives may take under this Section.

56.    Respondent may not condition the payment of any redress to any Affected

Consumer under this Order on that Affected Consumer waiving any right.

## IX
## Order to Pay Civil Money Penalties

**IT IS FURTHER ORDERED** that:

57.    Under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the

violations of law described in Section IV of this Consent Order, and taking into account

the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $100

million to the Bureau.

58.    Within 10 days of the Effective Date, Respondent must pay the civil money

penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the

Bureau's wiring instructions.

59.    The civil money penalty paid under this Consent Order will be deposited in

the Civil Penalty Fund of the Bureau as required by § 1017(d) of the CFPA, 12 U.S.C. §

5497(d).

60.    Respondent must treat the civil money penalty paid under this Consent

Order as a penalty paid to the government for all purposes. Regardless of how the

Bureau ultimately uses those funds, Respondent may not:

   a.    claim, assert, or apply for a tax deduction, tax credit, or any other

tax benefit for any civil money penalty paid under this Consent Order; or

b.      seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

61.     To preserve the deterrent effect of any civil money penalty in the California Enforcement Action or any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the California Enforcement Action or any Related Consumer Action because of the civil money penalty paid in this action (Penalty Offset). If the court in the California Enforcement Action or any Related Consumer Action grants such a Penalty Offset, Respondent must, within 30 days after entry of a final order granting the Penalty Offset, notify the Bureau, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X
## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that**:**

62.     In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

63.     Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

64.    Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

65.    Within 30 days of the entry of a final judgment, consent order, or settlement in the California Enforcement Action or any Related Consumer Action, Respondent must notify the Regional Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

## XI
## Reporting Requirements

**IT IS FURTHER ORDERED** that:

66.    Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case no later than 14 days after the development.

67.    Within 7 days of the Effective Date, Respondent must designate at least one telephone number and email, physical, and postal address as points of contact, which the Bureau may use to communicate with Respondent.

68.     Respondent must report any change in the information required to be submitted under Paragraph 67 at least 30 days before the change or as soon as practicable after the learning about the change, whichever is sooner.

69.     Within 90 days of the Effective Date, and again at least semi-annually until the actions under this Consent Order have been completed, Respondent must submit to the Regional Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board or a committee thereof, which, at a minimum:

     a.     describes in detail the manner and form in which Respondent has complied with this Order;

     b.     separately lists each corrective action required by this Consent Order, the Compliance Plan, and the Redress Plan;

     c.     Describes the current status of each corrective action taken and the required, actual, and anticipated completion date for each corrective action; and

     d.     attaches a copy of each Order Acknowledgment obtained under Section XII, unless previously submitted to the Bureau.

## XII
## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that,

70.     Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

71.     For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future board members and executive officers, as well as to any managers, employees, or other agents and representatives who will have responsibilities related to the subject matter of this Consent Order before they assume their responsibilities.

72.     Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 et seq., within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

## XIII
## Recordkeeping

**IT IS FURTHER ORDERED** that

73.     Respondent must create or, if already created, retain for at least 5 years from the Effective Date the following business records:

     a.     all documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau.

     b.     all documents and records pertaining to the Redress Plan, described in Section VIII above.

74.     Respondent must retain the documents identified in Paragraph 73 for the duration of the Consent Order.

75.     Respondent must make the documents identified in Paragraph 73 available to the Bureau upon the Bureau's request.

## XIV
## Notices

**IT IS FURTHER ORDERED** that:

76.    Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "In re Wells Fargo Bank, N.A., File No. 2016-CFPB-0015," and send them as follows:

a.    via email to WestRegion@cfpb.gov; and

b.    via overnight courier (not the U.S. Postal Service) as follows:

Regional Director, CFPB West Region, 301 Howard Street, 12th Floor, San Francisco, CA 94105.

## XV
## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

77.    Respondent must cooperate fully to help the Bureau determine the identity and location of, and the amount of injury sustained by, each Affected Consumer. Respondent must provide such information in its or its agents' possession or control within 14 days of receiving a written request from the Bureau.

78.    Respondent must cooperate fully with the Bureau in this matter and in any investigation related to or associated with the conduct described in Section IV. Respondent must provide truthful and complete information, evidence, and testimony and Respondent must cause Respondent's officers, employees, representatives, or agents to appear for interviews, discovery, hearings, trials, and any other proceedings that the Bureau may reasonably request upon 5 days written notice, or other reasonable

notice, at such places and times as the Bureau may designate, without the service of compulsory process.

## XVI
## Compliance Monitoring

**IT IS FURTHER ORDERED** that, to monitor Respondent's compliance with this Consent Order:

79.    Within 30 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

80.    Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview. The person interviewed may have counsel present.

81.    Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII
## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

82.    Respondent may seek a modification to non-material requirements of this Consent Order (e.g., reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

83.    The Regional Director may, in his or her discretion, modify any non-material requirements of this Consent Order (e.g., reasonable extensions of time and changes to reporting requirements) if he or she determines that good cause justifies the modification. Any such modification by the Regional Director must be in writing.

# XVIII
## Administrative Provisions

84.     The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 85.

85.     The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

86.     This Consent Order is intended to be, and will be construed as, a final Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

87.     This Consent Order will terminate 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the

Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

88.    Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

89.    Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

90.    The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may seek to impose the maximum amount of civil money penalties allowed under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

91.    This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

92.     Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this __4th__ day of September, 2016.

_Richard Cordray_
_____
Richard Cordray
Director
Consumer Financial Protection Bureau